IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-03-084 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| and HARVEST MULTIMEDIA, INC. | § | |
| Defendant. | § | |

United States District Court
Southern District of Texas
FILED

MAR 1 0 2004

Michael N. Milby
Clerk of Court

---

## DEFENDANT TOWN OF SOUTH PADRE ISLAND'S MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . iv

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT . . . . . . . . . . . . v

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

1. The song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501.

2. No copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" took place because the Town of South Padre Island had authority to distribute the song from a joint author of that work.

3. Gary Graham's conduct and actions constitute an implied license for the Town of South Padre Island to use the song called "South Padre Island" by his actions and conduct.

**SUMMARY JUDGMENT EVIDENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARGUMENTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    **A. Standard for Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    **B. The song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    **C. No copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" took place because the Town of South Padre Island had authority to distribute the song from a joint author/owner of that work.** . . . . . 6

    **D. Gary Graham's conduct and actions constitute an implied license for the Town of South Padre Island to use the song called "South Padre Island" by his actions and conduct.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF CITATIONS

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986) . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Childress v. Taylor*, 945 F.2d 500, 508-509(2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Cloughston v. The American Academy of Orthopedic Surgeons*, 930 F. Supp. 1156, 1159(W.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Erickson v. Trinity Theater, Inc.*, 13 F3d 1061, 1068 (7th Cir. 1994) . . . . . . . . . . . . . . . 5, 6

*Generally Goodman v. Lee*, 988 F2d 619 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 6

*International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lulirama Ltd., Inc. vs. Axcess Broadcast Services, Inc.* , 128 F3d 872(5th Cir. 1997) . . . . . . . 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) . . . . . . . . . . . 5

*Pye v. Mitchell*, 574 F.2d 476 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . 4

*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988) . . . . . . . . . . . . . . . . 4

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Written discovery and the deposition of Plaintiff Gary Graham have been conducted. The case was also mediated before the Honorable Judge Felix Recio. An impasse was reached by the parties. This matter has been set for jury selection on May 6, 2004. A Docket Call and final pre-trial conference has been set for May 4, 2004.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

1.  Whether or not the song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501.

2.  Whether or not a copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" took place

3.  Whether or not the Town of South Padre Island had authority to distribute the song from a joint author/owner of that work ;

4.  Whether or not Gary Graham's conduct and actions constituted an  implied license for the Town  of South Padre Island to use the song called "South Padre Island" by his actions      and conduct.

## SUMMARY OF THE ARGUMENT

1.    **The song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501**.

Under 17 U.S.C. section 501, a joint work is one that is prepared by two or more authors with the intention that their contributions be merged into inseparable and interdependent parts of a unitary whole. The song "South Padre Island" was a joint collaboration and project of Gary Graham and the band Pelican West. Gary Graham holds a copyright to the lyrics of the song, and Pelican West holds a copyright as to the music of the song.

2.    **No copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" took place because the Town of South Padre Island had authority to distribute the song from a joint author/owner of that work.**

Pelican West is a joint author/owner of the song "South Padre Island". Authorization to a third party from one joint owner is a defense to an action against that party brought by the other joint owner. Both Pelican West and its leader Damion Giachinno expected the Town of South Padre Island to use the song "South Padre Island" (deemed the "official town song") and neither feel that the town illegally used the song.

3.    **Gary Graham's conduct and actions constitute an implied license for the Town of South Padre Island to use the song called "South Padre Island" by his actions and conduct.**

The conduct and actions of a copyright holder can constitute an implied license to a third party to use a copyrighted work. Gary Graham brought the song to the Town of South Padre Island at two separate town meetings, was present and was pleased when the song was deemed the "official town song" by the board of Aldermen, and never asked the Town of South Padre Island for any money or royalties associated with the song.

-vi-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-03-084 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| and HARVEST MULTIMEDIA, INC. | § | |
| Defendant. | § | |

## DEFENDANT TOWN OF SOUTH PADRE ISLAND'S
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES DEFENDANT TOWN OF SOUTH PADRE ISLAND and files this it's Motion

for Summary and in support thereof would show as follows:

## I.
## SUMMARY JUDGMENT EVIDENCE

Exhibit A:     Deposition Testimony of Gary Graham

Exhibit B:     Affidavit of Damion Giacchino

Exhibit C.     Copyright of Gary Graham

Exhibit D:     Copyright of Damion Giacchino

Exhibit E:     Minutes and Agenda of Town Meeting

Exhibit F:     Affidavit of Paul Cunningham

Exhibit G:     Copy of cover to audio cd of "South Padre Island"

## II.
## STATEMENT OF THE CASE

Plaintiff Gary Graham has sued the Town of South Padre Island and Harvest Multimedia Inc. for an alleged copyright infringement under title 17 of the United States Code. Mr. Graham claims that in September of 2002 he heard an illegally reproduced CD of his alleged copyrighted song called "South Padre Island" being played by representatives of the Town of South Padre Island without his permission. He further alleges that the Town of South Padre Island did not cease using the song after being told by him to do so. He sues for an intentional infringement of his copyright rights under title 17 of the United States Code.

The song was declared the "official town song" by the Board of Aldermen after Graham took the song to them at a town meeting. Defendant did not sell the song or distribute the song for profit. It included the song in a visitor's guide CD-ROM which was distributed for free to the public. Defendant contends it had consent to use the song at issue by virtue of the conduct and actions of Graham and Damion Giacchino/ Pelican West.

## III.
## STATEMENT OF FACTS

This case involves a dispute regarding the former official town song of Defendant Town of South Padre Island entitled "South Padre Island." Plaintiff Gary Graham holds a copyright to the lyrics of that song (lyrics only). (See Ex. A pg. 19 lines 17-24, pg. 23 lines 21-23, and Exhibit C). Plaintiff does not hold a copyright to the entire song called "South Padre Island". (See Exhibit A pg. 27 line 25, pg. 28 ln1). Damion Giacchino of Pelican West actually holds the copyright to the music and vocal melody to the song. (See Ex A pg 29 lines 17-19; Exhibit B, D, and G). Plaintiff developed the initial version of lyrics to the

2

song and approached Pelican West with them to record the song because he thought they were a good group. (See Exhibit A pg. 24 lines 18-24, pg. 26 lines 8-25, pg. 32 lines 12-25, and pg. 33 lines 1-12). Damion Giacchino's band is called Pelican West. (See Exhibit B). Giacchino/Pelican West re-wrote the original lyrics provided by Graham, changed the music to the song, performed and recorded the song, and provided the vocals that appear on the finished song. (See Exhibit A pg. 29, lines 22-25, pg. 30 lines 1-4, pg. 31 lines 8-25, pg. 32 lines 1-3, and see Exhibit B).

According to Plaintiff Graham, he entered into a deal with Pelican West that called for Pelican West to pay for everything to record the song, produce a finished CD they could sell off of the stage, and go to the radio stations at Pelican West's expense. (See Exhibit A pg. 24 line 25, pg. 25 lines 1-4). Plaintiff expected Pelican West to make the song known to the public and get it distributed. (See Exhibit A pg. 25 lines 14-16). Plaintiff asserts he was asked to bring the song to a Town meeting. (See Exhibit A pg. 35 lines 15-25, pg. 36 lines 1-8). Plaintiff attended two Town meetings where the song was played, voted on, and declared the "official town song." (See Exhibit A pg. 36 lines 9-25, pg. 37 lines 1-25, and Exhibit E). Pelican West did not attend the meetings with Graham, but they knew about it, voiced no objection to it, were "thrilled" about it, and wanted it to happen. (See Exhibit A pg. 38 lines 8-14). Plaintiff Graham was pleased with the decision of the town to adopt the song as the official town song. (See Exhibit A pg. 39 lines 10-23).

Plaintiff never asked Defendant Town of South Padre Island for any money associated with the song and he did not discuss royalties with them either. (See Exhibit A pg. 40 lines 3-25, pg. 41 lines 1, 8-11). After declaring the song the official town song of the Town of South Padre Island, the town included the song in its visitor's guide cd-rom which was produced at the expense of the town and

3

distributed for free. (See Exhibit F). Damion Giacchino of Pelican West expected that the Town would use the song and play the song since it was the "official town song". (See Exhibit B).    Damion Giacchino's only criticism with respect to the use of the song by the Town of South Padre Island is that the visitor's guide cd-rom featuring the song was of poor quality, they had no criticism of the use of the song by the town.    (See Exhibit B).

## IV.
## ARGUMENTS AND AUTHORITIES

### A. Standard for Summary Judgment.

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial."

4

*Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

## B. The song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501.

A joint work is prepared by two or more authors with the intention that their contributions be merged into inseparable and interdependent parts of a unitary whole. 17 U.S.C 101. A work is considered a joint work if authors collaborated with each other or if each prepared his or her contribution knowing and intending that it would be merged with the contributions of the other as a part of an integrated unit. Id.; *see also Erickson v. Trinity Theater, Inc.*, 13 F3d 1061, 1068 (7th Cir. 1994). The critical element with respect to a joint work is the intention at the time the work is done that parts be combined into a unitary whole. *Childress v. Taylor*, 945 F.2d 500, 508-509(2nd Cir. 1991), *Cloughston v. The American Academy of Orthopedic Surgeons*, 930 F. Supp. 1156, 1159(W.D. Tex. 1996).

Plaintiff's deposition testimony referenced above clearly indicates that the song "South Padre Island" was a joint work that consisted of contributions by himself and Damion Giacchino/Pelican West. Plaintiff developed the original lyrics, but the lyrics were re-written and set to music created and prepared by Pelican West. (See Exhibit A pg. 29, lines 22-25, pg. 30 lines 1-4, pg. 31 lines 8-25, pg. 32 lines 1-3,

5

and see Exhibit B). Plaintiff holds the copyright to the lyrics, but the copyright to the song's music is held by joint author Damion Giacchino/Pelican West.(See Ex. A pg. 19 lines 17-24, pg. 23 lines 21-23, pg. 27 line 25, pg. 28 ln1, pg 29 lines 17-19; and Exhibits B, C, and D). Accordingly, Defendant's summary judgement evidence establishes that the song "South Padre Island" constitutes a joint work as defined by 17 U.S.C 101.

**C. No copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" took place because the Town of South Padre Island had authority to distribute the song from a joint author of that work.**

The authors of a joint work are co-owners of the copyright in the work. 17 U.S.C 201. Authors of a joint work hold undivided interests in it, despite any differences in each author's contribution. *Erickson,* 13 F.3d at 1068; *Childress,* 945 F.2d at 508-509; *Pye v. Mitchell,* 574 F.2d 476 (9th Cir. 1978). Generally, all joint authors share equally in the ownership of copyright of a joint work. *See Generally Goodman v. Lee,* 988 F2d 619 (5th Cir. 1993). Joint authors enjoy all rights of authorship under 17 U.S.C. sec. 304. A co-owner of a copyright needs no consent to use or license the use of a work non-exclusively as each owner has the right to use or to license the use of the work subject to an accounting to the other co-owner for any profits. *See Childress,* 945 F.2d at 505; *Erickson,* 13 F.3d at 1068. An authorization to a third party from one joint owner is a defense to an action against that party brought by the other joint owner. MELVIN B. NIMMER & DAVID NIMMER, 1 NIMMER ON COPYRIGHT § 6.10 (1999).

Defendant's summary judgement evidence establishes that Damion Giacchino and his band Pelican West are joint authors/owners of the song "South Padre Island." Damion Giacchino/Pelican West owns the copyright to the music and vocal melody of the song, and Plaintiff has conceded that his intent was to have his lyrics merged with Pelican West's music to create the song that appears on the cd called "South

Padre Island." (See Exhibit A pg. 27 lines 11-19, pg. 29 lines 17-19; and Exhibits B, C, D, and G). Plaintiff specifically confirmed in his deposition that both he and Pelican West undertook a joint effort to produce the melody and harmony to the song, and that Pelican West changed the original music to the song. (See Exhibit A pg. 30 lines 1-4, 16-25, pg. 31 lines 1-7). Pelican West knew the song was being taken to the town and were thrilled about it. (See Exhibit A pg. 38 lines 1-14). After discovering that the song was included on the town's visitor's guide cd-rom, neither Pelican West nor Damion Giacchino voiced any objection to the town's use of the song other than that they did not like the quality of the reproduction. (See Exhibit B). Pelican West and Damion Giacchino do not feel that the Town of South Padre Island illegally used the song "South Padre Island" in their visitor's guide cd-rom. (See Exhibit B).

Pelican West had the authority under the law to grant Defendant a non-exclusive license to use the song at issue. A non exclusive license to use a joint work can be impliedly granted by the conduct and actions of a joint owner or copyright holder of a work. See *Lulirama Ltd., Inc. vs. Axcess Broadcast Services, Inc.*, 128 F3d 872(5th Cir. 1997). Defendant's summary judgement evidence establishes that Defendant was impliedly granted such license by the actions, attitude, and conduct of joint author/owner Damion Giacchino/Pelican West including their essential consent to the use of the official town song on the visitor's guide cd-rom.

**D.    Gary Graham's conduct and actions constitute an implied license for the Town of South Padre Island to use the song called "South Padre Island" by his actions and conduct.**

As noted above, a non exclusive license to use a joint work can be impliedly granted by the conduct and actions of a joint owner or copyright holder of a work. Id. Plaintiff Graham's conduct and actions clearly evidence that the Defendant was given an implied license to use the song by Plaintiff. Specific examples of this conduct include:

7

1. Plaintiff voluntarily took the song to the town at two separate official town meetings where the issue about declaring the song the official town song was discussed. (See Exhibit A pg. 36 lines 9-25, pg. 37 lines 1-25 and Exhibit E).

3. Plaintiff was impressed when he found out the town wanted to declare "South Padre Island" the official town song and was pleased with the decision to do so; (See Exhibit A pg 39 lines 10-23);

4. Plaintiff voluntarily played the song for the entire audience at a town meeting (See Exhibit A pg. 36 lines 19-25);

5. Plaintiff was present when the vote to declare the song the official town song was made, and he voiced no objections (See Exhibit A pg 37 lines 1-25); and

6. Plaintiff never sought any monies or royalties from the Defendant at any time (See Exhibit A pg. 40 lines 3-25, pg. 41 lines 1, 8-11).;

Plaintiff's conduct conclusively establishes that Defendant had an implied license to use the song which was allowed by Plaintiff to be declared the "official town song." For Plaintiff to suggest that the Defendant would not be able to utilize the song that he brought to the town after it was declared the official town song is simply ridiculous. Defendant did nothing more than to include the official town song on its visitor's guide cd-rom at its own expense for the purpose of distributing such cd-roms for free. To follow Plaintiff's argument to its fruition, Defendant would not have had the right to play the song at any official meeting or function without seeking license to do so by Plaintiff or Damion Giacchino/Pelican West. Such a conclusion is inconsistent with the evidence in this case, Plaintiff's deposition testimony, and the actions and attitudes of both Plaintiff and Damion Giacchino/Pelican West.

Finally, Defendant would refer the court to the fact that Plaintiff's copyright is for the lyrics to the song "South Padre Island". Defendant did not take Plaintiff's copyrighted lyrics and utilize them in some illegal or inappropriate manner. On the contrary, Defendant did not utilize the lyrics independently of the song

8

in any way. To suggest that Defendant intentionally violated Plaintiff's copyright with respect to the lyrics of the song would suggest that Defendant took those lyrics and incorporated them into some other work etc. to create a new product. This was simply not done. Accordingly, Defendant would respectfully request that the court grant it summary judgement as to any and all claims of Plaintiff.

## VI.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant the TOWN OF SOUTH PADRE ISLAND requests that all of Plaintiff's claims against it be dismissed with prejudice, that Plaintiff take nothing by this lawsuit, that Defendant recover all costs incurred herein, and that Defendant recover such other and further relief, at law and in equity, to which they may show itself to be justly entitled to.

Singed on this _10th_ day of March, 2004.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
1534 E. 6th Street Suite 200
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: _Charles Willette_ w/pEG
Charles Willette, Jr.
USDC No. 1937
State Bar No. 21509700

Eduardo Garza
State Bar No. 00796609
USDC Adm. No. 3399
**ATTORNEYS FOR DEFENDANT**
**THE TOWN OF SOUTH PADRE**
**ISLAND**

9

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2004, a true and correct copy of the above and foregoing has been served on all counsel of record via certified mail as noted below:

***Via CMRRR 7001 1140 0001 8376 6801***
Donald T. Cheatham
ATTORNEY AT LAW
825 West 11th Street
Austin, Texas 78701

***Via CMRRR 7001 1140 0001 8376 6801***
Eduardo V. Rodriguez
1265 N. Expressway 83
Brownsville, Texas 78521

Eduardo G Garza

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM | § | |
|         Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-03-084 |
| VS. | § | |
| | § | ( JURY REQUESTED) |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| and HARVEST MULTIMEDIA, INC. | § | |
|         Defendant. | § | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On the _____ day of _____, 2004, this cause came on to be considered the Defendant's Motion for Summary Judgment. The Court, after reading the Defendant's Motion for Summary Judgment is of the opinion that such motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that the Defendant's Motion for Summary Judgment be and is hereby granted and that the that PLAINTIFF take nothing against Defendant Town of South Padre Island, and that all claims against Defendant Town of South Padre Island be and are DISMISSED with prejudice.

SIGNED on this the _____ day of _____, 2004.


_____
JUDGE PRESIDING

xc:

Eduardo G Garza, 3505 Boca Chica, suite 460, Brownsville, Texas 78521
Donald T. Cheathham, ATTORNEY AT LAW, 825 West 11th Street, Austin, Texas 78701
Eduardo V. Rodriguez, 1265 N. Expressway 83, Brownsville, Texas 78521

11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GARY GRAHAM                    )(
                               )(
          Plaintiff            )(
                               )(
     VS.                       )( CIVIL ACTION NO. B-03-084
                               )(
TOWN OF SOUTH PADRE            )(
ISLAND and HARVEST             )(
MULTIMEDIA, INC.               )(
                               )(
          Defendant            )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
GARY GRAHAM
NOVEMBER 3, 2003

---

　　　ORAL AND VIDEOTAPED DEPOSITION OF GARY GRAHAM, produced

as a witness duly sworn by me at the instance of the defendant

Town of South Padre Island, taken in the above-styled and

numbered cause on November 3, 2003, before THURMAN J. MOODY,

Certified Shorthand Reporter No. 2861 in and for the state of

Texas, at the offices of Willette & Guerra, L.L.P., 3505 Boca

Chica Boulevard, Suite 460, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.



**EXHIBIT**

A

ALL-STATE LEGAL®

CERTIFIED COPY

POCKRUS REPORTING SERVICE
McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

| 1 | APPEARANCES |
|---|---|
| 2 | FOR THE PLAINTIFF GARY GRAHAM (APPEARING TELEPHONICALLY): |
| 3 | DONALD T. CHEATHMAN |
| | LAW OFFICE OF DONALD T. CHEATHMAN |
| 4 | 825 West 11th Street |
| | Austin, Texas 78701 |
| 5 | |
| | FOR THE DEFENDANT TOWN OF SOUTH PADRE ISLAND: |
| 6 | |
| | EDUARDO G. GARZA |
| 7 | WILLETTE & GUERRA, L.L.P. |
| | 3505 Boca Chica Boulevard, Suite 460 |
| 8 | Brownsville, Texas 78520 |
| 9 | FOR THE DEFENDANT HARVEST MULTIMEDIA, INC. |
| 10 | EDUARDO V. RODRIGUEZ |
| | LAW OFFICE OF EDUARDO V. RODRIGUEZ |
| 11 | 1265 North Expressway 83 |
| | Brownsville, Texas 78521 |
| 12 | |
| | ALSO PRESENT: |
| 13 | |
| | DEBBIE GRAHAM |
| 14 | CLAUDIA GARZA, Videographer |
| 15 | INDEX |

16  Appearances ------------------------------------------------2

17  Stipulations -----------------------------------------------4

18  GARY GRAHAM
        Examination By Mr. Garza --------------------------------5

19

    Errata Sheet ----------------------------------------------57
20  Signature Page --------------------------------------------58
    Reporter's Certificate ------------------------------------59

21              DOCUMENTARY EVIDENCE

22

23  No.   Description                                Identified

    1   Certificate of Registration ------------------------28
24

    2   South Padre Island, By Gary Graham, 8/23/00 ----------32
25

**POCKRUS REPORTING SERVICE**

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940



1                   <u>REQUESTED DOCUMENTS/INFORMATION</u>

2    <u>NUMBER</u>    <u>DESCRIPTION</u>                                          <u>PAGE</u>

3    1    Texas Driver License ---------------------------------54

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**POCKRUS REPORTING SERVICE**

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

1                       S-T-I-P-U-L-A-T-I-O-N-S

2            IT IS STIPULATED and agreed by and between counsel

3 for the respective parties hereto that the deposition of the

4 witness named in the caption hereto may be taken at this time

5 and place before the officer named in the caption hereto;

6            THAT said deposition, or any part thereof, when so

7 taken, may be used on the trial of this case with the same

8 force and effect as if the witness were present in court and

9 testifying in person;

10            THAT the necessity for preserving objections at the

11 time of taking is waived, and that any and all legal

12 objections to this deposition, or any part thereof, may be

13 urged at the time same is sought to be offered in evidence on

14 the trial of this cause; except, however, that objections to

15 the form of the question and/or responsiveness of the answer

16 must be made at the time of taking, or else such objections

17 are waived;

18            THAT the original of this deposition shall be

19 presented to DONALD T. CHEATHMAN for presentation to the

20 witness for examination and signature, and thereafter shall be

21 returned to Pockrus Reporting Service;

22            THAT if the signed original is not presented to

23 Pockrus Reporting Service prior to the time of trial, a copy

24 may be used in lieu thereof.

25

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | GARY DEAN GRAHAM                                                     |
|       | 2  | having been first duly sworn, testified as follows:                 |
|       | 3  | EXAMINATION                                                         |
| 11:00 | 4  | BY MR. GARZA:                                                        |
| 11:00 | 5  | Q.    Would you please state your name for the record, sir?          |
| 11:00 | 6  | A.    Gary Dean Graham.                                              |
| 11:00 | 7  | Q.    Mr. Graham, have you ever had your deposition taken            |
| 11:00 | 8  | before?                                                              |
| 11:00 | 9  | A.    No.                                                            |
| 11:00 | 10 | Q.    Have you ever testified live in court before?                  |
| 11:00 | 11 | A.    Yes, I have.                                                   |
| 11:00 | 12 | Q.    On what occasions?                                             |
| 11:00 | 13 | A.    It was in '77.  It was in a murder trial.                      |
| 11:00 | 14 | Q.    As a witness?                                                  |
| 11:00 | 15 | A.    Yes.                                                           |
| 11:00 | 16 | Q.    Have you ever testified in any other capacity, any             |
| 11:00 | 17 | other time?                                                          |
| 11:00 | 18 | A.    Not that I can recall.                                         |
| 11:00 | 19 | Q.    My name is Eddy Garza, and we just met a moment ago            |
| 11:00 | 20 | before this deposition --                                            |
| 11:00 | 21 | A.    Right.                                                         |
| 11:00 | 22 | Q.    -- proceeded.  I'm the attorney for the town of South          |
| 11:00 | 23 | Padre Island.                                                        |
| 11:00 | 24 | A.    Right.                                                         |
| 11:00 | 25 | Q.    Do you understand who I am and who I represent?                |

6

| 11:00 | 1 | A.    Yes. |

11:00   1     A.    Yes.

11:00   2     Q.    Okay.  I'm going to be asking you some questions

11:00   3   today about the lawsuit that you have filed, and all of the

11:00   4   answers that you give in response to my questions will have

11:00   5   the same effect as testimony that is given before a judge and

11:01   6   a jury.

11:01   7             You understand that?

11:01   8     A.    I understand that.

11:01   9     Q.    And you're sworn here -- have we sworn him in?

11:01   10    A.    Yes.

11:01   11    Q.    You're sworn here to tell the truth --

11:01   12    A.    Right.

11:01   13    Q.    -- and subject to the same rules and laws that would

11:01   14  apply if we were sitting before a judge and jury at this very

11:01   15  moment?

11:01   16    A.    I understand.

11:01   17    Q.    One last thing to -- or actually a couple things,

11:01   18  just technical rules in depositions.  One of them is if at any

11:01   19  time you don't understand one of my questions or one of the

11:01   20  questions of the other lawyers, would you agree to ask us to

11:01   21  explain it or clarify it before you answer?

11:01   22    A.    Sure.

11:01   23    Q.    Otherwise, we're going to assume you understand the

11:01   24  question when you answer it.  Okay?

11:01   25    A.    Yes.

| | | |
|---|---|---|
| 11:01 | 1 | Q.    Last thing is if you'll -- you may anticipate some of |
| 11:01 | 2 | any questions today and know what I'm going to ask you, and in |
| 11:01 | 3 | normal conversation we could probably, you know, understand |
| 11:01 | 4 | each other if we're talking at the same time.  But since we |
| 11:01 | 5 | have a court reporter who's taking down what we're doing, I |
| 11:01 | 6 | need to make sure and finish my questions and I need to make |
| 11:01 | 7 | sure and let you finish your answers, too. |
| 11:01 | 8 | A.    Right. |
| 11:01 | 9 | Q.    You're doing a good job so far, but as we get in the |
| 11:02 | 10 | process you're going to probably see that you'll -- |
| 11:02 | 11 | A.    Well, I'm not used to it.  I'm nervous, so, you know, |
| 11:02 | 12 | it's -- |
| 11:02 | 13 | Q.    If you need to take a break today for any reason -- |
| 11:02 | 14 | A.    I'll let you know. |
| 11:02 | 15 | Q.    -- if you want to pick up the phone, talk to your |
| 11:02 | 16 | lawyer at any time, you're free to do so.  Just please let me |
| 11:02 | 17 | know. |
| 11:02 | 18 | A.    Okay. |
| 11:02 | 19 | Q.    The only caveat I'll have is if I have a question |
| 11:02 | 20 | outstanding, I'd like you to provide an answer to the question |
| 11:02 | 21 | before we talk a break.  Okay? |
| 11:02 | 22 | A.    (Witness nodded.) |
| 11:02 | 23 | Q.    Where do you currently live, sir? |
| 11:02 | 24 | A.    Warsaw, Missouri. |
| 11:02 | 25 | Q.    And how long have you lived there? |

| | | |
|---|---|---|
| 11:02 | 1 | A.    Four months. |
| 11:02 | 2 | Q.    What is your current address? |
| 11:02 | 3 | A.    609 Bolivar Street. |
| 11:02 | 4 | Q.    And what the ZIP Code in Missouri? |
| 11:02 | 5 | A.    65355. |
| 11:02 | 6 | Q.    What's your telephone, sir? |
| 11:02 | 7 | A.    (660) 438-3887. |
| 11:02 | 8 | Q.    Do you have a Texas driver's license? |
| 11:02 | 9 | A.    Yes, I do. |
| 11:02 | 10 | Q.    Do you have it with you today? |
| 11:02 | 11 | A.    It's in the vehicle. |
| 11:03 | 12 | Q.    Do you know your license number, the Texas license, |
| 11:03 | 13 | driver's license number? |
| 11:03 | 14 | A.    No.  My wife can get it if you'd like. |
| 11:03 | 15 | Q.    Actually we can take a little break in a little |
| 11:03 | 16 | perhaps, but I'd like to get a copy of your drivers' |
| 11:03 | 17 | license -- |
| 11:03 | 18 | A.    Okay. |
| 11:03 | 19 | Q.    -- if that's all right. |
| 11:03 | 20 |       What's your social security number? |
| 11:03 | 21 | A.    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. |
| 11:03 | 22 | Q.    Where did you live prior to living in Warsaw, |
| 11:03 | 23 | Missouri? |
| 11:03 | 24 | A.    South Padre Island. |
| 11:03 | 25 | Q.    And that was four months ago? |

11:03  1      A.    Yes.

11:03  2      Q.    How long had you been living on South Padre Island

11:03  3   before moving to Missouri?

11:03  4      A.    Four years.

11:03  5      Q.    So you moved this year to Missouri?

11:03  6      A.    Yes.

11:03  7      Q.    When did you first move to South Padre Island?

11:03  8      A.    In June of '99.

11:03  9      Q.    And where did you live before that?

11:03  10     A.    Sedalia, Missouri.

11:03  11     Q.    Were you born in Missouri?

11:03  12     A.    Yes.

11:04  13     Q.    Did you live in any other places in between Missouri

11:04  14  and South Padre Island?

11:04  15     A.    No.

11:04  16     Q.    Why did you move down to South Padre Island?

11:04  17     A.    We had sold a business and just thought it was a good

11:04  18  idea.  I came down here on a couple of occasions with a friend

11:04  19  of mine, I liked the place.

11:04  20     Q.    And why did you leave South Padre Island?

11:04  21     A.    I sold half of my business.

11:04  22     Q.    What business was that?

11:04  23     A.    Paradise Wreckers, towing.

11:04  24     Q.    What do you mean by you sold only half of your

11:04  25  business?

**POCKRUS REPORTING SERVICE**

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

| | | |
|---|---|---|
| 11:04 | 1 | A.    I sold half the business. |
| 11:04 | 2 | Q.    You still maintain -- |
| 11:04 | 3 | A.    Half ownership. |
| 11:04 | 4 | Q.    Who is the other owner? |
| 11:04 | 5 | A.    Gregg Padgett. |
| 11:04 | 6 | Q.    He resides in South Padre? |
| 11:04 | 7 | A.    No, he lives in Warsaw, Missouri, part of the time |
| 11:04 | 8 | and down here part of the time. |
| 11:05 | 9 | Q.    So you sold half the business and that was the reason |
| 11:05 | 10 | you moved to Warsaw, Missouri? |
| 11:05 | 11 | A.    Right. |
| 11:05 | 12 | Q.    Do you have another job in Warsaw? |
| 11:05 | 13 | A.    We have -- we got another business in the deal. |
| 11:05 | 14 | Q.    What do you do in Warsaw, Missouri? |
| 11:05 | 15 | A.    Radio Shack. |
| 11:05 | 16 | Q.    Do you own it or -- |
| 11:05 | 17 | A.    Yes. |
| 11:05 | 18 | Q.    Any other businesses that you're involved in? |
| 11:05 | 19 | A.    No. |
| 11:05 | 20 | Q.    Can you give me a -- just a history of your |
| 11:05 | 21 | educational background ever since high school? |
| 11:05 | 22 | A.    From high school I went to the military. |
| 11:05 | 23 | Q.    What division? |
| 11:05 | 24 | A.    Navy. |
| 11:05 | 25 | Q.    How long were you in the Navy? |

| | | |
|---|---|---|
| 11:05 | 1 | A.   Two years. |
| 11:05 | 2 | Q.   Did you receive an honorable discharge? |
| 11:05 | 3 | A.   Yes. |
| 11:05 | 4 | Q.   And where did you graduate high school from? |
| 11:05 | 5 | A.   School of the Osage in Missouri. |
| 11:05 | 6 | Q.   Have you had any other additional training, |
| 11:06 | 7 | certification or educational courses subsequent to the Navy? |
| 11:06 | 8 | A.   Could you say that again, please? |
| 11:06 | 9 | Q.   Sure.  I'll break them down. |
| 11:06 | 10 | Any other educational courses or training that |
| 11:06 | 11 | you've taken since being discharged from the Navy? |
| 11:06 | 12 | A.   No. |
| 11:06 | 13 | Q.   Have you -- do you have any type of vocational |
| 11:06 | 14 | training or certifications in any other areas of employment? |
| 11:06 | 15 | A.   I was an entertainer for twenty years. |
| 11:06 | 16 | Q.   In what capacity? |
| 11:06 | 17 | A.   Singer, guitar player. |
| 11:06 | 18 | Q.   Where did you do that? |
| 11:06 | 19 | A.   All over the world. |
| 11:06 | 20 | Q.   All over the world? |
| 11:06 | 21 | A.   Yes. |
| 11:06 | 22 | Q.   Did you -- where have you done that in Texas? |
| 11:06 | 23 | A.   Pardon me? |
| 11:06 | 24 | Q.   Have you done any work as an entertainer in Texas? |
| 11:06 | 25 | A.   A long time ago in Beaumont, Texas. |

| 11:06 | 1 | Q. | Where did you work or what did you did? |
| 11:06 | 2 | A. | It was Red Carpet Inn I think at the time. |
| 11:07 | 3 | Q. | What were you hired to do? |
| 11:07 | 4 | A. | Entertain. |
| 11:07 | 5 | Q. | In what capacity; what did you do? |
| 11:07 | 6 | A. | I had a show. |
| 11:07 | 7 | Q. | Was it just you? |
| 11:07 | 8 | A. | No. |
| 11:07 | 9 | Q. | Describe the show for me. |
| 11:07 | 10 | A. | I had a five-piece group behind me. |
| 11:07 | 11 | Q. | And you all just -- you played music? |
| 11:07 | 12 | A. | Yes. |
| 11:07 | 13 | Q. | Were these songs you wrote or songs someone else |

wrote?

| 11:07 | 14 | | |
| 11:07 | 15 | A. | Both. |
| 11:07 | 16 | Q. | Did you have a band that was yours? |
| 11:07 | 17 | A. | Yes. |
| 11:07 | 18 | Q. | What was the name of that band? |
| 11:07 | 19 | A. | Well, it changed over the years.  There was -- we had |

The Four Boys, the Gary Graham Show.  In Vietnam it was the

Gary Graham Review.  That's basically kind of it.

| 11:07 | 20 | | |
| 11:07 | 21 | | |
| 11:07 | 22 | Q. | When is the last time you worked as an entertainer? |
| 11:07 | 23 | A. | In '83. |
| 11:07 | 24 | Q. | Where was that? |
| 11:08 | 25 | A. | I was on the road. |

11:08    1        Q.    What places did you -- were you there with that same
11:08    2    band?
11:08    3        A.    No, the members changed.
11:08    4        Q.    What was the name of your band in 1983?
11:08    5        A.    Gary Graham Show.
11:08    6        Q.    And how many people were in your show?
11:08    7        A.    There was five besides myself.
11:08    8        Q.    And where did you perform in 1983?
11:08    9        A.    Missouri.  Illinois.  Iowa.  North Dakota.  South
11:08   10    Dakota.  I can't recall all of them.
11:08   11        Q.    How much income did you generate from performing in
11:08   12    the Gary Graham Show in 1983?
11:08   13        A.    I can't -- I can't be for certain on that.
11:08   14        Q.    Since 1983 you have not performed in any other
11:09   15    capacity?
11:09   16        A.    Occasionally I have.  Yes, to sit-ins and things of
11:09   17    that nature.
11:09   18        Q.    Where?
11:09   19        A.    At the Radisson on South Padre Island was the most
11:09   20    recent time.
11:09   21        Q.    When was that?
11:09   22        A.    In 2001.
11:09   23        Q.    Were you contracted to work there?
11:09   24        A.    No.
11:09   25        Q.    How did you come about performing at the Radisson in

11:09  1    2001?

11:09  2         A.   I was asked to.

11:09  3         Q.   By whom?

11:09  4         A.   By a group called Pelican West.

11:09  5         Q.   How many times did you sit in with them?

11:09  6         A.   No, no, no.  It was just one show.  I just did one

11:09  7    show.

11:09  8         Q.   That was in 2001?

11:09  9         A.   Yes.

11:09  10        Q.   Do you remember the month?

11:09  11        A.   I can't be for certain.

11:09  12        Q.   And did you sit in with them?

11:09  13        A.   Yes.

11:09  14        Q.   When we say one show, that's one evening?

11:10  15        A.   Yes.

11:10  16        Q.   What did you do that night?  What was your -- what

11:10  17    was your involvement in the show?

11:10  18        A.   I sang.

11:10  19        Q.   Did you play any instruments?

11:10  20        A.   I played a guitar, yes.

11:10  21        Q.   You played a guitar and you sang?

11:10  22        A.   Uh-huh.

11:10  23        Q.   Did you sing any songs that -- I'm sorry.  Was that a

11:10  24    yes or a no?

11:10  25        A.   Say again.

11:10  1    Q.   I didn't go over this at the beginning, but we need
11:10  2  to have all your answers be verbal answers.
11:10  3    A.   Okay.
11:10  4    Q.   I understand you when you say uh-huh or huh-uh --
11:10  5    A.   Yes.
11:10  6    Q.   -- or a nod, but it has to be yes or no for our court
11:10  7  reporter.
11:10  8    A.   Okay.
11:10  9    Q.   So just to clarify your last answer, your performance
11:10  10  in this show with Pelican West in 2001 involved you playing a
11:10  11  guitar and singing?
11:10  12    A.   Yes.
11:10  13    Q.   Was that recorded, anybody tape-record that?
11:10  14    A.   I think there is -- I think they have a videotape of
11:10  15  it.
11:10  16    Q.   What was the -- do you know the reason why you were
11:10  17  performing that night with Pelican West?
11:10  18    A.   They asked me to.  It was not a paid performance, by
11:10  19  the way.
11:10  20    Q.   Did you perform with them the whole evening?
11:10  21    A.   No.
11:10  22    Q.   How many songs did you perform?
11:11  23    A.   Probably twenty.  It was like a medley of songs.
11:11  24    Q.   Was there any special occasion that you were there
11:11  25  performing with them?

11:11  1    A.    I think that was the night that -- that Mayor

11:11  2  Cyganiewicz give them a plaque for the song, the song *South*

11:11  3  *Padre Island.*

11:11  4    Q.    Mayor Cyganiewicz gave whom a plaque?

11:11  5    A.    Pelican West.

11:11  6    Q.    Were you recognized in any way?

11:11  7    A.    Yes.

11:11  8    Q.    Were you given a plaque as well?

11:11  9    A.    I never received it.

11:11  10   Q.    Did somebody tell you you were going to get a plaque?

11:11  11   A.    Yes.

11:11  12   Q.    Who told you that?

11:11  13   A.    Mayor Cyganiewicz.

11:11  14   Q.    He just never sent it to you?

11:11  15   A.    I just never got it.

11:11  16   Q.    Were you recognized that evening?

11:11  17   A.    Yes.

11:11  18   Q.    How were you recognized?

11:12  19   A.    As the writer of the song.

11:12  20   Q.    Is this like a ceremony or something to that effect

11:12  21  or how did it --

11:12  22   A.    It was kind of sort of.  You know, it wasn't a big

11:12  23  deal.

11:12  24   Q.    Who was there?

11:12  25   A.    Mayor Cyganiewicz.  Couple of the board of aldermen.

11:12  1      Q.    Do you remember which members of the board of

11:12  2    aldermen?

11:12  3      A.    Doyle Wells and Rick Wells, I believe.  I can't be

11:12  4    for sure of that.

11:12  5      Q.    Anybody else that you recall?

11:12  6      A.    My wife was there and my mother and my two sons.

11:12  7      Q.    So this was a planned event?

11:12  8      A.    Yeah.  I didn't think -- it wasn't a celebration or

11:12  9    anything like that.  The mayor just come by and did his thing

11:12  10   and Pelican West asked me if I would get up and do some songs.

11:13  11   And I did rehearse with them, so I guess, yes, it was a

11:13  12   planned event.

11:13  13     Q.    Somebody told you that you would be recognized that

11:13  14   night for your contributions to the song called *South Padre*

11:13  15   *Island*?

11:13  16     A.    No, nobody told me that.  They just said that -- not

11:13  17   if I remember, just the mayor was going to be there and he was

11:13  18   going to award them a plaque and they asked me if I would get

11:13  19   up and sing some of my songs and I did.

11:13  20     Q.    Did you enjoy the evening?

11:13  21     A.    Yeah, it was okay.

11:13  22     Q.    Did you have any conversations with anyone from the

11:13  23   city that night?

11:13  24     A.    Not really.

11:13  25     Q.    When was the last time you --

| | | |
|--|--|--|
| 11:13 | 1 | MR. CHEATHMAN:  I didn't hear the answer. |
| 11:13 | 2 | MR. GARZA:  What was his answer to the last |
| 11:13 | 3 | question? |
| 11:13 | 4 | THE REPORTER:  Not really. |
| 11:13 | 5 | MR. CHEATHMAN:  You have to speak up, Gary. |
| 11:14 | 6 | A.   Okay. |
| 11:14 | 7 | Q.   (By Mr. Garza:)  When was the last time that you |
| 11:14 | 8 | copyrighted a song or you had copywritten a song? |
| 11:14 | 9 | A.   The last time I have copywritten a song? |
| 11:14 | 10 | Q.   Yes. |
| 11:14 | 11 | A.   Was -- let's see.  I've got to think about this for a |
| 11:14 | 12 | minute, get the exact month. |
| 11:14 | 13 | Q.   Okay. |
| 11:14 | 14 | A.   It was right after the Twin Towers, I wrote a song |
| 11:14 | 15 | about the Statue of Liberty. |
| 11:14 | 16 | Q.   What did you copyright? |
| 11:14 | 17 | A.   The whole song. |
| 11:14 | 18 | Q.   What's the song called? |
| 11:14 | 19 | A.   *This Lady Won't Let You Slide*. |
| 11:15 | 20 | Q.   Has it been published anywhere? |
| 11:15 | 21 | A.   I am the publisher of it, yes.  And it's been on MP3. |
| 11:15 | 22 | Q.   Prior to that -- how many copyrights do you hold? |
| 11:15 | 23 | A.   I don't know.  Over -- have to go back through them |
| 11:15 | 24 | to see, and this is rough, maybe a dozen. |
| 11:15 | 25 | Q.   Okay. |

11:15 1    A.    Maybe more.  I didn't -- I have to think about it.

11:15 2    Q.    Do you maintain the paperwork on your copywritten

11:15 3    songs?

11:15 4    A.    Yes.

11:15 5    Q.    You have them in a file somewhere?

11:15 6    A.    Yes.

11:15 7    Q.    Is that currently at your home or in your possession?

11:15 8    A.    It's in Missouri.

11:16 9    Q.    The twelve or so copyrights that you do have, one of

11:16 10   them is obviously the Statue of Liberty song?

11:16 11   A.    Right.

11:16 12   Q.    And you said you copywrote the entire song?

11:16 13   A.    Uh-huh.  Yes.

11:16 14   Q.    So that's a -- explain to me what's involved in

11:16 15   copyrighting a song.

11:16 16   A.    You apply to the Library of Congress.

11:16 17   Q.    And with respect to the song *South Padre Island*, you

11:16 18   only copywrote a portion of that song, correct?

11:16 19   A.    Yes.

11:16 20   Q.    Is that the same --

11:16 21   A.    That's -- wait a minute.  Not a portion.  I copy -- I

11:16 22   had copyright on the lyrics.

11:16 23   Q.    The lyrics of the song?

11:16 24   A.    Right.

11:16 25   Q.    With respect to your other twelve copyrights that you

11:16  1    talked about, are you copyrighting lyrics of songs or music of

11:16  2    songs or both or what are you --

11:16  3        A.    Both.

11:16  4        Q.    It's a combination?

11:16  5        A.    Yes.

11:16  6        Q.    Have you ever had -- do you own any other copyrights

11:16  7    or hold any other copyrights where you have only copywritten

11:16  8    the lyrics to a song?

11:16  9        A.    No.

11:17  10       Q.    Have you sold any of your copywritten songs for

11:17  11   revenue?

11:17  12              MR. CHEATHMAN:  Objection; form.

11:17  13       Q.    (By Mr. Garza:)  For money?

11:17  14       A.    To what now?

11:17  15       Q.    Have any of the songs that you hold copyright to --

11:17  16       A.    Yes.

11:17  17       Q.    Have you generated revenue from copyrighting these

11:17  18   songs?

11:17  19       A.    Income from it, yes.

11:17  20       Q.    How?

11:17  21       A.    Through sales.

11:17  22       Q.    You sold -- how many songs have you sold?

11:17  23       A.    I can't begin to tell you.

11:17  24       Q.    Have you sold more than half of the ones that you

11:17  25   have copyrights on?

**POCKRUS REPORTING SERVICE**
McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

| 11:17 | 1 | A.    Well, when you say sell a song, I don't sell my |
| 11:17 | 2 | songs, okay?  The money that you receive from that is through |
| 11:17 | 3 | the sales of -- as far as back as albums and 45s. |
| 11:17 | 4 | Q.    So how does it work.  How would you generate money |
| 11:18 | 5 | off of copyrighting a song? |
| 11:18 | 6 | A.    You sell them in stores. |
| 11:18 | 7 | Q.    And on the twelve songs that you have copyrights on, |
| 11:18 | 8 | have you sold them in stores? |
| 11:18 | 9 | A.    Yes. |
| 11:18 | 10 | Q.    All of them? |
| 11:18 | 11 | A.    No. |
| 11:18 | 12 | Q.    How many of them have you sold in stores? |
| 11:18 | 13 | A.    It's kind of vague there because -- fact is that some |
| 11:18 | 14 | of them are on an album.  So I can't give you an exact answer. |
| 11:18 | 15 | Q.    What album are you talking about? |
| 11:18 | 16 | A.    I had an album we made in, I think it was, 1981 that |
| 11:19 | 17 | we sold in the stores and we sold off of the stage at the |
| 11:19 | 18 | shows and things like that. |
| 11:19 | 19 | Q.    And the album are songs that are exclusively yours? |
| 11:19 | 20 | A.    Some of them, yes. |
| 11:19 | 21 | Q.    So whose other songs were on the album? |
| 11:19 | 22 | A.    Oh, I have recorded a lot of people's songs.  One of |
| 11:19 | 23 | Willie Nelson's songs is on there, you know. |
| 11:19 | 24 | Q.    So it's a combination of you performing someone |
| 11:19 | 25 | else's song as you performing songs that you wrote? |

11:19  1        A.    Right.

11:19  2        Q.    Is that accurate?

11:19  3        A.    Uh-huh.

11:19  4        Q.    And you sold that album -- what's the name of that

11:19  5    album?

11:19  6        A.    The West Texas -- The West Texas Express.  It was

11:19  7    back in the Urban Cowboy days.

11:19  8        Q.    How many volume -- how many records did you sell?

11:19  9        A.    I can't -- I can't recall that.

11:19  10       Q.    Was it more than a thousand?

11:19  11       A.    I don't know.

11:19  12       Q.    Do you have any records that you maintain that would

11:19  13   show how many West Texas Express albums were sold?

11:19  14       A.    No, because we had a fire and all that stuff was

11:20  15   burned.

11:20  16       Q.    How much revenue do you generate a year from

11:20  17   copywritten songs?

11:20  18       A.    Again, I can't tell you.  I can't tell you because

11:20  19   it's -- I don't know without doing a lot of research, go back

11:20  20   to records.

11:20  21       Q.    Do you maintain your tax records at home?

11:20  22       A.    Yeah.

11:20  23       Q.    For how many years?

11:20  24       A.    I don't know.  My wife takes care of all that.

11:20  25       Q.    Do you have an accountant?

| | | |
|---|---|---|
| 11:20 | 1 | A.    Yes. |
| 11:20 | 2 | Q.    Does your accountant do your taxes for you? |
| 11:20 | 3 | A.    Yes. |
| 11:20 | 4 | Q.    Who's your accountant? |
| 11:20 | 5 | A.    Used to be Ron -- I can't recall his name now.  It's |
| 11:21 | 6 | Moore, Horton & Company in Missouri.  I can't recall his name. |
| 11:21 | 7 | Q.    Did your -- when you did your work as an entertainer |
| 11:21 | 8 | or a songwriter, was that done under a separate name, a |
| 11:21 | 9 | company name, or just done under your name? |
| 11:21 | 10 | A.    Just under my name. |
| 11:21 | 11 | Q.    There's no separate type of income tax that's filed |
| 11:21 | 12 | on behalf of -- |
| 11:21 | 13 | A.    No. |
| 11:21 | 14 | Q.    -- a recording company or something like that? |
| 11:21 | 15 | A.    No. |
| 11:21 | 16 | Q.    What was your involvement in the song called *South* |
| 11:22 | 17 | *Padre Island*? |
| 11:22 | 18 | A.    I wrote the song. |
| 11:22 | 19 | Q.    What exactly did you write? |
| 11:22 | 20 | A.    The lyrics. |
| 11:22 | 21 | Q.    You hold a copyright for those lyrics of the song |
| 11:22 | 22 | *South Padre Island*, correct? |
| 11:22 | 23 | A.    Yes, I do. |
| 11:22 | 24 | Q.    When did you approach the band Pelican West to put |
| 11:22 | 25 | music to those lyrics? |

**POCKRUS REPORTING SERVICE**

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

11:22  1      A.    I think it was sometime in January of '01.

11:22  2      Q.    May I ask what you're referring to?

11:22  3      A.    This is a time line.

11:22  4      Q.    Are those documents that -- there's a folder in front

11:22  5   of you with some documents in it, correct?

11:22  6      A.    Right.

11:22  7      Q.    Are those documents you reviewed in preparation for

11:22  8   your deposition today?

11:22  9      A.    No.

11:22  10     Q.    What is it?

11:22  11     A.    Just this time line.

11:22  12     Q.    That's the first page you're talking about?

11:22  13     A.    Right.

11:22  14     Q.    What's the rest of that folder that you have here?

11:23  15     A.    Correspondence.

11:23  16     Q.    That's stuff between you and your lawyer?

11:23  17     A.    Yes.

11:23  18     Q.    Why did you approach Pelican West with these lyrics

11:23  19   that you wrote?

11:23  20     A.    Good group.

11:23  21     Q.    What did you want them to do?

11:23  22     A.    I wanted them to record it and I played it for them

11:23  23   on the guitar and they loved it and they wanted to record it.

11:23  24   We made a deal for them to record it.

11:23  25     Q.    What was the deal?

11:23   1        A.    The deal was -- is that they paid for everything to

11:23   2   record it, get a finished CD that they could sell off of the

11:23   3   stage and plus go to the radio stations with at their expense.

11:24   4   In exchange for that, I gave them the music.

11:24   5        Q.    Any other details to the agreement?

11:24   6        A.    I don't have it here in front of me.  I do have it,

11:24   7   but I think that it mentions in there that the royalty rate

11:24   8   will be standard for the industry.

11:24   9        Q.    Is this a written agreement?

11:24   10       A.    Yes.

11:24   11       Q.    Do you maintain a copy of that agreement at your

11:24   12   home?

11:24   13       A.    Yes, I do.

11:24   14       Q.    And Pelican West was supposed to, I guess, make this

11:24   15   song known to the public, get it distributed, or what?

11:24   16       A.    Right.  It was a cooperative effort.

11:25   17       Q.    What exactly did you give them?  Did you give them

11:25   18   anything in writing?

11:25   19       A.    We had a typed-up agreement.

11:25   20       Q.    But other than that, with respect to the lyrics of

11:25   21   the song -- did you provide them lyrics in writing?

11:25   22       A.    I don't understand.

11:25   23       Q.    You said that you provided them with the lyrics so

11:25   24   that they could put music to the song, right?

11:25   25       A.    Right.

11:25  1      Q.   Did you?

11:25  2      A.   Well, let's make it exact here.  The deal was -- is

11:25  3   that in exchange for them putting up the money for the

11:25  4   recording session, whatever, I gave them half the music, which

11:25  5   is -- it's done a lot.

11:25  6      Q.   Okay.

11:25  7      A.   That's what the deal was.

11:25  8      Q.   How did you give them the lyrics?  Was it something

11:25  9   you typed up on a sheet of paper, something you wrote up,

11:25  10  or --

11:25  11     A.   Yes.

11:25  12     Q.   Which one was it?

11:25  13     A.   I sang it, played it for them plus I gave them the

11:25  14  typed lyrics.

11:26  15     Q.   How many pages of lyrics did you provide them?

11:26  16     A.   One.

11:26  17     Q.   It was a typewritten document?

11:26  18     A.   Yes.

11:26  19     Q.   Did that page have any writing on it other than the

11:26  20  typewritten -- stuff that you would have typed with a

11:26  21  computer, I would imagine?

11:26  22     A.   I think it was on a computer, yes.

11:26  23     Q.   Did the page you gave Pelican West have anything

11:26  24  other than typewritten words on it?

11:26  25     A.   No.

11:26  1      Q.   what did Pelican West do with respect to the song
11:26  2    *South Padre Island?*
11:26  3      A.   What did they do?  They recorded it.
11:26  4      Q.   Other than -- when you say they recorded it, what
11:26  5    does that mean?  Can you be more specific to what exactly they
11:26  6    did?
11:26  7      A.   Went to the studio and did what we call a session.   I
11:26  8    was present and helped with engineering on it and what have
11:26  9    you, then we brought -- get the master from that, and they
11:27  10   sent the master away to a company and had CDs produced.
11:27  11     Q.   was it your intent that the lyrics that you wrote for
11:27  12   the song *South Padre Island* be merged with music of Pelican
11:27  13   West to create the song that appears on the CDs *South Padre*
11:27  14   *Island?*
11:27  15     A.   You merge the lyrics with the music.  Of course
11:27  16   that's what you do.
11:27  17     Q.   That was your intent when you provided them with the
11:27  18   lyrics, correct?
11:27  19     A.   Right.
11:27  20     Q.   You do not hold a copyright on the song *South Padre*
11:27  21   *Island*, correct?
11:27  22     A.   I hold a copyright on the song *South Padre Island*.
11:27  23     Q.   You own a copyright to the lyrics *South Padre Island?*
11:27  24     A.   Right.
11:28  25     Q.   But do you have a copyright on the entire song?

POCKRUS REPORTING SERVICE

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

| | | |
|---|---|---|
| 11:28 | 1 | A.   No. |
| 11:28 | 2 | (Exhibit No. 1 marked.) |
| 11:28 | 3 | Q.   (By Mr. Garza:)  Mr. Graham, I'm going to hand you |
| 11:28 | 4 | what's been marked as Deposition Exhibit No. 1. |
| 11:28 | 5 | A.   Uh-huh. |
| 11:28 | 6 | Q.   Do you know what that document is? |
| 11:28 | 7 | A.   Yes. |
| 11:28 | 8 | Q.   Can you identify it for me please? |
| 11:28 | 9 | A.   It's a United States copyright. |
| 11:28 | 10 | Q.   And what copyright is it on? |
| 11:28 | 11 | A.   *South Padre Island*. |
| 11:28 | 12 | Q.   What part of the song *South Padre Island* is it a |
| 11:29 | 13 | copyright on? |
| 11:29 | 14 | A.   It says here the lyrics. |
| 11:29 | 15 | Q.   Is there any other part of the song that is included |
| 11:29 | 16 | in the copyright registration that you have that you're |
| 11:29 | 17 | holding as Exhibit No. 1? |
| 11:29 | 18 | A.   No. |
| 11:29 | 19 | Q.   And who is the holder of those lyrics as per the |
| 11:29 | 20 | document marked Exhibit 1? |
| 11:29 | 21 | A.   I am. |
| 11:29 | 22 | Q.   Was this document signed by you? |
| 11:29 | 23 | A.   Yes. |
| 11:29 | 24 | Q.   What numbered paragraph was it signed on? |
| 11:29 | 25 | A.   Paragraph six here. |

11:29  1      Q.   May I see it?  I'd like to hold it up just for the

11:29  2  video record, if we can get a shot and see what Deposition

11:29  3  Exhibit 1 is.

11:29  4              THE VIDEOGRAPHER:  I've got it.

11:29  5              MR. GARZA:  Thank you.

11:29  6      Q.   (By Mr. Garza:)  Now, under the -- under section

11:29  7  five where it says types of authorship in this work, there's

11:29  8  three boxes.  There's one for music, there's one for lyrics,

11:29  9  there's one for something called other text.  The one that's

11:29 10  marked off on this registration is lyrics, right?

11:30 11      A.   Correct.

11:30 12      Q.   Was that done by you?

11:30 13      A.   Yes.

11:30 14      Q.   Did you make all the marks on this form before filing

11:30 15  it with the copyright office?

11:30 16      A.   My wife typed it and I signed it.

11:30 17      Q.   Pelican West holds a copyright on the song *South*

11:30 18  *Padre Island*, correct?

11:30 19      A.   For the music, yes, that's correct.

11:30 20      Q.   Did Pelican West change some of your lyrics?

11:30 21      A.   Yeah.  We changed some of them at the time.

11:30 22      Q.   Pelican West actually wrote some of the lyrics that

11:30 23  appear in the final version of the song *South Padre Island*,

11:30 24  correct?

11:30 25      A.   Some of them, yes.

11:30  1      Q.   Did Pelican West write the music to the song *South*
11:30  2  *Padre Island*?
11:30  3      A.   I gave them the music.  They changed some of that,
11:30  4  too.  So --
11:30  5      Q.   Did they write the sheet music for the song *South*
11:30  6  *Padre Island*?
11:30  7      A.   I have never seen any sheet music to it.
11:30  8      Q.   Did they choose the chords that they were going to
11:30  9  play in the song *South Padre Island*?
11:31  10      A.   I don't know what that has -- you know, I guess when
11:31  11  you get in the studio, anything can happen, you know.  Whether
11:31  12  they did, you know, I don't know.
11:31  13      Q.   Who wrote the melody that appears in the CD entitled
11:31  14  *South Padre Island*?
11:31  15      A.   I did.
11:31  16      Q.   Did Pelican West have any input in the melody of the
11:31  17  song -- to the music that appears on the song *South Padre*
11:31  18  *Island*?
11:31  19      A.   Yes.
11:31  20      Q.   Was it a joint effort between you and Pelican West?
11:31  21      A.   Yes.
11:31  22      Q.   Who wrote the harmony of the song *South Padre Island*?
11:31  23      A.   The harmony?
11:31  24      Q.   Yes, there's a melody and a harmony part, correct?
11:31  25  Or am I mistaken?

| | | |
|---|---|---|
| 11:31 | 1 | A.    There's a melody and it's -- harmonies are things |
| 11:31 | 2 | that are added in the studio. |
| 11:31 | 3 | Q.    Who decided to add the harmony to the song *South* |
| 11:31 | 4 | *Padre Island*? |
| 11:31 | 5 | A.    We all did. |
| 11:31 | 6 | Q.    Was it a joint effort? |
| 11:31 | 7 | A.    Yes. |
| 11:31 | 8 | Q.    Pelican West performed the song, correct? |
| 11:31 | 9 | A.    Yes. |
| 11:31 | 10 | Q.    Did you do any performance that appears on the CD, |
| 11:32 | 11 | the final CD of the song *South Padre Island*? |
| 11:32 | 12 | A.    I worked with the engineer. |
| 11:32 | 13 | Q.    Were you playing any instrument -- |
| 11:32 | 14 | A.    No. |
| 11:32 | 15 | Q.    -- singing or anything like that? |
| 11:32 | 16 | A.    No.  No. |
| 11:32 | 17 | Q.    Pelican West recorded the song, correct? |
| 11:32 | 18 | A.    Yes. |
| 11:32 | 19 | Q.    Who supplied the vocals for the song *South Padre* |
| 11:32 | 20 | *Island* that appears on the CD? |
| 11:32 | 21 | A.    Pam. |
| 11:32 | 22 | Q.    Who is Pam? |
| 11:32 | 23 | A.    Singer. |
| 11:32 | 24 | Q.    Who does she sing for? |
| 11:32 | 25 | A.    Pam.  Pam.  She's singer for Pelican West.  I think |

11:32   1    that's her.  Pam, yeah.

11:32   2         Q.    Pelican West supplied the vocals?

11:32   3         A.    Yes.  She did all the vocals.

11:32   4                  (Exhibit No. 2 marked.)

11:32   5         Q.    (By Mr. Garza:)  I'm going to hand you what's been

11:33   6    marked Deposition Exhibit No. 2.  Have you ever seen that

11:33   7    document before?

11:33   8         A.    Yeah.  This is back when I first -- first wrote it.

11:33   9         Q.    Can you tell me what Deposition Exhibit No. 2 is?

11:33  10         A.    It's a typed version of the song when I first wrote

11:33  11    it.

11:33  12         Q.    So Exhibit No. 2 contains a copy of the typewritten

11:33  13    lyrics to the song *South Padre Island*?

11:33  14         A.    Right.

11:33  15         Q.    And that -- the typing that appears in this document,

11:33  16    is that the same typing that you were referring to earlier

11:33  17    with respect to the lyrics you provided to Pelican West?

11:33  18         A.    Yeah.  Then there's some changes after this.

11:33  19         Q.    But you typed that document that's marked as Exhibit

11:33  20    2?

11:33  21         A.    I think so, yes.

11:33  22         Q.    The additional markings that are on the document

11:34  23    listed as Exhibit 1 --

11:34  24         A.    Uh-huh.

11:34  25         Q.    -- that appear to be made in pen or handwriting --

11:34  1        A.    Uh-huh.

11:34  2        Q.    -- that was done by somebody at Pelican West?

11:34  3        A.    It wasn't done by me.

11:34  4        Q.    So the only writing that you would have done on

11:34  5   Deposition Exhibit No. 2 would have been the actual

11:34  6   typewritten stuff; is that correct?

11:34  7        A.    Well, that's not -- that's not really correct.  We

11:34  8   changed -- we sat down and agreed on some of the lyrics

11:34  9   because originally the song was written as a commercial.

11:34  10       Q.    Who changed it from being a commercial?

11:34  11       A.    Damien and I both worked on it.  He put a lot of time

11:34  12  on it himself.

11:34  13       Q.    May I see it?  Do you know who made these markings

11:34  14  and handwriting?

11:34  15       A.    I do not.

11:34  16             MR. GARZA:  I'm going to hold the deposition up

11:34  17  to the one we have been referring to.  Thank you.

11:35  18       Q.    (By Mr. Garza:)  Whose idea was it to approach the

11:35  19  Town of South Padre Island with the song *South Padre Island*?

11:35  20       A.    That was a thing, that one of the aldermen heard me

11:35  21  playing it and singing it one day and he liked it and I told

11:35  22  him that when we got done with it I'd give him a CD, Pelican

11:35  23  West was going to record it.  And when we got finished with

11:35  24  it, I played it for him and they wanted me to bring it to a

11:35  25  town meeting.

| | | |
|---|---|---|
| 11:35 | 1 | Q.    Who's the alderman that heard you playing it? |
| 11:35 | 2 | A.    Doyle Wells. |
| 11:35 | 3 | Q.    Is he a friend of yours? |
| 11:35 | 4 | A.    Yeah, we know each other. |
| 11:35 | 5 | Q.    Do you consider him to be a friend? |
| 11:35 | 6 | A.    Yes. |
| 11:35 | 7 | Q.    And was he -- where did you play this for him? |
| 11:35 | 8 | A.    In my office on Padre Boulevard. |
| 11:35 | 9 | Q.    Did he just happen to stop by or were you all doing |
| 11:36 | 10 | business or something? |
| 11:36 | 11 | A.    He stopped by occasionally. |
| 11:36 | 12 | Q.    And did you specifically say, hey, let me show you |
| 11:36 | 13 | this song I wrote called *South Padre Island* and play it for |
| 11:36 | 14 | him? |
| 11:36 | 15 | A.    No, he asked me because he had heard it appraised. |
| 11:36 | 16 | Q.    Where had he heard it? |
| 11:36 | 17 | A.    It played it on the guitar for him. |
| 11:36 | 18 | Q.    Where? |
| 11:36 | 19 | A.    In the office. |
| 11:36 | 20 | Q.    Once you wrote it, did you just invite him over to |
| 11:36 | 21 | hear it or -- |
| 11:36 | 22 | A.    No, he was there one day and I was kind of proud of |
| 11:36 | 23 | it at that time because there had been a lot of attempts to |
| 11:36 | 24 | write the song *South Padre Island* and they all failed |
| 11:36 | 25 | miserably. |

11:36  1        Q.    Had you ever attempted to write a song for South

11:36  2    Padre Island before that time?

11:36  3        A.    No.

11:36  4        Q.    Who had?

11:36  5        A.    Oh, there's -- I can't recall now.  I looked it up on

11:36  6    the internet.  There's been several of them.

11:36  7        Q.    So Doyle Wells was in your office just on a personal

11:36  8    call?

11:36  9        A.    He just stopped by.

11:36  10       Q.    And you played the song for him.  This is before it

11:37  11   was actually reduced to a CD?

11:37  12       A.    Oh, yeah.

11:37  13       Q.    And what did he tell you after you finished playing?

11:37  14       A.    Loved it.

11:37  15       Q.    And how did it come about that the song was taken to

11:37  16   the Town of South Padre Island?  Whose idea was that?

11:37  17       A.    I was asked to bring it and we played it at a town

11:37  18   meeting.

11:37  19       Q.    Who asked you to bring it?

11:37  20       A.    Doyle did.  There was several people with him on that

11:37  21   occasion.

11:37  22       Q.    Who was with him?

11:37  23       A.    I can't recall who all.  Was friends of his.

11:37  24       Q.    Did you ask to be placed on an agenda at a town

11:37  25   meeting?

11:37    1        A.    I don't think I ever really asked.  I agreed.

11:37    2        Q.    You didn't make any oral request to be placed on the

11:37    3    agenda?

11:37    4        A.    I can't remember how that really transpired.  I think

11:38    5    I was asked to put it on the agenda.

11:38    6        Q.    It obviously got on the agenda for a town meeting,

11:38    7    correct?

11:38    8        A.    Right.

11:38    9        Q.    And my understanding is that the board of aldermen

11:38    10    meeting was held on April 18th, 2001, where the issue of

11:38    11    adopting that song as the town song was discussed; is that

11:38    12    correct?

11:38    13        A.    I'll take your word for the date.

11:38    14        Q.    Other than the date, is the rest of that correct?

11:38    15        A.    Yes.

11:38    16        Q.    Did you speak to the board of aldermen that day, the

11:38    17    day of the town meeting?

11:38    18        A.    No.

11:38    19        Q.    Did you make any type of presentation at the town

11:38    20    meeting where they were discussing whether or not to adopt

11:38    21    *South Padre Island* as the town song?

11:38    22        A.    Not at that meeting.  There was a previous meeting

11:39    23    where I played it for the entire audience.  There was an

11:39    24    audience that was a quite a crowd gathered and that I played

11:39    25    for them.

| | | |
|---|---|---|
| 11:39 | 1 | Q. How many meetings did you attend? |
| 11:39 | 2 | A. Two. |
| 11:39 | 3 | Q. So the first meeting you played it? |
| 11:39 | 4 | A. Uh-huh. Yes. |
| 11:39 | 5 | Q. And what did you do at the second meeting? |
| 11:39 | 6 | A. They voted on it. |
| 11:39 | 7 | Q. For the first meeting, were you on the agenda or did |
| 11:39 | 8 | you just appear and play it? |
| 11:39 | 9 | A. We just appeared and played it. |
| 11:39 | 10 | Q. Who appeared with you? |
| 11:39 | 11 | A. Trying to remember who was there. I set up the sound |
| 11:39 | 12 | system and played it to the crowd. |
| 11:39 | 13 | Q. Was it just you? |
| 11:39 | 14 | A. Uh-huh. Yes. |
| 11:39 | 15 | Q. Was it just -- I guess just your guitar, yourself? |
| 11:39 | 16 | A. No, no, no. |
| 11:39 | 17 | Q. Background music or -- |
| 11:39 | 18 | A. I didn't take my guitar. I played a CD. |
| 11:40 | 19 | Q. So by this time the song was already reduced to a CD |
| 11:40 | 20 | by Pelican West? |
| 11:40 | 21 | A. Yes. |
| 11:40 | 22 | Q. So at the first meeting when you showed the town the |
| 11:40 | 23 | song, you showed them the song as it was recorded on the CD by |
| 11:40 | 24 | Pelican West? |
| 11:40 | 25 | A. Correct. |

11:40  1     Q.    Was Pelican West present with you?

11:40  2     A.    No.

11:40  3     Q.    Did they know you were going to the town meeting?

11:40  4     A.    Yes.

11:40  5     Q.    They didn't voice any objection to you going to the

11:40  6   town meeting with the CD?

11:40  7     A.    No.

11:40  8     Q.    Were they happy about you going to the town meeting?

11:40  9     A.    They were thrilled.

11:40  10    Q.    It was something they wanted?

11:40  11    A.    Yes.

11:40  12    Q.    Was it something you wanted to do?

11:40  13    A.    Sure.  I thought it would be nice to have that as an

11:40  14   accolade, if you will.

11:40  15    Q.    Did anything else happen at the first meeting when

11:40  16   you played the song?

11:40  17    A.    Got standing ovation.

11:40  18    Q.    That's good to hear.

11:40  19          Once you were done playing, did anybody address

11:40  20   you or speak to you about it?

11:40  21    A.    No.

11:41  22    Q.    You don't know the date of that meeting?

11:41  23    A.    No, I do not.

11:41  24    Q.    The second meeting there was a vote that was held on

11:41  25   whether or not it was going to be a town song?

11:41  1      A.    Yes.

11:41  2      Q.    Do you know who asked for it to be a town song or be

11:41  3   named as the town song?

11:41  4      A.    It was on the agenda.

11:41  5      Q.    Do you know who placed that agenda item?

11:41  6      A.    Might have been Doyle Wells.

11:41  7      Q.    He liked it that much he wanted to try to make it a

11:41  8   town song?

11:41  9      A.    Yes.

11:41  10      Q.    What was your reaction when you found out that the

11:41  11   town wanted to make it a town song?

11:41  12      A.    They wanted to make it the official song, not the

11:41  13   town song.

11:41  14      Q.    The official song.  I apologize.  What was your

11:41  15   reaction to that?

11:41  16      A.    I was kind of impressed with it.

11:41  17      Q.    What was the ruling of the board?

11:41  18      A.    Five in favor of.

11:41  19      Q.    And what -- the resolution was to actually adopt the

11:41  20   song as the official town song, correct?

11:41  21      A.    Yes.

11:41  22      Q.    I'm assuming you were pleased with that decision?

11:42  23      A.    Yes, I was.

11:42  24      Q.    And what did you -- what did you -- what did you

11:42  25   foresee by the adopting of the song by the town?

11:42  1          A.    I thought it had a long life expectancy in front of

11:42  2    it.

11:42  3          Q.    You never asked the town for any money associated

11:42  4    with this song, correct?

11:42  5          A.    No, I did not.  I do not sell my songs.

11:42  6          Q.    Certainly voiced no objection to the town adopting

11:42  7    the song as the official town song?

11:42  8          A.    As the official town song.

11:42  9          Q.    What did you think the town was going to do with that

11:42  10   song after they adopted it?

11:42  11         A.    Well, I think the opportunities are endless, if done

11:42  12   correctly.

11:42  13         Q.    What did you think the town was going to do with that

11:42  14   song, though?  What was your --

11:43  15         A.    I thought.

11:43  16         Q.    Once they adopted it, what were they going to do with

11:43  17   it?

11:43  18         A.    I thought that we could reach a royalty arrangement

11:43  19   where they could have it on their own music, on the internet,

11:43  20   use it in commercials.

11:43  21         Q.    But you never approached the town with a royalty

11:43  22   proposal or anything like that, correct?

11:43  23         A.    Nobody ever discussed it with me.

11:43  24         Q.    You didn't discuss it with anybody at the town,

11:43  25   correct?

11:43  1      A.    No.

11:43  2      Q.    That's a correct statement?

11:43  3      A.    I never discussed it with anybody at the town?

11:43  4      Q.    Yes.

11:43  5      A.    I think early on, back before it was made the

11:43  6   official town song, that I had a short brief discussion with

11:43  7   Dan Quant (sic).

11:43  8      Q.    But you never approached anybody at the town with

11:43  9   respect to negotiating some type of royalty agreement or

11:43  10  purchase of your song?

11:43  11     A.    No.

11:44  12     Q.    One of the allegations you have in this lawsuit is

11:44  13  that you heard an illegally reproduced CD of that song,

11:44  14  correct?

11:44  15     A.    Correct.

11:44  16     Q.    Could you explain that allegation for me, please?

11:44  17          MR. CHEATHMAN:  Repeat the question, please.

11:44  18          MR. GARZA:  We didn't catch that.

11:44  19          MR. CHEATHMAN:  Please repeat.

11:44  20          MR. GARZA:  Yes.  I'm asking him to please

11:44  21  explain the allegation that he heard an illegally reproduced

11:44  22  CD of the song.

11:44  23          MR. CHEATHMAN:   I don't understand the

11:44  24  question.

11:44  25     Q.    (By Mr. Garza:)  You can answer, sir.

11:44  1      A.   Oh.  My son, who run our computer business on the
11:44  2  Island, brought in a CD and he said that he had gotten it from
11:44  3  a Stan who's up at in Toucan Graphics and said, I think this
11:45  4  is a CD with your song on it.  And I said, really?  And he
11:45  5  said yes.  And we played it.
11:45  6      Q.   And how was it illegally reproduced?
11:45  7      A.   I never gave anybody permission to do that.  Not only
11:45  8  illegally produced without my knowledge, it had a video on it.
11:45  9      Q.   Do you still have a copy of that CD?
11:45  10      A.   Yes, we do.
11:45  11      Q.   What is that CD called?
11:45  12      A.   I think it's *Where the Texans Kick Their Boots Off* or
11:45  13  something like that.  Mr. Cheathman has a copy of it in his
11:45  14  office.
11:45  15      Q.   Okay.  So other than the fact that the song *South*
11:45  16  *Padre Island* was incorporated into a CD that contains some
11:46  17  video on it --
11:46  18      A.   Right.
11:46  19      Q.   -- is there anything else that you are contending was
11:46  20  illegally done by someone at the Town of South Padre Island?
11:46  21      A.   Well, after I did the research and found that they
11:46  22  made thirty-five hundred copies of them after they told me
11:46  23  they did not, that to me is illegal.
11:46  24      Q.   Who told you that thirty-five hundred copies of the
11:46  25  CD was being made?

| | | |
|---|---|---|
| 11:46 | 1 | A.   It's pretty common knowledge. |
| 11:46 | 2 | Q.   I'm sorry.  Who told you that they were not making -- |
| 11:46 | 3 | A.   Dan Quant. |
| 11:46 | 4 | Q.   -- copies of the CD? |
| 11:46 | 5 | A.   Dan Quant. |
| 11:46 | 6 | Q.   You had a conversation with Dan Quant about -- the CD |
| 11:46 | 7 | you're referring to, is it the visitors guy CD you're talking |
| 11:46 | 8 | about? |
| 11:46 | 9 | A.   It's the one where *Texas Texans Kick Their Boots Off*. |
| 11:46 | 10 | Q.   You had a conversation with Mr. Quant about that CD? |
| 11:47 | 11 | A.   Yes. |
| 11:47 | 12 | Q.   What was that conversation? |
| 11:47 | 13 | A.   I told him it's a poor quality and I don't want that |
| 11:47 | 14 | distributed to anybody.  Because I had just gotten a call from |
| 11:47 | 15 | Damien of Pelican West and he was screaming at me, because he |
| 11:47 | 16 | just heard it, too. |
| 11:47 | 17 | Q.   Why was he screaming at you? |
| 11:47 | 18 | A.   Because of the quality. |
| 11:47 | 19 | Q.   He was blaming you for the quality? |
| 11:47 | 20 | A.   He wanted to why I -- how I let that happen.  I said |
| 11:47 | 21 | I didn't have anything to do with it.  I said today is the |
| 11:47 | 22 | first thing I knew about it. |
| 11:47 | 23 | Q.   So Damien was voicing objections as to the quality of |
| 11:47 | 24 | the song as it appeared on that CD? |
| 11:47 | 25 | A.   Yes. |

11:47  1    Q.  And you were obviously voicing objections to the

11:47  2    quality of the song?

11:47  3    A.  Yes, I did.

11:47  4    Q.  Was there anything other than the quality of the song

11:47  5    as it appeared on that CD that you were having a problem with?

11:47  6    A.  Well, you have to understand when you put a CD in to

11:47  7    play and you give it a little volume and it starts distorting,

11:47  8    that's from overcompression from -- of a CD that's made from a

11:48  9    copy.

11:48  10   Q.  Okay.

11:48  11   A.  And it's -- makes a disservice to the whole song and

11:48  12   the whole effort.

11:48  13   Q.  So other than that criticism you have with respect to

11:48  14   the reproduction of that song, is there anything else that

11:48  15   you're alleging was done illegally by the Town of South Padre

11:48  16   Island?

11:48  17   A.  I don't think I have made any other accusation.

11:48  18   Q.  If that reproduction on the visitors guide CD had

11:48  19   come out nicely, if it had been -- if it sounded as good as it

11:48  20   sounds on the original CD, would you consider that to be

11:48  21   illegal conduct?

11:48  22   A.  Yes, I would.

11:48  23   Q.  Why?

11:48  24   A.  Because they did not discuss it with me, it's my

11:48  25   song, my lyrics, for sure, and thirty-five hundred copies?

11:49  1    Huh-uh.

11:49  2        Q.   Why were you upset about it?

11:49  3        A.   Because they did it without anybody knowing about it.

11:49  4        Q.   Did you want your song to be spread and heard?

11:49  5        A.   Sure.  But I would like some royalty rates off of it

11:49  6    or something.

11:49  7        Q.   You're upset because you weren't generating any

11:49  8    revenue for the distribution of these CDs?

11:49  9        A.   I'm upset today.

11:49  10       Q.   That was the basis of your complaint?

11:49  11       A.   Yes.

11:49  12       Q.   When did you first hear that, that CD, the visitors

11:49  13   guide CD?

11:49  14       A.   I think it approximately was around the first of

11:49  15   September in 2001.

11:49  16       Q.   What did you do after you heard it?

11:49  17       A.   I called Dan Quant -- well, not immediately because I

11:49  18   sat there and I fumed for a little bit, then I called him.

11:49  19   But in the meantime Damian from Pelican West called me.

11:50  20       Q.   And what did you talk to Mr. Quant about?

11:50  21       A.   I told him it was terrible quality.

11:50  22       Q.   What else did you tell him?

11:50  23       A.   Well, he indicated to me that they only made like a

11:50  24   few copies.  And I said, well, I don't want that copy

11:50  25   distributed to anybody, and I said, Damien has already called

11:50   1    me, he's upset, too.

11:50   2        Q.    What else did you all talk about?

11:50   3        A.    That's kind of it.

11:50   4        Q.    Did he tell you anything else?

11:50   5        A.    Not that I can recall.

11:50   6        Q.    That was the entirety of the substance of that

11:50   7    conversation?

11:50   8        A.    Best I can remember.

11:50   9        Q.    Where were you when you heard it?

11:50  10        A.    In my office.

11:50  11        Q.    Was that the only time you have told Dan Quant to

11:50  12    stop distribution of this visitors guide CD when you were

11:50  13    talking to him on the telephone?

11:51  14        A.    Yes.

11:51  15        Q.    Did you tell anybody else at the city to stop

11:51  16    distributing this visitors guide CD?

11:51  17        A.    No.

11:51  18        Q.    What did the town do after you made that phone call?

11:51  19        A.    Nothing.

11:51  20        Q.    Did they continue to distribute the CD?

11:51  21        A.    Yeah.   In October -- in October they passed out fifty

11:51  22    press packets at the Lantern Grill at a media dinner.   They

11:51  23    passed -- excuse me, out to the press.

11:51  24        Q.    Were you present?

11:51  25        A.    No.

11:51  1       Q.    How do you know that occurred?

11:51  2       A.    A reporter from Valley Morning Star called me and

11:51  3    said the CD stunk.

11:51  4       Q.    Who is that?

11:51  5       A.    Mark Milam.

11:52  6       Q.    Is he a friend of yours?

11:52  7       A.    He's an acquaintance.

11:52  8       Q.    Are those the terms he used to describe that CD to

11:52  9    you?

11:52  10      A.    Yeah.

11:52  11      Q.    What exactly did he tell you?

11:52  12      A.    He said he played the CD and it sucked.  That's

11:52  13   exactly what he said.

11:52  14      Q.    And he was talking about the visitors guide CD?

11:52  15      A.    That's the one they pressed and passed out.

11:52  16      Q.    That's the one he was referring to in the

11:52  17   conversation?

11:52  18      A.    Yes.

11:52  19      Q.    Have you ever had any disputes with Dan Quant other

11:52  20   than the dispute associated with this visitors guide CD?

11:52  21      A.    Disputes, no.  Have I been critical of him?  Yes.

11:52  22      Q.    How have you been critical of him?

11:52  23      A.    Of the operation in general out there.

11:52  24      Q.    Operation of what?

11:52  25      A.    Of the convention center.

11:52  1      Q.   What are your criticisms of Mr. Quant?

11:52  2      A.   I'm not alone in that now.

11:52  3               MR. GARZA:   Objection; nonresponsive.

11:52  4      Q.   (By Mr. Garza:)   What are your criticisms of

11:53  5  Mr. Quant?

11:53  6      A.   I think that he's a poor businessman.

11:53  7      Q.   How so?

11:53  8      A.   Well, I mean the Island pretty well speaks for

11:53  9  itself.

11:53  10      Q.   Explain.

11:53  11      A.   No business.

11:53  12      Q.   What has Mr. Quant done that you -- that you're

11:53  13  critical of?

11:53  14      A.   There's been a few things along, he gave away fifty

11:53  15  wristbands to Garth Brooks' concert to a known drug dealer.

11:53  16      Q.   Who's that?

11:53  17      A.   I don't know.  He's in Alabama in jail now.

11:53  18      Q.   What's the name of the known drug dealer?

11:53  19      A.   His name was -- he worked at the Paradise.  That's

11:54  20  been quite a while ago.

11:54  21      Q.   You don't remember this gentleman's name?

11:54  22      A.   I can come up with it.

11:54  23      Q.   How?

11:54  24      A.   I'll ask somebody on the Island, they'll help me.

11:54  25      Q.   But you don't know it today?

49

11:54  1      A.    Not right now, no.

11:54  2      Q.    How do you know he distributed fifty wristbands to

11:54  3   this person?

11:54  4      A.    Because he came in and wanted us to sell them on the

11:54  5   internet for him.

11:54  6      Q.    Who did?

11:54  7      A.    He did.  The conversation he had was with my son.

11:54  8      Q.    Okay.  When you say he, who are you talking about?

11:54  9      A.    This guy that they came and hauled back to Alabama.

11:54  10     Q.    So the drug dealer came and had a conversation with

11:54  11  your son?

11:54  12     A.    Wanting him to sell the wristbands on the internet

11:54  13  and my son did sell one of them.  When I found out about it, I

11:54  14  stopped it.  And I asked this -- sorry I can't remember his

11:55  15  name, he's just not somebody I socialize with.  But I asked

11:55  16  him where he got them.  He said from Dan Quant.

11:55  17     Q.    How did he acquire them?

11:55  18     A.    I don't know.

11:55  19     Q.    So you don't know whether or not he purchased them or

11:55  20  not?

11:55  21     A.    No, he didn't purchase them.

11:55  22     Q.    You know that for a fact?

11:55  23     A.    Well, maybe he did, I don't know.  Maybe he purchased

11:55  24  them.  I don't know, I can't say.

11:55  25     Q.    You don't know one way or the other?

11:55  1    A.    I disagreed with him for the fact, you know, our

11:55  2  bridge had been down for a long time and Garth Brooks was

11:55  3  putting on a concert, it was free, but you had to have a

11:55  4  wristband to get there.  And it was fifty people, you know.

11:55  5    Q.    A moment ago you said that he -- are you implying

11:55  6  that Mr. Quant did anything that's criminal?

11:55  7    A.    I'm not implying anything criminal.

11:55  8    Q.    So what was wrong about Mr. Quant if he did give

11:56  9  fifty wristbands away to somebody, what did you find critical

11:56  10  of that?

11:56  11    A.    Well, because people had to, through CBS's promotion,

11:56  12  they had to go through their local affiliates and do all

11:56  13  the -- dance through all the hoops to get one of these

11:56  14  wristbands.  They were very valuable.  One of them I think

11:56  15  brought four hundred on the internet.

11:56  16    Q.    Who was selling them on the internet?

11:56  17    A.    My son sold one.

11:56  18    Q.    Did you find any criticism with the fact that your

11:56  19  son was selling these bands on the internet?

11:56  20    A.    If I had any criticisms?

11:56  21    Q.    Uh-huh.

11:56  22    A.    I told him it was illegal, he couldn't could it.

11:56  23    Q.    Do you know of anybody that sold wristbands?

11:56  24    A.    No.

11:56  25    Q.    What other criticisms do you have of Mr. Quant?

| | | |
|---|---|---|
| 11:56 | 1 | A.   What I just said, poor businessman. |
| 11:56 | 2 | Q.   Any other specific examples of him being a poor |
| 11:56 | 3 | businessman that you can identify? |
| 11:56 | 4 | A.   Well, go look at the town right now. |
| 11:56 | 5 | Q.   What's your specific criticism of Mr. Quant, if you |
| 11:57 | 6 | have them? |
| 11:57 | 7 | A.   Fifty-two thousand dollar ads in Texas Monthly.  I |
| 11:57 | 8 | was on the convention visitors bureau board -- |
| 11:57 | 9 | THE REPORTER:  Sir, I'm having trouble |
| 11:57 | 10 | understanding you. |
| 11:57 | 11 | THE WITNESS:  Okay.  Where were you? |
| 11:57 | 12 | THE REPORTER:  I was having trouble. |
| 11:57 | 13 | THE WITNESS:  Get everything now? |
| 11:57 | 14 | THE REPORTER:  No.  I was having trouble |
| 11:57 | 15 | something. |
| 11:57 | 16 | Q.   (By Mr. Garza:)  Fifty-two thousand dollars in ads |
| 11:57 | 17 | for Texas Monthly? |
| 11:57 | 18 | A.   One ad. |
| 11:57 | 19 | Q.   What was that for? |
| 11:57 | 20 | A.   The Radisson Resort. |
| 11:57 | 21 | Q.   And why were you critical of it? |
| 11:57 | 22 | A.   Because it only included -- in the advertising it |
| 11:57 | 23 | only included a couple of hotels. |
| 11:57 | 24 | Q.   Did the board approve that? |
| 11:57 | 25 | A.   We're not a board that has to approve; we were an |

11:58   1   advisory board.

11:58   2        Q.   Did the board approve that ad?

11:58   3        A.   Doesn't need my approval.

11:58   4        Q.   So they didn't address the issue whether or not that

11:58   5   ad would go forward?

11:58   6        A.   No, we're an adviser board.  He does it on his own.

11:58   7        Q.   Did anybody on the advisory board voice criticism of

11:58   8   that?

11:58   9        A.   Everybody did.

11:58   10       Q.   Did any support the ad?

11:58   11       A.   I would say that Bill Donahue did.  He's -- he's one

11:58   12   of the owners of the Radisson.

11:58   13       Q.   He's on the board?

11:58   14       A.   Uh-huh.

11:58   15       Q.   Yes or no?

11:58   16       A.   Yes.

11:58   17       Q.   When did that ad come out?

11:58   18       A.   Last year.

11:58   19       Q.   Any other specific criticisms of Mr. Dan Quant?

11:59   20       A.   I think I have covered it.

11:59   21       Q.   Did Mr. Dan Quant ever have a dispute with your son?

11:59   22       A.   No, not really.

11:59   23       Q.   Did your son ever work for Mr. Quant?

11:59   24       A.   Yes.

11:59   25       Q.   When was that?

| | | |
|---|---|---|
| 11:59 | 1 | A. 2001, I believe. 2000 and 2001. |
| 11:59 | 2 | Q. What was his position? |
| 11:59 | 3 | A. He didn't work for him. He did computer work for |
| 11:59 | 4 | him. |
| 11:59 | 5 | Q. Was he contracted or employed? |
| 11:59 | 6 | A. Contracted. |
| 11:59 | 7 | Q. Did your son lose that contract at some point in |
| 11:59 | 8 | time? |
| 11:59 | 9 | A. No. Dan took bids for computers from other companies |
| 12:00 | 10 | and didn't include my son. |
| 12:00 | 11 | MR. CHEATHMAN: Excuse me just for a second. |
| 12:00 | 12 | Can you tell me what this has to do with the copyright? |
| 12:00 | 13 | MR. GARZA: He's criticizing -- well, actually |
| 12:00 | 14 | I'm just asking questions, conducting discovery, counsel. |
| 12:00 | 15 | MR. CHEATHMAN: All right. |
| 12:00 | 16 | Q. (By Mr. Garza:) You can continue, sir. |
| 12:00 | 17 | A. They didn't include him in the bid. Anything over |
| 12:00 | 18 | twenty-five thousand dollars had to go out for bids, so -- and |
| 12:00 | 19 | it was in excess of that, but my son managed to create this |
| 12:00 | 20 | job in -- |
| 12:00 | 21 | Q. Did your son have a company? |
| 12:00 | 22 | A. Paradise Computers. |
| 12:00 | 23 | Q. Where is your son now? |
| 12:00 | 24 | A. San Antonio. |
| 12:00 | 25 | Q. Was he in San Antonio working out of San Antonio at |

| | | |
|---|---|---|
| 12:00 | 1 | that time? |
| 12:00 | 2 | A.   NO. |
| 12:00 | 3 | Q.   He was based here in the Valley? |
| 12:00 | 4 | A.   On the Island. |
| 12:01 | 5 | Q.   Have you ever been involved in a lawsuit before? |
| 12:01 | 6 | A.   I was in a class action lawsuit was the only one I |
| 12:01 | 7 | was ever in.  It was over the census. |
| 12:01 | 8 | Q.   As a plaintiff, I would take it? |
| 12:01 | 9 | A.   Yes. |
| 12:01 | 10 | Q.   Any other lawsuits? |
| 12:01 | 11 | A.   Nope.  No. |
| 12:01 | 12 | Q.   Your driver's license, you said you have a Texas |
| 12:01 | 13 | driver's license? |
| 12:01 | 14 | A.   Yes. |
| 12:01 | 15 | Q.   Currently, correct? |
| 12:01 | 16 | A.   Yes. |
| 12:01 | 17 | Q.   And that's in your car downstairs? |
| 12:01 | 18 | A.   Yes. |
| 12:01 | 19 | Q.   Is that the same license you held for several years? |
| 12:01 | 20 | A.   For four -- ever since I have been in Texas. |
| 12:01 | 21 | Q.   Okay. |
| 12:01 | 22 |        MR. GARZA:  Counsel, can we agree just give us a |
| 12:01 | 23 | copy of that have at your earliest convenience? |
| 12:01 | 24 |        MR. CHEATHMAN:  Sure. |
| 12:01 | 25 |        MR. GARZA:  That way he doesn't have to go |

12:01  1    downstairs and get it now.

12:01  2              MR. CHEATHMAN:  That's fine.  It's twelve

12:01  3    o'clock.  What are you going to do about --

12:01  4              MR. GARZA:  I'm almost finished up here,

12:02  5    personally.  I'd like to go off the record and look at my

12:02  6    notes.

12:02  7              MR. CHEATHMAN:  All right.

12:02  8              MR. GARZA:  We can just take a quick break and

12:02  9    go off the record.

12:06  10             (Short recess.)

12:06  11        Q.   (By Mr. Garza:)  Mr. Graham, have you ever been

12:06  12   arrested, sir?

12:06  13        A.   No.

12:07  14        Q.   Have you been convicted of a crime involving theft or

12:07  15   dishonesty?

12:07  16        A.   No.

12:07  17        Q.   And I have to ask that as part of my discovery.  I

12:07  18   apologize.

12:07  19             Have you understood my questions here today?

12:07  20        A.   Yes.

12:07  21        Q.   And if at any time you did not understand one of my

12:07  22   questions here today, did you make it known to me that you did

12:07  23   not understand it before you answered?

12:07  24        A.   I believe I did.

12:07  25             MR. GARZA:  Thank you.  I'll pass the witness.

12:07  1              MR. RODRIGUEZ:  I'm going to reserve my

12:07  2   questions.

12:07  3              MR. GARZA:  Donald?

12:07  4              MR. CHEATHMAN:  We reserve.

12:07  5              MR. GARZA:  All right.  Thank you.

       6

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

GARY GRAHAM - ERRATA SHEET

Reasons for changes:     (1) Clarify the record
                         (2) Conform to the facts
                         (3) Correct transcription errors

| PAGE | LINE | CHANGE FROM/CHANGE TO | REASON |
|------|------|----------------------|--------|
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |
| ____ | ____ | _____ | ___ |

1

2

3 _____

    GARY GRAHAM

4

5 SIGNATURE OF GARY GRAHAM

6

7        I have read the foregoing transcript of my

8 deposition and it is a true and accurate record of my

9 testimony given on November 3, 2003, except as to any

10 corrections I have listed on page 56 herein.

11

12

13 _____

    GARY GRAHAM

14 THE STATE OF _____

15 COUNTY OF _____

16        SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _____ day of

17 _____, 2003.

18

19 _____

    Notary Public in and for
20 The State of Texas

21 My commission expires:

22 _____

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GARY GRAHAM                        )(
                                   )(
            vs.                    )( CASE NO. B-03-084
                                   )(
TOWN OF SOUTH PADRE ISLAND and)(
HARVEST MULTIMEDIA, INC.       )(

REPORTER'S CERTIFICATE

I, THURMAN J. MOODY, Certified Shorthand Reporter, certify that the witness, GARY GRAHAM, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on November 3, 2003; that the deposition was reported by me in Stenographic shorthand and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on November _____, 2003.

_____
THURMAN J. MOODY, CSR NO. 2861
Expiration Date: 12/31/03

Pockrus Court Reporting Service
Firm Registration No. _____
Post Office 531786
Harlingen, Texas 78553
1-800-423-7713 (Toll Free)

SOUTH PADRE ISLAND, BY GARY GRAHAM, 8/23/00

ITS BEEN ABOUT A YEAR OR SO

I HEARD A SONG ON THE RADIO

THEY WERE TALKING ABOUT THE BEACHES

ON THE GULF OF MEXICO

IF YOU WANT TO GET AWAY MY FRIEND

THE TIP OF TEXAS IS WHERE IT BEGINS

I LOOKED AROUND AT THE SNOW AND ICE

YOU KNOW I REALLY DIDN'T HAVE TO THINK TWICE

CHORUS

THE BEACHES THE BEAUTY ARE BEYOND COMPARE

I DON'T CLOSE MY EYES I WON'T DARE

I LOOK AROUND I CAN'T STOP SMILIN'

'CAUSE HERE I AM ON SOUTH PADRE ISLAND

THESE FANCY HOTELS THAT DEMAND A STARE

DON'T EVER THINK THAT I DON'T CARE

THE FOOD TASTES LIKE ITS HEAVEN SENT

IT'S ALL BEEN WORTH IT FOR WHAT I'VE SPENT

copy right    august 2000    ASCAP



EXHIBIT NO. 2
T. MOODY



# CERTIFICATE OF REGISTRATION

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

**REGISTER OF COPYRIGHTS**
United States of America

OFFICIAL SEAL

**SHORT FORM PA** 
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

PA 1-041-851

Effective Date of Registration

3/26/01

Application Received
MAR 26 2001
Deposit Received
One MAR 26 2001 Two
Fee Received

---

**TYPE OR PRINT IN BLACK INK. DO NOT WRITE ABOVE THIS LINE.**

| | | |
|---|---|---|
| **Title of This Work:** Alternative title or title of larger work in which this work was published: | **1** | SOUTH PADRE ISLAND |
| **Name and Address of Author and Owner of the Copyright:** Nationality or domicile; Phone, fax, and email: | **2** | GARY D. GRAHAM P.O. BOX 3655 SOUTH PADRE ISLAND, TX 78597<br><br>Phone (956) 761-8599    Fax (956) 548-0556<br>Email: dgraham@starband.net |
| **Year of Creation:** | **3** | 2000 |
| **If work has been published, Date and Nation of Publication:** | **4** | a. Date March ⎯ 12 ⎯ 2001 (Month, day, and year all required)<br> Month   Day   Year<br>b. Nation UNITED STATES |
| **Type of Authorship in This Work:** Check all that this author created. | **5** | ☐ Music  ☐ Other text (includes dramas, screenplays, etc.)<br>☑ Lyrics  (If your work is a motion picture or other audiovisual work, use the Standard Form PA.) |
| **Signature:** (Registration cannot be completed without a signature.) | **6** | I certify that the statements made by me in this application are correct to the best of my knowledge.* Check one:<br>☑ Author<br>☐ Authorized agent   X _____ |

**COPY**

| | | |
|---|---|---|
| OPTIONAL **Name and Address of Person to Contact for Rights and Permissions:** Phone, fax, and email: | **7** | ☑ Check here if same as #2 above.<br><br>Phone ( )    Fax ( )<br>Email: |

EXHIBIT NO. 1
T. MOODY

---

| **8** Certificate will be mailed in window envelope to this address: | Name ▼ GARY GRAHAM<br>Number/Street/Apt ▼ P.O. BOX 3655<br>City/State/ZIP ▼ SOUTH PADRE ISLAND, TX 78597 | **9** Deposit Account #_____<br>Name _____<br>_____<br>_____<br>DO NOT WRITE HERE    Page 1 of ___ pages |
|---|---|---|

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
June 1999—100,000
WEB REV: June 1999
PRINTED ON RECYCLED PAPER
☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/51

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GARY GRAHAM §
        Plaintiff, §
§      CIVIL ACTION NO. B-03-084
VS. §
§      (JURY REQUESTED)
§
TOWN OF SOUTH PADRE ISLAND §
and HARVEST MULTIMEDIA, INC. §
        Defendant. §

## AFFIDAVIT OF DAMION GIACCHINO

STATE OF TEXAS §
§
COUNTY OF CAMERON §

    COMES NOW, Damion Giacchino, an individual personally known to me who duly deposed, and sworn under oath stated follows:

1.    My name is Damion Giacchino. I am over 18 years of age and I have personal knowledge of the matters stated herein, and they are true and correct.

2.    My band's name is Pelican West. Gary Graham approached me and the band Pelican West with lyrics to a song he called "South Padre Island". Gary had written the lyrics to the song and wanted Pelican West's help in putting music to it, performing it, and recording it.

3.    Pelican West holds the copyright to the music of the song "South Padre Island". Gary Graham holds a copyright to the lyrics of the song "South Padre Island". Gary Graham provided the original lyrics to the song. I changed some of the original lyrics to the song, added new lyrics I had written, and incorporated them into the song with some of the original lyrics written by Gary Graham.

4.    Pelican West provided the music and song arrangement for the song "South Padre Island" as it appears in the finished product. The finished product was reduced to a compact disc at Pelican West's expense. Pelican West incurred all expenses for the production of the song "South Padre Island". The song "South Padre Island" is a combination of lyrics written by Gary Graham, lyrics written by Pelican West, music written by Pelican West, and a musical arrangement prepared by Pelican West. The song was recorded using Pelican West's instruments, vocals, and members.

5.    I, the band Pelican West, and Gary Graham were very happy and excited about the fact that



EXHIBIT

B

the Town of South Padre Island chose to adopt the song "South Padre Island" as their official town song.

6.    I did not know that the Town was going to include the song "South Padre Island" onto its visitor's guide cd-rom and did not find out about it until after the cd-roms were created. However, I never voiced or had any opposition to the Town using the song "South Padre Island" on their visitor's guide cd-rom. Pelican West never voiced or had any opposition to the Town using the song "South Padre Island" on their visitor's guide cd-rom. I do not feel that the Town of South Padre Island illegally used the song "South Padre Island" in their visitor's guide cd-rom. Pelican West does not feel that the Town of South Padre Island illegally used the song "South Padre Island" in their visitor's guide cd-rom.

7.    I never asked the Town of South Padre Island for any payment or royalties associated with the song "South Padre Island". Pelican West never asked the Town of South Padre Island for any payment or royalties associated with the song "South Padre Island".

8.    Both myself and Pelican West expected that the Town would use the song and play the song since it was the "official town song". However, we did not like the quality of the reproduction as it appeared on the visitor's guide cd-rom. My only criticism with respect to the use of the song by the Town of South Padre Island is that the visitor's guide cd-rom featuring the song was of poor quality. Pelican West's only criticism with respect to the use of the song by the Town of South Padre Island is that the visitor's guide cd-rom featuring the song was of poor quality.

9.    If the reproduction of the song on the visitor's guide cd-rom had been of a quality that Pelican West approved of, Pelican West would have been happy that the Town was going to be distributing these cd-roms to the public. After considering that the reproduction of the song on the visitor's guide cd-rom was of poor quality, Pelican West decided that a good way to resolve the situation was to re-do the visitor's guide cd-rom so that the credits and re-production of the song were acceptable by Pelican West.

Further affiant sayeth not.

Damion Giacchino

SUBSCRIBED AND SWORN TO BEFORE ME, on the 8th day of December, 2003, to certify which witness my hand and official seal.

Sue D. Britton
Notary Public, State of Texas
My Commission Expires
OCTOBER 16, 2004

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS



# CERTIFICATE OF REGISTRATION

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
United States of America

OFFICIAL SEAL

**SHORT FORM PA** 
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

PA 1 - 041 - 851

Effective Date of Registration
**3/26/01**

Application Received
MAR 26 2001

Deposit Received
One  MAR 26 2001  Two

Fee Received

Examined By

Correspondence ☐

---

**TYPE OR PRINT IN BLACK INK. DO NOT WRITE ABOVE THIS LINE.**

| | | |
|---|---|---|
| **Title of This Work:**<br><br>Alternative title or title of larger work in which this work was published: | **1** | SOUTH PADRE ISLAND |
| **Name and Address of Author and Owner of the Copyright:**<br><br>Nationality or domicile:<br>Phone, fax, and email: | **2** | GARY D. GRAHAM<br>P.O. BOX 3655<br>SOUTH PADRE ISLAND, TX 78597<br><br>Phone (956   )761-8599          Fax ( 956   ) 548-0556<br>Email: dgraham@starband.net |
| **Year of Creation:** | **3** | 2000 |
| **If work has been published, Date and Nation of Publication:** | **4** | a. Date  March          12        2001    *(Month, day, and year all required)*<br>         Month          Day      Year<br>b. Nation  UNITED STATES |
| **Type of Authorship in This Work:**<br>Check all that this author created. | **5** | ☐ Music    ☐ Other text (includes dramas, screenplays, etc.)<br>☑ Lyrics    *(If your work is a motion picture or other audiovisual work, use the Standard Form PA.)* |
| **Signature:**<br>(Registration cannot be completed without a signature.) | **6** | *I certify that the statements made by me in this application are correct to the best of my knowledge.* Check one:<br>☑ Author<br>☐ Authorized agent   X _____ |
| **Name and Address of Person to Contact for Rights and Permissions:**<br><br>Phone, fax, and email: | **7** | ☑ Check here if same as #2 above.<br><br>Phone (        )          Fax (        )<br>Email: |

OPTIONAL

**EXHIBIT**

C

ALL-STATE LEGAL

---

| | | |
|---|---|---|
| **8**<br>Certificate will be mailed in window envelope to this address: | Name ▼<br>GARY GRAHAM<br>Number/Street/Apt ▼<br>P.O. BOX 3655<br>City/State/ZIP ▼<br>SOUTH PADRE ISLAND, TX 78597 | **9** Deposit Account # _____<br>Name _____<br><br><br><br>DO NOT WRITE HERE    Page 1 of ___ pages |

Complete this space only if you currently hold a Deposit Account in the U.S. Copyright Office.

*17 U.B.C. § 506(e). Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
June 1999—100,000
WEB REV: June 1999

☺ PRINTED ON RECYCLED PAPER

☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/51

# CERTIFICATE OF REGISTRATION



OFFICIAL SEAL

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE



PA 1-042-583

EFFECTIVE DATE OF REGISTRATION

1 0 APR 2001

Month   Day   Year

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** TITLE OF THIS WORK ▼

SOUTH PADRE ISLAND

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See Instructions

WORDS & MUSIC

**2**

**a** NAME OF AUTHOR ▼ DAMION Giacchino

DATES OF BIRTH AND DEATH
Year Born ▼ 1960   Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[X] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? [ ] Yes [ ] No
Pseudonymous? [ ] Yes [ ] No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed ▼
MUSIC AND VOCAL MELODY

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[ ] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? [ ] Yes [ ] No
Pseudonymous? [ ] Yes [ ] No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[ ] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? [ ] Yes [ ] No
Pseudonymous? [ ] Yes [ ] No
If the answer to either of these questions is "Yes," see detailed instructions

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed ▼

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2001 ◀ Year

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ MARCH   Day ▶ 12   Year ▶ 2001   USA ◀ Nation

**4** COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
DAMION Giacchino
500 PADRE BLVD #4309
S.P.I., TX 78597

APPLICATION RECEIVED
APR 10 2001
ONE DEPOSIT RECEIVED
APR 10 2001
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

See instructions before completing this space

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.

DO NOT WRITE HERE
Page 1 of 2 pages

**EXHIBIT**

D

ALL-STATE LEGAL®

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for the work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a ☐ This is the first published edition of a work previously registered in unpublished form.

b ☐ This is the first application submitted by this author as copyright claimant.

c ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION**  Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation

**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

See instructions before completing this space

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

**Name** ▼          **Account Number** ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name / Address / Apt / City / State / ZIP ▼

b

DAMION GIACCHINO
500 PADRE BLVD #4309
S.P.I., TX 78597

Area code and daytime telephone number ▶ (956) 761-7311          Fax number ▶ (    )

Email ▶ PELICANWEST2000@aol.com

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▶ { ☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

DAMION GIACCHINO          Date ▶ APRIL 2, 2001

Handwritten signature (X) ▼

x  Damion Giacchino

Mail certificate to:

**Name** ▼
DAMION GIACCHINO

**Number/Street/Apt** ▼
500 PADRE BLVD #4309

**City/State/ZIP** ▼
SOUTH PADRE ISLAND, TX 78597

Certificate will be mailed in window envelope

**9**

• Complete all necessary spaces
• Sign your application in space 8

1. Application form
2. Nonrefundable $30 filing fee in check or money order payable to Register of Copyrights
3. Deposit material

Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
July 1998—70,000
WEB REV July 1998          ♻ PRINTED ON RECYCLED PAPER          ☆U.S. GOVERNMENT PRINTING OFFICE: 1998-432-381/80,012

| EXAMINED BY | FORM PA |
| --- | --- |
| CHECKED BY | |
| CORRESPONDENCE ☐ Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
☐ This is the first published edition of a work previously registered in unpublished form.

EXAMINED BY

FORM PA

CHECKED BY

CORRESPONDENCE
[ ] Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
[ ] Yes  [X] No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
a. [ ] This is the first published edition of a work previously registered in unpublished form.
b. [ ] This is the first application submitted by this author as copyright claimant.
c. [ ] This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▼     **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

See instructions
before completing
this space

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account
**Name** ▼                                                            **Account Number** ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name / Address / Apt / City / State / ZIP ▼

DAMION GIACCHINO
500 PADRE BLVD #4309
S.P.I, TX 78597

b

Area code and daytime telephone number ▶ ( 956 ) 761-7311          Fax number ▶ (          )
Email ▶ PELICANWEST 2000 @ AOL.COM

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one
[X] author
[ ] other copyright claimant
[ ] owner of exclusive right(s)
[ ] authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

DAMION GIACCHINO                                     Date ▶ APRIL 2, 2001

Handwritten signature (X) ▼
X  _Damion Giacchino_

Mail
certificate
to:

Name ▼
DAMION GIACCHINO
Number/Street/Apt ▼
500 PADRE BLVD #4309
City/State/ZIP ▼
SOUTH PADRE ISLAND, TX 78597

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
July 1998—70,000                                  ☼ PRINTED ON RECYCLED PAPER                      ☆U.S. GOVERNMENT PRINTING OFFICE: 1998-432-381/80,012
WEB REV. July 1998

**148**

---

**TOWN OF SOUTH PADRE ISLAND, TEXAS
BOARD OF ALDERMEN
MINUTES OF REGULAR MEETING
APRIL 18, 2001**

---

**I     CALL TO ORDER**

A Regular Meeting of the Board of Aldermen of the Town of South Padre Island, Texas was held April 18, 2001 at the Convention Centre, 7355 Padre Boulevard. Mayor Pro Tem Thornton called the meeting to order at 5:30 p.m. A quorum was present: Aldermen Doyle Wells, David Bymard, and Rick Wells. Mayor Cyganiewicz had an excused absence (Item VI. d.) Staff present were Clifford Rowell, Darla Honea, Bob Fudge, Robert Rodriguez, Paul Cunningham, Ray Kendall and Susan Hill.

**II    PLEDGE OF ALLEGIANCE**

**III   PRESENTATIONS AND PROCLAMATIONS**

Mayor Pro Tem Thornton presented a Proclamation of April 18, 2001 as Club Padre Volunteers Day, and thanked those members who had helped at City Hall during "Texas Week".

**IV    PUBLIC COMMENTS AND ANNOUNCEMENTS**

Mr., Gary Graham asked the Town to work with Cameron County Judge Gilberto Hinojosa to resolve the traffic problems on the beach north of the Town limits.

Linda Nassar, of the Beautification and Parks Committee, announced that on Saturday the Texas Adopt a Beach project would be held, in conjunction with Trash Bash and Arbor Day activities. She invited public participation.

**V     DEPARTMENT REPORTS**

Written reports were submitted with the Agenda packages.

**VI    APPROVE CONSENT AGENDA**

Upon a motion by R. Wells and second by Eymard, the Consent Agenda was approved unanimously, as follows:

a.   Minutes of Regular Meeting, April 4, 2001;

b.   Approve/accept PIISD Tax Collection and Adjustment Reports for March, 2001;

c.   Approve and accept Town of South Padre Island Quarterly Investment Report;



EXHIBIT

E

ALL-STATE LEGAL®

*70*

d. Approve excused absence for Mayor Ed Cyganiewicz from April 18 Workshop and Regular Meeting;

e. Approve invoices: paid by General Fund checks numbered 058383 and 058997 through 059132, totaling $225,527.11.

**VII   DISCUSSION AND ACTION TO NAME "SOUTH PADRE ISLAND", BY GARY GRAHAM, AS THE OFFICIAL ISLAND SONG**

A motion to approve Gary Graham's "South Padre Island" song as the Official Island song, was made by R. Wells, seconded by D. Wells, and carried unanimously.

**VIII   DISCUSSION AND ACTION TO APPROVE ON FIRST READING, ORDINANCE NO. 01-05, CLOSING WEST JUPITER STREET TO TRAFFIC BETWEEN PADRE BOULEVARD AND LAGUNA BOULEVARD**

Discussion was held. Alderman D. Wells assured other West Jupiter property owners that they would have a chance to provide input on the new City Hall facilities during the planning stage.

A motion by Eymard, seconded by R. Wells, to approve Ordinance No. 01-05 on first reading, carried unanimously.

**IX   DISCUSSION AND TO AUTHORIZE THE PUBLIC WORKS DIRECTOR TO OBTAIN PROFESSIONAL ENGINEERING PROPOSALS FOR A TOWN-WIDE DRAINAGE STUDY**

Discussion was held. Alderman Eymard suggested that parking, curbs and gutters be included with drainage in a comprehensive study.

A motion was made by Eymard to table action on this item until the Utility Committee could consider the Alderman's request. A second was made by R. Wells, whereupon the item was tabled unanimously.

**X   DISCUSSION AND ACTION ON BEACH AND DUNE PERMIT APPLICATION BY THE TOWN FOR A PILOT PROJECT TO DETERMINE BEST DUNE VEGETATION PLANTING METHODS FOR DUNE VEGETATION TRANSPLANTATION**

Discussion was held.

A motion by Eymard, seconded by D. Wells to approve the Beach and Dune Permit application by the Town of South Padre Island for a pilot project to determine the best dune vegetation planting methods for dune vegetation transplantation, carried unanimously.

**XI   DISCUSSION AND ACTION ON AMENDING A BEACH AND DUNE PERMIT APPLICATION BY JIM BARRETT, OWNER OF LOT 8, BLOCK 176, PADRE BEACH, SECTION XI TO PLANT A PALM TREE APPROXIMATELY NINETY FEET EAST OF HIS EXISTING RETAINING WALL**

71

**150**

Discussion was held.

A motion by R. Wells, seconded by D. Wells, to deny an amendment to a Beach and Dune permit by Jim Barrett, Lot 8, Block 170, Padre Beach, Section XI, carried unanimously.

**XII DISCUSSION AND ACTION ON BEACH AND DUNE PERMIT APPLICATION BY RICK LABUNSKI ON BEHALF OF TEXAS CONTEC FOR LOT 1, BLOCK 69, PADRE BEACH, SECTION V FOR THE ALTERATION OF TERRAIN EAST OF THE HISTORIC BUILDING LINE**

Discussion was held.

A motion to deny the Beach and Dune Permit application for Lot 1, Block 69, Padre Beach, Section V, was made by R. Wells, seconded by D. Wells. The motion carried unanimously.

**XIII DISCUSSION AND ACTION TO CONSTRUCT WAVE SHELTERS IN PORT ISABEL**

The idea of asking Port Isabel to contribute to the Town's cost for building the shelters was proposed by Mayor Pro Tem Thornton. Discussion was held.

A motion by D. Wells, seconded by R. Wells, to table action on this item until Public Works Director Bob Fudge could bring some information on Port Isabel's (attitude regarding) funding the project carried unanimously.

**XIV DISCUSSION AND ACTION TO APPROVE RESOLUTION NO. 664 TO AMEND THE 2000/01 FISCAL YEAR BUDGET**

Discussion was held.

A motion by Eymard, seconded by R. Wells, to approve Resolution No. 664 carried unanimously.

A true and correct copy of said resolution was placed in the Town's Resolution Book, entitled Resolution No. 664, and by reference hereto, included in these minutes as if fully set out and spread upon the pages of the Minutes Book.

**XV ADJOURNMENT**

Mayor Pro Tem Thornton adjourned the meeting at 6:25 p.m.

Joyce Adams, City Secretary

APPROVED:

Edmund K. Cyganiewicz, Mayor

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-03-084 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| | § | |
| TOWN OF SOUTH PADRE ISLAND, | § | |
| and HARVEST MULTIMEDIA, INC. | § | |
| Defendant. | § | |

---

### AFFIDAVIT OF PAUL Y. CUNNINGHAM, JR.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

COMES NOW, Paul Y. Cunningham, Jr., an individual personally known to me who duly deposed, and sworn under oath stated follows:

1.    My name is Paul Y. Cunningham, Jr. I am over 18 years of age and I have personal knowledge of the matters stated herein, and they are true and correct.

2.    I am the city attorney for the Town of South Padre Island. I was the city attorney for the Town of South Padre Island when the town declared the song "South Padre Island" the official town song. I am personally familiar with the use of the song "South Padre Island" by the Town of South Padre Island.

3.    After declaring the song the official town song, the Town of South Padre Island retained the services of a multimedia company to include the song on its Visitor's Guide cd-rom The Town of South Padre Island incurred all of the costs associated with preparing the cd-roms and distributed them for free. The Town of South Padre Island has never sold its Visitor's Guide cd-roms or any cds that include the song "South Padre Island".

**EXHIBIT**

**F**

ALL-STATE LEGAL®

Further affiant sayeth not.

Paul V. Cunningham, Jr.

SUBSCRIBED AND SWORN TO BEFORE ME, on the 9th day of March , 2004, to certify which witness my hand and official seal.

PETRA M. ORTA
Notary Public, State of Texas
My Commission Expires 7-09-2005

Petra M. Orta
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS





EXHIBIT

G



