United States District Court
Southern District of Texas
FILED

APR 0 6 2004

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | B-03084 |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| AND HARVEST MULTIMEDIA, | § | |
| INC., | § | |
| Defendants. | § | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AS WELL AS, PLAINTIFF'S MOTIONS FOR LEAVE TO AMEND COMPLAINT TO ADD THIRD INDISPENSABLE PARTY DEFENDANT, AS WELL, AGAINST BOTH DEFENDANTS, AND FOR OTHER RELIEF, WITH PROPOSED ORDER**

---

**To the Honorable United States District Judge Hilda G. Tagle:**

Comes Now Gary Graham,  who is hereinafter referenced as "Plaintiff", before this Honorable Court, through his counsel of record, Donald T. Cheatham, and respectfully states and avers in support of his Response in Opposition to Defendant Town of South Padre Island, Texas' Motion for Summary Judgment, (Hereinafter "Padre Island"), and in Support of his own Motion for Leave to Amend Complaint to Add Third Indispensable Parities, as well as, continuing against both Defendants, (Hereinafter Harvest Multimedia, Inc. referenced as "Harvest"), and for other relief, as follows:

## TABLE OF CONTENTS:

TABLE OF CONTENTS:...................................................................i

TABLE OF CITATIONS:..............................................................viii

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS:..xii**

**STATEMENT OF ISSUES THIS HONORABLE COURT NEEDS TO RULE ON**

**SUMMARY OF ARGUMENT:**.............................................................ii

1.      Whether or not either Defendant, Town of South Padre Island, or Defendant Harvest Multimedia, Inc., Has Satisfied the Fifth Circuit's Summary Judgment Standard for Federal Rule of Civil Procedure, (Hereinafter  F.R.Civ.P.") 56(e), (f), and (g).

2.      Whether or Not The District Court in Evaluating the Propriety of Granting a Motion for Summary Judgment Is To Apply the Specific Test of Whether or Not There Exists Any Material Fact In Dispute.

3.      Whether or Not In This Case There Exists A Disputed Material Issue of Fact as To the Existence of Plaintiff's "Implied Consent", for A "Joint Work", To What Extent Such Extends, and Is Tied to Plaintiff's State of Mind At The Time Damion Giacchino and Pelican West Supplied The Music for Plaintiff's  Copyrighted Lyrics.

4.      Whether or Not Such "Implied Consent" Extends for an Unrestricted License of the Joint Work, or At A Minimum Whether Plaintiff's Acts or Conduct in this Regard constituted such  "Implied Consent".

5.      Whether or Not, States of Mind Such As "Intent" are Decisive Elements of A Claim or Defense, Where Summary Judgment Will Not Lie.

6.      Whether or Not, Summary Judgment On A Contractual Claim, Such as An Implied License, Is Appropriate Only Where There is No Ambiguity in The Contract.

7.      Whether or Not, At Best, There Only Existed Plaintiff's Vague and Ambiguous Oral and  Unwritten Consent For Damion Giacchino/Pelican West To Formulate  Copyrightable Music for Plaintiff's Copyrighted Lyrics.

8.      Whether or Not, Defendant South Padre, Now Offers Any Summary Judgment Evidence At All, That Such "Implied Consent" for Music Applied to Copyrighted Lyrics Extended to Allow the Co-Authors, Who Are Not Parties to These Proceedings to Then Attempt to Copyright the "Joint Work", Independently, On Their Own, as Damion Giacchino Evidently Attempted To Do, and Apparently Only for Himself, As An "Original Work"

for Both "Words and Music," Without Any Provision for Plaintiff in The Application and Certificate. Defendant's Summary Judgment Exhibit "D".

9.      Whether or Not, In Order For Defendant to Prevail On Their Present Motion for Summary Judgment, Defendant Padre Island Somehow Must Show This Court, that in Addition to the Factually Established "Implied Consent" for the "Joint Work," with the Other Joint Co-Author, Damion Giacchino/Pelican West, That There Follows and Exists Without Additional Summary Judgment Evidence, Plaintiff's "Implied Consent" for aforesaid non-party Co-Authors To Be Able Also Directly to Sub-License the Entire "Joint Work," On Their Own, In Order to Justify and Enable Padre Island lawfully to Re-Record and Distribute for Its own Commercial Benefit the Song "South Padre Island."

10.      Whether or Not, It Is Legally Necessary that Damion Giacchino/Pelican West Be Able to Sub-License the "Joint Work" to Third Parties, Without The Actual Original Copyright Lyric Author's Readily Perceivable Consent for Such, In Order for Defendants here to Avoid Liability for Copyright Infringement.

11.      Whether or Not, The Deficient Legal Bases of Such An Arrangement Is The Absence of the Statutorily Required Provision for An Arrangement for Royalties.

12.      Whether or Not, Defendant Padre Island Offers Absolutely Any Adequate Summary Judgment Evidence to Establish Through the Federal Copyright Act Legal Bases for Such an Actual Unrestricted Ability for Plaintiff's non-party Co-Author, to Sub-License and So To Allow Padre Island, as Such Third Party Licensee the Right of Re-Recordation and Distribution of Such An Alleged "Joint Work" Without Considering the Actual Contracted for Royalty Compensation between the Co-Authors.

13.      Whether or Not, Plaintiff's "Implied Consent" for a "Joint Work" Extends and Amounted to An "Implied Consent" to An Unrestricted License to Plaintiff's Co-Authors To Be Able So To Allow South Padre to Use The Copyrighted Lyrics, and that Such Sub-License also Led to

Plaintiff's "Implied Consent" for South Padre Island's Use of the "Joint Work," Without There Being Any Requirement for Royalty Payments to the Original Copyright Lyric Author Plaintiff here, Without His Actual Consent.

14.    Whether or Not, Without Summary Judgment Evidentiary Proof of Some Intent By Plaintiff Beyond That Necessary for the Provision of Music Added to The Copyrighted Lyrics for a "Joint Work," Defendant Offers No More Than A Mere Conclusion of the Required Factual Grounds and/or Legal Bases for a Summary Judgment, Without Any Summary Judgment Evidence Supporting Any Explanation for The Failure of Either Defendant or Their Purported Licensor to Apply for A Compulsory License, and Because of Such Deficiency, Whether or Not Defendant Padre Island's Motion for Summary Judgment Must Fail. 17 United States Code, (Hereinafter "USC"), § 115 (a), (b), (c), and (d).

15.    Whether or Not Either Defendant Has Met Their Individual Burden of Proof, Which Burden Is A Conclusive Showing That There Is An Absence of Any Issue of Material Fact In Dispute, Which Negates Plaintiff's Claims, and That As A Matter of Law Movant Thereby Is entitled to Summary Judgment. F.R. Civ.P. 56 ( c),(e), and (f).

16.    Whether or Not, Defendant Harvest Was Acting At All Times Pertinent Hereto, As the Agent for Its Principal, Defendant South Padre Island, and Whether Or Not The Doctrine of *Respondeat Superior* Applies.

17.    Whether or Not Either Defendant Fulfilled Any of The Statutory Requirements of and for A Compulsory License Under § 115 (a),(b) and (c).

18.    Whether or Not, The Only Fact Not In Dispute In Regard to South Padre's Motion for Summary Judgment Established Through Proper Summary Judgment Evidence Is that Plaintiff Granted Only A Limited License to Co-Author Damion Giacchino/Pelican West, Which License Only Allowed the Co-Author to be a Co-Author, That Is, To Put Suitable Music to the Copyrighted Lyrics, and Nothing More,

19.    Whether or Not Proposed Third Indispensable Party Defendants Damion Giacchino and Pelican West Filed a Fraudulent Copyright

iv

Application under 17 USC § 506, and Whether or Not Such Constituted Willful Copyright Infringement under the Facts of This Case .

20.     Whether or Not, Plaintiff Especially Never Granted Such Purported License For The Unfettered Use of The Copyrighted Lyrics Without Royalty Compensation, and That Defendant South Padre Has Offered No Summary Judgment to the Contrary.

Please Accord, Plaintiff's Summary Judgment Affidavit and its incorporated Exhibits Hereto Appended.

21.     Whether or Not, For A Putative "Implied Consent for a Supposed License" To Exist for The Purposes of Summary Judgment, The Proof Must Be F or What the P rospective Testimony of Any Affiant Will Be At Trial, and Not A Merely For A Recitation of What Might Have Occurred In The Past, as Leading to An Otherwise  Untenable Conclusion That the "Implied Consent" Extended Beyond What The Agreement the Record Contains for Proper Summary Judgment Evidence.

22.     Whether or Not, South Padre Island Ever Had Actual or Implied Authority to Hire, Engage, and Pay Defendant Harvest for the Phonographic Reproduction through Re-Recording and Distributing of Such Public Performance of the Copyrighted Lyrics by non-party Co-Author Damion Giacchino/Pelican West, as Modified for the Provision of Pelican West's Musical Score, Without Plaintiff's Concurrence, and Without Actual Arrangements for Royalty Compensation from Padre  Island  to  Plaintiff, Even Through the Co-Author.     17 USC § 201, *et sequitur.*

23.     Whether or Not, To Be "Joint Authors" for Purposes of the Federal Copyright Act, the Parties Must Have Intended To Be Joint Authors at The Time The Work Was Created, and Each Alleged Author's Contribution Must Be Copyrightable Independently of The Other. 17 USC §§ 102 and 201(a).

24.     Whether or Not, Either Defendant Here Has the Right to Raise the "Joint Work" Provisions or Doctrine, as a Defense Against Plaintiff's Infringement Action, as Neither Defendant to These Proceedings Is Either a

v .

Co-Author, Joint Author, Collaborator, but Merely Only Alleged Sub-Licensees, Where Neither Defendant Made Any Attempt, Much Less Any Arrangement for Them to Pay Any Royalties To Plaintiff Directly, or Even Indirectly Through The Co-Authors, At Any Time Before the Actual Public Distributions of The Re-Recorded Song.

25.    Whether or Not, Either Defendant Applied for A Compulsory License as Required By The Federal Copyright Act Under Such Circumstances.

26.    Whether or Not, For Purposes of the Federal Copyright Act, Defendants Are Not Co-Owners of the Song with Plaintiff, and Merely Are At Best Third Party Licensees, If Anything, to Plaintiff, and That Neither Has or Had Any Statutory Rights to Establish "Joint Work" for Themselves, or for Each Other, or Individually For Each Alone for Purposes of Defending on the Legal grounds or Factual Bases of "Joint Work" Against Plaintiff's Federal Complaint for Infringement

27.    Whether or Not, Defendant Padre Island's Summary Judgment Affidavit Of and On Behalf of Damion Giacchino and Pelican West Fails To Establish that Mr. Giacchino Will or Even Could Testify at Trial Before a Jury, That His Contribution to What Defendant South Padre Paid Defendant Harvest to Re-Record and Distribute Publicly, As A Phonographic Reproduction Was Copyrightable, And At This Juncture, If Not, Whether or Not, Such Re-Recorded Work Would Not Be Copyrightable, As A Matter of Law, As There Was Insufficient Licensing Authority To Produce Such Work, Joint or Otherwise, as 17 USC § 201 Mandatorily Requires.

28.    Whether or Not, A Co-Authorship Claimant Bears the Burden of Establishing as a Co-Author, that Each of the Putative Coauthors (1) Made Independently Copyrightable Contributions to the Joint Work, and (2) Fully Intended to Be Co-Authors, for All Purposes, Pursuant to 17 USC § 101 *et seqitur,* and whether or not, Either Defendant Has Met That Burden, as Neither Could. Please Accord Defendant Padre Island's Summary Judgment Evidence Exhibit "D", which is Disputed in Its Entireties by

Plaintiff's Own Summary Judgment Affidavit and Exhibits Thereto Incorporated as Appended. .

29. Whether or Not, The Giacchino/Pelican West Affidavit Establishes That What Is Represented As a "Joint Work" Is Copyrighted At All, But Rather Seems to Indicate That What It Is Intended to Be Copyrighted Is A "New Work." Please accord Exhibit "D" to Defendant South Padre Island's Motion For Summary Judgment, page 2, Items on Form Identified as "5" and "6" on the Right Hand Side, Which Directly Contradict Paragraphs 3, 4, 5, and 6, of The Defendant Padre Island's Affidavit of Damion Giacchino/Pelican West, Which Renders The Copyright Application, at a Minimum as Void, and Not At All In Accord With Any Title 17 Provisions.

30. Whether or Not, The Giacchino Copyright Application Identifies Properly Plaintiff Gary Graham, or Pelican West, As "Contributors," as Statutorily Required, and Whether or Not, The Document Itself Would Be Inadmissible as Evidence At Trial, As it Has Not Been Authenticated Properly As Is Thereby Necessary For It To Constitute Summary Judgment Evidence. Federal Rule of Evidence 802.

31. Whether or Not, Plaintiff Is Entitled to Amend Complaint to Name Third Party Indispensable Defendants Damion Giacchino and Pelican West.

32. Whether or Not, Defendants Padre Island and Harvest under the Facts and Circumstances of this Court's Summary Judgment Record Failed IN Their Legal Duty to Plaintiff to Accord Properly His Copyright.

SUMMARY JUDGMENT EVIDENCE:............................................................Page 1

STATEMENT OF THE CASE:....................................................................Page 1

STATEMENT OF FACTS:.........................................................................Page 2

ARGUMENT AND AUTHORITIES:.............................................................Page 5-32

    Please Accord Paragraphs 1-23 Hereinabove "Summary of Argument", Page ii.

CONCLUSION:......................................................................................Page 32

CERTIFICATE OF SERVICE:...................................................................Page 33

**Table of Citations:**

**Constitution:**

United States Constitution Article 1, § 8, clause 8...........................................1

**Cases:**

*Aalmuhammed v. Lee,* 202 F.3d 1227 (9th Cir. 2000)..................................**20,26**

*Am. Press Ass'n v. Daily Story Publ'g Co.,* 120 F. 766 (7th Cir. 1902)..............**10**

*Animal Fair, Inc. v. Amfesco Indus., Inc.,* 620 F. Supp. 175 (D. Minn. 1985)....................................................................................................**16**

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 105 (2d Cir. 1951)..**19**

*Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239 (1902)......................**17**

*Bright Tunes Music Corp. v. Harrisongs Music, Ltd.,* 420 F.Supp.177 (D.C.N.Y. 1976),...................................................................................................**7**

*BTE v. Bonnecaze,* 43 F. Supp. 2d 619 *(E.D. La. 1999)*.......................................**26**

*Buck v. Jewell-LaSalle Realty Co.,* 283 U.S. 191 (1931)....................................**10**

*Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884)................**14,15,19**

*Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387 **(C.A.5 (Tex.) 1980)**.....................................................................................................**13**

*Chamberlin v. Uris Sales Corp.,* 150 F.2d 512 (2d Cir. 1945).............................**19**

*Childress v. Taylor,* 945 F.2d 500 (2d Cir. 1991).......................................**20,21,26**

*Clogston v. Am. Acad. of Orthopaedic Surgeons,* 930 F. Supp. 1156 **(W.D. Tex. 1996)**...................................................................................................**21**

*De Acosta v. Brown,* 146 F.2d 408 (2d. Cir. 1944)..............................................**9, 10**

*Demetriades v. Kaufmann,* 690 F. Supp. 289 (S.D.N.Y. 1988)............................**27**

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266 (2d Cir. 1944)................................................................................................**21**

*Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, (7th Cir. 1994)....................**20,26**

*Esquire, Inc. v. Varga Enters.,* 81 F. Supp. 306 (N.D. Ill. 1948)........................**17**

*Feist Publ'ns Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991)..................**9,11,26**

*Ferguson v. NBC,* 584 F.2d 111 **(5th Cir. (Tex.) 1978)**.......................................**18**

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110 (2d Cir. 1986)...........**6**

*Franklin Mint Corp. v. Nat. Wildlife Art Exchange Inc.* 575 F.2d 62 (3d Cir. 1978). ...............................................................................**16**

*Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.*, 226 F.3d 387 <u>(C.A.5 (Tex.) 2000)</u>...................................................................................... **12**

*Gershwin Publ'g Co. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971).............................................................................................**28**

*Gilliam v. Am. Broad. Co.*, 538 F.2d 14, 22 (2d Cir. 1976)..................................**26**

*Gross v. Seligman*, 212 F. 930 (C.A.21 914)..........................................................**17**

*Haas v. Leo <u>Feist</u>, Inc.*, 234 F. 105, 107 (S.D.N.Y. 1916)......................**6,15,18,19**

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985)..............**9**

*Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 <u>(C.A.5 (Tex.),1997)</u> .......................................................................................**29,31**

*Lawrence v. Dana*, 15 F. Cas. 26 (C.C.D. Mass. 1869)..........................................**10**

*Lindsay v. The Titanic*,.No. 97 Civ. 9248, 1999 WL 816163, at *6 (S.D.N.Y. Oct. 13, 1999).........................................................................................................**26**

*Moore v. Col. Pictures Indus., Inc.*, 972 F.2d 939 (8th Cir. 1992).....................**12**

*North Coast Industries v. Jason Maxwell, Inc.*, 972 F.2d 1031 (9th Cir. 1992).**11**

*Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F. Supp. 1328 (S.D.N.Y. 1997)..........................................................................................................**16**

*R. Ready Productions, Inc. v. Cantrell*, 85 F.Supp.2d 672 <u>(S.D.Tex. 2000)</u>......**12**

*Reed v. Holliday*, 19 F. 325, 327 (C.C. W.D. Pa. 1884)...........................................**7**

*Respect Inc. v. Committee on Status of Women*, 815 F.Supp. 1112 (N.D.Ill.,1993)..**26**.

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989)................................**20**

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp. 399 (S.D.N.Y. 1966)..............................................................................................**28**

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)..........**10**

*Sheldon v. Metro-Goldwyn Pictures, Corp.*, 81 F.2d 49 (2d Cir. 1936)................**15**

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)..............**28**

*Stern v. Jerome H. Remick & Co.*, 175 F. 282 (C.C.S.D.N.Y. 1910).....................**6**

*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998)................................................**26**

*Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167 (7th Cir. 1997).......................**16**

*Weissmann v. Freeman,* 868 F.2d 1313 (2d Cir.1989)............................................22

**Statutes:**

**Title 17 United States Code**................................................................**1,6,7,9,19,27**

     **§ 101**....................................................................................................**14,20**

     **§ 106**.....................................................................................................**9, 10**

     **§ 409**.........................................................................................................**10**

     **§ 501** .....................................................................................................**2,20**

     **§ 506**.........................................................................................................**2,5**

     **§ 511**...........................................................................................................**6**

**Statute of Anne, 8 Ann., c. 19 (1709) (Eng.)**................................................**8**

**U S Copyright Act of 1790**.............................................................................**8**

**U S Copyright Act of 1870**.............................................................................**8**

**U S Copyright Act of 1909**.............................................................................**8**

**U S Copyright Act of 1976**.............................................................................**8**

**Treatises:**

Howard B. Abrams, "Originality and Creativity in Copyright Law," 55 LAW &
CONTEMP. PROBS., Spring 1992,.............................................................**18**

Rochelle Cooper Dreyfuss, "Collaborative Research: Conflicts on Authorship, Ownership,
and Accountability," 53 VAND. L. REV. 1161, 1206 (2000)..................................**20**

Craig Joyce, et al., "COPYRIGHT LAW" (5th ed. 2000)...................................**15,18**

Susan Keller, *"Comment, Collaboration in Theater: Problems and Copyright Solutions,"*
33 UCLA L. REV. 891, 903-04 (1986).......................................................**22**

Linda J. Lacey, "Of <u>Bread and Roses and Copyrights", 1989 DUKE L.J. 1532, 1541
(1989)</u>..........................................................................................**13**

Alan Latman, "THE COPYRIGHT LAW" (5th ed. 1979)...........................................**8**

Marsghall Leaffer, "UNDERSTANDING COPYRIGHT LAW".............................**8,28**

Melville B. Nimmer and David Nimmer, " NIMMER ON COPYRIGHT" (2000)**15,20,27**

A. Samuel Oddi, "Contributory Copyright Infringement: The Tort and Technology
Tensions," 69 NOTRE DAME L. REV. 47, 51 (1989).................................................**28**

Dale P. Olson, "Copyright Originality," 48 MO. L. REV. 29 (1983)........................**18**

Kate O'Neill, "Against Dicta: A Legal Method for Rescuing Fair Use From the Right of First Publication", 89 CAL. L. REV. 369, 374 (2001)..............................................**17**

L. Ray Patterson and Stanley W. Lindberg, "THE NATURE OF COPYRIGHT: A LAW OF USERS' RIGHTS" (1991)......................................................................................**8**

L. Ray Patterson, "The Statute of Anne: Copyright Misconstrued," 3 HARV. J. LEGIS. 223, 223 (1966)......................................................................................................**8**

Mitzi S. Phalen, "Comment, *How Much is Enough? The Search for a Standard of Creativity in Works of Authorship Under Section 102(a) of the Copyright Act of 1976,"* 68 NEB. L. REV. 835, 835-36 (1989)........................................................................**19**

*"An Inquiry into the Merits of Copyright: The Challenges of Consistency, Consent, and Encouragement Theory",* 41 STAN. L. REV. 1343, 1390-91 (1989).........................**7**

Laurie Stearns, Comment, *"Copy Wrong: Plagiarism, Process, Property, and the Law",* 80 CAL. L. REV. 513, 536 (1992)..................................................................**13**

Russ VerSteeg, "Roman Law Roots of Copyright," 59 MD. L. REV. 522 (2000)...**8,18**

Alfred C. Yen, "Copyright Opinions and Aesthetic Theory," 71 S. CAL. L. REV. 247, 257-58 (1998)......................................................................................................**19**

Alfred C. Yen, "A Personal Injury Law Perspective on Copyright in an Internet Age," 52 HASTINGS L.J. 929, 931 (2001)................................................................................**28**

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS:

Both Parties have conducted written discovery.

Defendant South Padre Island took the Deposition of Plaintiff Gary Graham.

The Honorable Magistrate Judge Felix Recio mediated the case without success.

This Honorable Court has set a Docket Call and a final pre-trial conference for May 4th 2004, as well as, Jury Selection for May 6th 2004.

Defendant Town of South Padre Island Has Filed a Motion for Summary Judgment, to Which Plaintiff Now Responds.

Plaintiff Has Filed A Motion for Leave to Amend to Add Indispensable Third Party Defendants.

## STATEMENT OF ISSUES THIS HONORABLE COURT NEEDS TO RULE ON

**Plaintiff respectfully avers and states that the Statement of Issues This Honorable Court needs to rule on are contained and enunciated in the "Summary of Issues",** *Supra,* **page ii, which this reference herein incorporates in its entireties.**

**I.**
## SUMMARY JUDGMENT EVIDENCE:

1.      **This reference incorporates herein Defendant South Padre Island's submitted Summary Judgment Evidence in its entirety.**

2.      **Plaintiff hereby attaches Affidavit of Plaintiff, Gary Graham hereto, together with its exhibits, which this reference herein incorporates in their entireties.**

**II.**
## STATEMENT OF THE CASE

3.      Plaintiff Gary Graham artistically composed a poetic lyric, which he lawfully copyrighted on March 26th 2001 under Title 17 of the United States Code, (hereinafter "USC"), which Congress enacted pursuant to the United States Constitution, Article 1, Section 8 Clause 8.

4.      Plaintiff obtained his valid copyright to the song lyrics for "South Padre Island" under the statutory "Poor man's copyright." 17 United States Code, ("USC").

5.      The Town of South Padre Island, Texas, ("South Padre"), entered into a market and publication agreement with Defendant Harvest Multimedia, Inc., ("Harvest") to re-record on a video disc CD-ROM a version containing the Plaintiff's copyrighted lyrics for promotion of their beachside resort city, which proposed indispensable parties Damion Giacchino, ("Giacchino"), and his band, Pelican West previously had recorded.

6.      Padre Island had officially adopted said pre-recorded "song," as their own "official town song." All actual and proposed Defendants here intended to distribute widely such CD-ROMs, which they did.

7.      Plaintiff's copyright was infringed, and he brought suit here in this Court for damages under the infringement provisions for damages of USC Title 17.

8.      In the course of this Summary Judgment proceedings, Plaintiff for the first time learned, that Pelican West band leader, Giacchino had copyrighted both the "words and music" to the "song", "South Padre Island," on April 10th 2001, without informing Plaintiff of such copyright application, without his consent or permission, and contrary to two agreements between Plaintiff and that band leader, respectively of March 12th 2001 and June 6th 2001.

9.     Proposed third Indispensable party Defendant Giacchino willfully have infringed Plaintiff's copyright, breached his contracts with Plaintiff, and has filed a fraudulent application to the United States Copyright Office, directly in violation of the civil remedy portions of USC Title 17, as well as, 17 USC § 506, the latter which imposes criminal sanctions on anyone who does what Giacchino admits to doing, as reflected now in his Summary Judgment Affidavit, offered as evidence to this Court.

10.     It is clear from this Court's record summary judgment evidence that Giacchino has attempted without Plaintiff's concurrence or agreement, in fact contrary to his written agreement with Plaintiff, to circumvent intentionally Plaintiff's constitutional, statutory, copyright and common law contractual rights.

11.     United States Code Title 17§ 501 establishes **strict liability** *per se* for any infringement, to wit: "[a]nyone who violates any of the exclusive rights of the copyright owner" is any infringer, whether innocent or intentional, and is strictly liable for any copyright infringement.

12.     There are few defenses, if any, to infringement of a copyright, and as Plaintiff conclusively demonstrates here, and there is no defense available under the law for the actual Defendants, Padre Island and Harvest, or the proposed Defendants, Giacchino Pelican West.

13.     As a result, because of the law and facts present in this record, Defendant Padre Island's Summary Judgment Motion should fail.

### III.

### STATEMENT OF FACTS

14.     To the extent that there is no conflict, or material facts in dispute, which there is, this reference incorporates here the Statements of Facts contained in Defendant South Padre Island's Summary Judgment, as well as, those contained in paragraphs numbered 1 through 12 hereinabove, which Plaintiff respectfully summarizes as follows:

a. On March 12th 2001 Plaintiff and proposed Defendant entered into a valid common law copyright Contract, which is attached as Exhibit "A" to Plaintiff Gary Graham's Affidavit, Exhibit "1" hereto appended, which states in pertinent part that "**Gary Graham** is [sic."the"] **composer** of the **lyrics**;" "Damion *Giacchino* is *composer* of music;" and "**Lyrics and**

2

music to be copywritten (sic."copyrighted") and published by the company 'Code Music,' ASCAP," as well as, that "...**Any other agreements between Gary Graham, Damion Giacchino and the group "Pelican West" shall and will be made on a separate document stating the terms and conditions of such document and will have no bearing on this agreement.**"; (Our Emphasis Added.)

b. Plaintiff filed a poor man's copyright, on March 26th reflected as Exhibit "1" to his Deposition, Padre Island's Summary Judgment Exhibit "A";

c. Giacchino was well aware and knew, that Plaintiff filed such copyright before *Giacchino* fraudulently *filed* for his own competing *copyright* for both the *"Words & Music"* on April 10th 2001, and he acknowledges in his Summary Judgment Affidavit, that Plaintiff holds a valid copyright for *"the lyrics of the song "South Padre Island;"*

d. Giacchino does *not* hold a valid copyright to the "music and vocal melody", as asserted in III."STATEMENT OF FACTS" 1st paragraph, page 2 Padre Island's Summary Judgment Motion, where South Padre Island directly relies upon Giacchino's factually misleading affidavit, where as sworn affiant Giacchino states that, "Pelican West only holds the copyright to the music", (Paragraph 3 of Affidavit of Giacchino of December 12th 2003, Exhibit B to South Padre Island's Summary Judgment Motion.

e. Giacchino's affidavit actually states contradictory to South Padre Island's own Exhibit "D", Giacchino's Copyright "Certificate of Registration" that, "Pelican West holds the copyright to the music of the song 'South Padre Island' ".

f. The Copyright "Certificate of Registration" South Padre Island has offered as Exhibit "D" to its Summary Judgment Motion fraudulently and erroneously deposes to the United States Copyright Office under Paragraph "1", "Title of This Work", "South Padre Island, "previous or Alternative Titles",        , [Giacchino leaves blank], "Nature of This Work", "WORDS & MUSIC", Paragraph "2", "Name of Author", "Damion Giacchino", "Nature of Authorship", "MUSIC AND VOCAL MELODY ".

g. On the Second Page of aforesaid "Certificate of Registration, at Paragraph "5" appears the following:

**"PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office? [] YES [X] NO. If your answer is 'Yes', why is another registration being sought? (Check appropriate box.) +

a. [] This is the first published edition of a work previously registered in unpublished form.

b. [] This is the first application submitted as a copyright claimant.

c. [] This is a changed version of the work, as shown by space 6 on this application.

If your answer is 'Yes' give **Previous Registration Number+ Year of Regist**. +'

h. On the Second Page of aforesaid "Certificate of Registration, at Paragraph "6" appears the following:

**"DERIVITIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

 "6a" **Preexisting Material** Identify preexisting work or works this work is based on or incorporates.+

**"6b" Material Added to This Work** Give a brief general statement of the material that has been added to this work and in which copyright is claimed. +" ("+" Denotes downward arrow in Original Copy, Exhibit "D".)

i. Giacchino filed the herein above referenced "Certificate of Registration" on "April 2, 2001", or nineteen days (19) after Giacchino had signed a contract with Plaintiff, as outlined hereinabove Paragraph 14 *sub* a.

j. It is of note that Giacchino left blank those portions on that official instrument, which would have identified Plaintiff as the composer author of the "lyrics", or "words", or "vocal melody", which Giacchino has agreed would be the copyright personalty belonging only to Plaintiff, and that there was to be a jointly owned copyright  shared in by Plaintiff,  Giacchino, and Pelican West, in their respective capacities, as lyricist, musical composer, and performers, and that per Exhibit "A"

4

paragraph "4.[,] Industry standard royalties will apply to this agreement." The June 4th 2001 "Legal Agreement", Exhibit "B" to Plaintiff's Affidavit this Response hereto as Exhibit "1" was to control The share of those royalties.

k. The June 6th "Legal Agreement" between Plaintiff and proposed Defendant Giacchino, hereto appended as Exhibit "B" to this Plaintiff's Response in Opposition to  Summary Judgment Affidavit, Exhibit "1", by copy, reflects the "copyright" intention of the parties.  This is also contrary and in dispute to what South Padre Island now asserts in their Summary Judgment Motion in regards to what actually occurred, and the effect of which USC Title 17 and precedent control. Please accord, Plaintiff's Deposition Page 24 Line 22 through Page 35 Line 22, which is Padre Island Summary Judgment Exhibit "A".

---

*THESE DISPUTED FACTUAL DISCREPANCIES BETWEEN WHAT IS ON THE RECORD AND WHAT PADRE ISLAND ASSERTS IN THEIR SUMMARY JUDGMENT MOTION  WOULD APPEAR TO establish MATERIAL FACTS IN DISPUTE BETWEEN Plaintiff and Defendant SUFFICIENT TO DEFEAT SOUTH PADRE ISLAND'S CURRENT SUMMARY JUDGMENT MOTION.*
(Our emphasis Added.)

---

## IV.

## ARGUMENT AND AUTHORITY

15.    The provisions of 17 USC§ 501 (a) indelibly marks anyone who does not accord a copyright holder his rights as thereunder enunciated as an "infringer". This section establishes strict liability.

16.    The defense South Padre Island raises in their current Summary Judgment Motion, of and for "joint work" is available *neither* to the actual, current Defendants, South Padre Island and Harvest *nor* the proposed Defendants, Giacchino and Pelican West, as a matter of law.

17.    Material issues of fact are in dispute, which should defeat the current motion. Plaintiff adopts as his own the well delineated Standard for Summary Judgment contained in Sub-Paragraph "A", page 4-5 of South Padre Island's Summary Judgment Motion.

**A. Absent a Legitimate Defense Under the "Joint Work" Doctrine of** 17 USC § 501,
**Which Is Unavailable for All actual and Proposed Defendants In This Case, Who Are**
**Strictly Liable for Infringements of Plaintiff's Copyright, as a Matter of Law**

18.     Marking indelibly for life "*any*" misuser as an *"infringer"* of a person's
copyright, USC Title 17 cuts a wide swathe for the rights and prohibitions the Constitution
and statutes thereunder attempt to accomplish. The Copyright Act grants a monopoly to the
holder, and prohibits everyone else from using what legitimately is copyrighted. In no other
area of the law, however, does such legislative authority, other than for patents and
trademarks, cause as much confusion.

19.     Although, Defendant South Padre Island attempts quite artfully to simplify
the copyright law in its attempts to obtain a dispositive summary judgment from this Court,
the legal complexity of copyright law can not be overlooked, as it applies to the  legitimate
copyright holder, such as Plaintiff.

20.     It is not sufficient to state a reason for the allowance of infringement, as
sparingly allowed by Title 17, as grounds to justify an infringer's actions. Congress has
made quite difficult the burden of establishing justification for infringement, as is reflected
in the "Compulsory License" requirements of § **511, for those desiring as occurred in**
**this case, re-recording and distribution publicly of a previously copyrighted and**
**published "joint work."**

21.     USC Title 17 marks all infringers the same. It does not discriminate in any
way, regardless of whether the infringement is intentional or innocent. It is absolutely,
completely irrelevant in establishing an actual infringement, of whether or not the infringer
is faultless or culpable.

22.     Please accord, *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110,
1113 (2d Cir. 1986), stating that, "...[R]eliance--justified or otherwise--is irrelevant in
determining whether [the defendant] infringed [the plaintiff's] copyrights. **Even an**
**innocent infringer is liable for infringement....**"; also *Haas v. Leo Feist, Inc., 234 F.*
*105, 107* (S.D.N.Y. 1916) stating that, "**...The plaintiff's right to damages against the**
**defendant** *Feist,* **regardless of its innocence, is unquestionable...**"*Stern v. Jerome H.*
*Remick & Co.,* 175 F. 282, 282 (C.C.S.D.N.Y. 1910), finding necessary that the defendant

6

should have intended to violate the copyright of the plaintiff..."; and ***Reed v. Holliday***, 19 F. 325, 327 (C.C. W.D. Pa. 1884) enunciating the principle that, **"...Intention, however, is a matter of no moment if infringement otherwise appears..."**.  (Our Emphasis Added.)

      23.    In ***Bright Tunes Music Corp. v. Harrisongs Music, Ltd.***, 420 F.Supp.177 (D.C.N.Y. 1976), what District Judge Owen succinctly held at page 180 in regard to one of George Harrison's very well known published works appears to be of great pertinence to the present case, as it applies to South Padre Island, as opposed to Giacchino:

> "...Did Harrison ***deliberately use the music*** of He's So Fine? I do not believe he did so deliberately. Nevertheless, it is clear that My Sweet Lord is the very same song as He's So Fine with different words, and Harrison had access to He's So Fine. ***This is, under the law, infringement of copyright, and is no less so even though subconsciously accomplished***. ***Sheldon v. Metro-Goldwyn Pictures Corp.***, 81 F.2d 49, 54 (2d Cir. 1936); ***Northern Music Corp. v. Pacemaker Music Co., Inc.,*** 147 U.S.P.Q. 358, 359 (S.D.N.Y.1965).(Our Emphasis Added.)

It is apparent that Defendant South Padre Island is quite mistaken concerning the view of the copyright law as anyway permissible for the infringements that occurred in the case at bar. Intent has no bearing in reference to this Court's decision concerning South Padre Island's complicity in the infringements of Plaintiff's copyright which obviously took place.

      24.    In spite of the readily apparent differences of moral culpability between, on the one hand, Giacchino and Pelican West, and, on the other hand, South Padre Island and Harvest, 17 USC establishes strict liability for their respective copyright infringements for both actual and proposed parties Defendant alike in this case. Please accord, Wendy J. Gordon, *"An Inquiry into the Merits of Copyright: The Challenges of Consistency, Consent, and Encouragement Theory"*, 41 STAN. L. REV. 1343, 1390-91 (1989*)*, defines the "'trespass' character of infringement suits" and elaborates that "as in trespass to realty ... even unconscious copying gives rise to liability in copyright cases".

      25.    The strict liability provisions of USC Title 17 have readily ascertainable historical bases. As in other areas of American law, copyright law has its roots in British law.  Parliament established the Statute of Anne as the initial British Copyright legislative enactment in our own pre-independence colonial period. The Statute of Anne imposed liability even on the innocent, and definitively established that statutory, actionable copyright infringement occurred "[i]f any other bookseller, printer, or other person

7

whatsoever ... shall print, reprint, or import, or cause to be printed, reprinted or imported, any such book ... without the consent of the proprietor ...."

26. Many knowledgeable commentators view the Statute of Anne, 8 Ann., c. 19 (1709) (Eng.), as "England's "first" copyright statute. There is wide recognition of this statute as the basis of both the Copyright Clause of the United States Constitution, Article 1, Section 8, Clause 8, and other early federal copyright acts. Please accord, Alan Latman, "THE COPYRIGHT LAW" at page 2 (5th ed. 1979), stating that, "Our whole law relating to literary and artistic property is essentially an inheritance from England."; Marsghall Leaffer, "UNDERSTANDING COPYRIGHT LAW" § 1.2, at page 3 (1989), stating that, "The Statute of Anne became the general model for copyright law in the United States."; L. Ray Patterson  and Stanley W. Lindberg, "THE NATURE OF COPYRIGHT: A LAW OF USERS' RIGHTS" at page 47 (1991), stating that, "The 1710 Statute of Anne is the direct ancestor of American copyright law ... the statute itself clearly served as the model for the Copyright Act of 1790, the first U.S. copyright statute."; L. Ray Patterson, "The Statute of Anne: Copyright Misconstrued," 3 HARV. J. LEGIS. 223, 223 (1966), stating that, "The Statute of Anne has deeply affected the American law of copyright ... [i]t was used in this country during the 1780's as a model for copyright laws enacted by twelve of the thirteen states ... [l]ater, it served as a model for the first federal copyright act, passed in 1790."; and Russ VerSteeg, "Roman Law Roots of Copyright," 59 MD. L. REV. 522, 525 (2000), stating that, "[L]ong before the Founding Fathers ever considered the issue of copyright, British legislators and courts had worked out the basic policies and principles. It was from these foundations that the Constitutional drafters borrowed."

27. The thirteen colonial legislatures' earliest copyright enactments tracked the British law of the time, and definitively enunciated that strict liability was the standard for copyright infringement. After the federal Constitution's ratification, the early congress reiter-rated in their own statutes strict liability on those who "...printed, published, or imported" infringing copies without the consent of the copyrighted author. Later congresses imposed strict liability sanctions on infringers in all of the major federal copyright acts that followed the 1790 Act, including legislation enacted in 1870, 1909, and 1976. The 1976 Copyright Act, in fact, as did previous enactments, reaffirmed a strict liability copyright infringement stand-

8

ard. Under the 1976 Copyright Act, any person infringes who "violates any of the exclusive rights of the copyright owner ...." 17 U.S.C. § 501(a) (1994).

28.    In fact 17 USC § 106 (1994 & Supp. VI 2001). provides copyright owners a "bundle" of six exclusive rights in their copyrighted works, to wit: ***the owner of copyright ... has the exclusive rights" of reproduction, preparation of derivative works, distribution, public performance, public display, and public performance through digital audio transmission.*** (Our Emphasis Added.)

29.    Unlike other statutory torts, and the common law, USC Title 17's standard for infringement liability is devoid of any requirement for the proof of scienter, intent, knowledge, negligence, or other contemplation by the infringing actor. In fact, what USC Title 17 establishes indubitably to the contrary is strict tort liability for any copyright infringement. USC Title 17 simply requires a copyright owner to prove only **two elements to establish copyright infringement: ownership of a valid copyright, and copying of "constituent elements of the work that are original."** Please accord, *Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991), citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985).

30.    Prior to and since congress enacted the current 17 USC in 1976, Courts have continued to apply strict liability in copyright infringement cases, and in so imposing such strict liability on any such copyright infringer, to hold intent to infringe, as irrelevant to any determination of issues involving copyright infringement.

31.    In *De Acosta v. Brown*, 146 F.2d 408 (2d. Cir. 1944). the United States Second Circuit Court of Appeals found Hearst Magazines, Inc. strictly liable for publishing unwittingly and ignorantly an excerpt from a screenplay in its Cosmopolitan magazine. Although the defendant publishers claimed to have infringed the original author's copyright "innocently" by erroneously relying on the assurances of the purported author, that court rejected these excuses, citing the "unanimity of view" that liability is strict, and holding that the "protection accorded literary property would be of little value if ... insulation from payment of damages could be secured by a publisher by merely refraining from making inquiry...". The *De Acosta* court compared innocent infringement to the tort of conversion, finding such comparison so compelling and "complete" to justify

9

recovery against even an innocent copier. After *De Acosta*, innumerable defendants have been held liable for copyright infringement irrespective of their innocent intent, *Supra.* 12.

32.    Please accord, *Buck v. Jewell-LaSalle Realty Co.*, 283 U.S. 191, 198 (1931), holding that,  "...**Intention to infringe is not essential under the Act**..."; *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963), holding, "...**While there have been some complaints concerning the harshness of the principle of strict liability in copyright law ... courts have consistently refused to honor the defense of absence of knowledge or intention...**"), (citations omitted); *Am. Press Ass'n v. Daily Story Publ'g Co.*, 120 F. 766, 769 (7th Cir. 1902), holding that, **"...It is not material, we think, that the appellant in publishing this copyrighted story was not aware that the story was protected by copyright. It published at its peril, and ignorance will not avail..."**); and, *Lawrence v. Dana*, 15 F. Cas. 26, 60 (C.C.D. Mass. 1869) (No. 8, 136), holding that,  **"...Evidence of innocent intention ...cannot be admitted that it is a legal defence [sic] where it appears that the party setting it up has invaded a copyright..."**. (Our Emphasis Added.)

33.    In the case at bar, South Padre Island rely heavily in their Summary Judgment Motion on what Plaintiff and Giacchino intended, instead of what intent their two contracts reflect, and how the law views Plaintiff's actually valid copyright. Similarly, South Padre Island also relies there on what they postulate the record should reflect, as to the vitality and controlling aspect of their own Summary Judgment Exhibit "D", Giacchino's afore referenced "Certificate of Registration". The same protagonist, Giacchino falsely attests, in contradiction of his "Certificate of Registration, in his own Summary Judgment Affidavit, as to the factually misleading supposed efficacy of his own invalid contract.

34.    Appearing at the bottom of page 2 [ sic.the actual back page] of the proposed Defendant Giacchino's "Certificate of Registration", is the unconsidered but quite ponderable statement, "17 USC § 506(e): **(e)** **Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500**.

35.    Please also accord that 17 USC § 506 (a) [subsec. (a) of this section] **contains a special provision applying to any person who infringes willfully and for purposes of com-**

ercial advantage the copyright in a sound recording or a motion picture. For the first such offense a person shall be fined not more than $25,000 or imprisoned for not more than one year, or both. For any subsequent offense a person shall be fined not more than $50,000 or imprisoned not more than two years, or both. (Our Emphasis Added.)

36.    Neither Plaintiff nor Defendant South Padre Island, nor for that matter, proposed Defendant Giacchino dispute the fact that what Harvest did was to re-record and publish some 5,000 CD-ROMS, a visual and audio "commercial" promotional product, on behalf of South Padre Island, containing a sound recording that Giacchino and Pelican West previously had recorded. Summary Judgment Motion, pages "Statement of Fact" as well as, pages 6, 7, and 8.

37.    In order for Defendant South Padre Island to be able to rely on Giacchino and/or Pelican West's copyright ownership of the "Words and Music", or the "Music and Vocal Melody", it is their burden of proof to establish that aforesaid Giacchino and Pelican West actually owned a valid copyright, or copyright interest. Based on the "Certificate of Registration" as offered here, contrary and in breach of two written agreements between Plaintiff and Giacchino alone, Plaintiff affirmatively asserts here that *neither* Giacchino *nor* Pelican West could "license" to Defendant South Padre Island, anything regarding the Plaintiff's copyrighted *lyrics*, absent a proven valid copyright for Giacchino and/or Pelican West. Without a valid copyright, vesting in Giacchino and/or Pelican West, South Padre then legally could *not* hire Harvest to re-record, publish and distribute what Giacchino and Pelican West had recorded originally under their written agreements with Plaintiff.

38.    To establish copyright infringement, the holder of the copyright must prove valid ownership of the copyright and that there was an infringement of that copyright by the alleged infringer. Infringement requires a showing of both access to copyrighted material on the part of the alleged infringer and substantial similarity between the copyrighted work and the alleged infringing work.

Please Accord, *North Coast Industries v. Jason Maxwell, Inc.,* 972 F.2d 1031 (9th Cir. 1992); *Feist, Infra.,* 499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).

39.    A copyright owner can establish the alleged infringer's access to his or her work by showing that the infringer had the opportunity "to view or to copy" the owner's work. Establishing a "bare possibility" of access is not enough, rather the owner must

11

prove that the alleged infringer had a "reasonable possibility" of viewing the work.

Please accord, *Moore v. Col. Pictures Indus., Inc.,* 972 F.2d 939 (8th Cir. 1992).

40.    Defendant South Padre Island has not proven that Giacchino's "Certificate of Registration" constitutes proof of the filing requirements of the controlling statute. In order to maintain a defense asserting authorized use of another copyrightable work, the party asserting such defense must prove the formal elements required in the application. The Fifth Circuit has enunciated such requirements for the copyright application in *Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.,* 226 F.3d 387 (C.A.5 (Tex.) 2000), where at page 392, as follows:

> "...To maintain a copyright infringement claim, the owner of the copyright must have registered it. *See* 17 U.S.C. § 411(a). *An action for copyright infringement requires the plaintiff to show "ownership" of the material and "copying" of the material by the defendant. Lakedreams v. Taylor, 932 F.2d 1103, 1107 (5th Cir.1991). To establish "ownership" of the material the plaintiff must show that the material is original, the material can be copyrighted, and compliance with all statutory formalities. Id.*
> Trace argues that Scan cannot establish "ownership" of the material *because it did not comply with all of the statutory formalities for copyright registration. We have previously held that a plaintiff has complied with all statutory formalities for copyright registration when the Copyright office receives the plaintiff's application for registration, fee, and deposit. Id. at 1108..."*
> (Our Emphasis Added.)

Defendant South Padre Island's Summary Judgment Motion fails in these regards.

41.    In this District, the Houston's Division Judge, the Honorable District Judge ATLAS, found in *R. Ready Productions, Inc. v. Cantrell,* 85 F.Supp.2d 672 (S.D.Tex. 2000). at page 682, that:

> "...**A valid copyright certificate of registration constitutes *prima facie* evidence of the validity of a copyright.** *See Norma Ribbon,* 51 F.3d at 47 (citing 17 U.S.C. § 410(c)). **This presumption, however, is rebuttable, as the burden of proof is shifted to the defendant to prove the invalidity of the plaintiff's copyright.** *See Entertainment Research v. Genesis Creative Group,* **122 F.3d 1211, 1217 (9th Cir.1997);** *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* **97 F.3d 1504, 1513 (1st Cir.1996);** *Masquerade Novelty v. Unique Industries,* **912 F.2d 663, 668 (3d Cir.1990).** In cases in which the originality of a plaintiff's registered work is at issue, the defendant must offer proof "that the plaintiff's product was copied from other works or similarly probative evidence." *See Ocean Coast Properties,* **97 F.3d at 1513** (citing *Masquerade Novelty,* 912 F.2d at 668, 669). **Once the defendant offers such**

**proof, the burden shifts back to the plaintiff to demonstrate originality.** *See Ocean Properties,* 97 F.3d at 1513..." (Our Emphasis Added.)

There are glaring discrepancies of material issues of fact as here identified between what South Padre Island asserts in its Summary Judgment Motion, in Giacchino's offered Summary Judgment Affidavit, Giacchino's offered "Certificate of Registration", and Plaintiff's Summary Judgment Affidavit and its Exhibits "A" and "B".

42.    Under the law and precedent herein above cited, South Padre Island's Summary Judgment Motion should and must fail.

---

**B. The Song "South Padre Island" as Actual Defendants Re-Recorded from Previous Giacchino and Pelican West Recording Does Not Constitute a "Joint Work" under 17 USC§ 501, and even if it were such, Defendants did Not comply with the "Compulsory License" Requirements and Procedure of § 511, in the event it was even available to them, under the facts and circumstances of this case.**

43.    As early as 567 A.D., the Irish King Diarmed purportedly recited the copyright-as-property comparison, when considering a student's infringement of his teacher's psalm book. The King ruled that both the original and the "infringing" copy rightfully belonged to the teacher, explaining, "To every cow her calf, and accordingly to every book its copy." The story of King Diarmed is a favorite among copyright scholars. Please accord, Latman, "THE COPYRIGHT LAW", *infra.,* paragraph 26; Linda J. Lacey, "Of Bread and Roses and Copyrights", 1989 DUKE L.J. 1532, 1541 (1989), reciting Diarmed's story as **a "...graphic statement of the fruits-of-the-creator's- labor natural law theory...";** and Laurie Stearns, Comment, *"Copy Wrong: Plagiarism, Process, Property, and the Law"*, 80 CAL. L. REV. 513, 536 (1992), stating that, "...development of copyright law in England and the United States has built upon this notion that the relationship between authors and their writings is that of owners to their property..."; and Stearns, Supra., at page 535, "...Diarmed saw the book as [the teacher's] property, the ownership of which entitled [him] to its product, the copy. The king's ruling thus pointed in the direction of the future development of copyright law...".

44.    In *Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387 (C.A.5 (Tex.) 1980), the Fifth Circuit establishes, the following at page 394:

13

"...Relying on *Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc.,* 333 F.2d 672 (5th Cir. 1964), the District Court noted the **three elements of misappropriation: (1) the idea is novel; (2) the disclosure of the idea was made in confidence; and (3) the idea was adopted and made use of by the defendant...**"

"...[T]he Court expressly relied upon the *Eastern Air Lines* case, which **initially held,** *as a matter of law,* **that the use of radio to broadcast airline flight information did not constitute an intellectual or ingenious concept.** 333 F.2d at 674. However, it must be noted, that **upon Petition for Rehearing the author of the opinion,* Judge Hunter, expressly concurred in Judge Rives' special concurrence, wherein Judge Rives stated that the novelty question is one more properly left to a jury.** 333 F.2d at 676..."

"...**The District Court also found, as a matter of law, that Capital had not revealed the title to ABC-Fries in a "confidential relationship." The Court reasoned that a "confidential relationship" could not have existed, because the film was nationally advertised in 1964. On appeal, Capital argues that, in the context of the custom of the movie industry, screenings to potential film distributors is common practice and can support the factual basis for a jury's finding that a confidential or type of fiduciary relationship exists between the parties. Furthermore, Capital argues that various agents for ABC viewed the Capital film within the above described setting and that Capital could have produced ample summary judgment evidence demonstrating these facts, if they had been given proper notice that this cause of action was to be tested by summary judgment. We agree with Capital's contentions and hold that, under certain circumstances, the practice of screening movies can support a jury's finding of "confidential relationship."**..." (Our Emphasis Added.)

South Padre Island could license no more than Giacchino and Pelican Island held as licensor.

45.     This Court should apply and analyze the complex issue of *copyrightability* of an alleged "joint work" here, as well as its two components, in light of South Padre Island's purported excuses or defenses, as such, to the infringements of Plaintiff's copyright.

46.     In an early case, *Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53, at page 60, (1884), the U S Supreme Court established the controlling premise that it is first necessary to analyze the "intellectual production" and "thought" of an author when making the threshold determination of copyrightability. It follows that Courts have stated often that Copyright protection extends only to "original works of authorship." 17 U.S.C. § 101 (1994).

47.     The U S Supreme Court has held that this "originality" requirement mandates that a work, to be *copyrightable,* must be "**original**," that is, the **product of independent creation and must be "creative," that is, reflect a "modicum" or "spark" of "creativity."**

Please accord, ***Feist , Infra.,*** 499 U.S. at 346, explaining that although "...[T]he requisite level of creativity is extremely low" originality nevertheless requires both 'independent creation plus a modicum of creativity..."; also Craig Joyce, et al., "COPYRIGHT LAW" (5th ed. 2000), stating that, "...Some courts have attempted to clarify the two aspects of originality ... independent origin and sufficient quantum of original matter-by describing the former characteristic as 'originality' and the latter as 'creativity'."; and, i.e. "[O]ne is original and ... an author in both a constitutional and statutory sense, if the resulting work is the product of one's own independent efforts, i.e., has not been copied." Melville B. Nimmer and David Nimmer, "1 NIMMER ON COPYRIGHT" (2000), page 8, § 1.06[a], where they state, "...Assuming such independent efforts, authorship will be recognized in the resulting work, even if, independently and unknown to the creator, a similar, or even identical, work created by another can be shown to have prior existence...". 4 "NIMMER" at § 13.08 , stating that, "...[T]he injury to a property interest is worthy of redress, regardless of the innocence of the defendant...".

48.    Courts have long regarded "originality" as "a constitutional requirement", which is the "sine qua non of copyright," despite the fact such is not directly defined in USC Title 17.

Please accord, See ***Feist, Infra.,*** 499 U.S. at 346, stating that,  the Framers' use of the terms "authors" and "writings" in the Copyright Clause of the Constitution "presuppose a degree of originality", and ***Supra.,*** at 348.

49.    A Court's necessary determination of whether or not a work is of **"Independent Origin"** is a difficult task. Because Copyrightability unlike patentability does not hinge on the requirement of "novelty," which causes as an effect the resultant premise that, "..."a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying..."

Please accord, ***Burrow-Giles, Infra.,***  111 U.S. at 59-60, stating  that unlike the patent system, "...**Our copyright system has no ... provision for previous examination by a proper tribunal as to the originality of the ... matter offered for copyright .... [i]t is therefore much more important that when the supposed author sues for a violation of his copyright, the existence of those facts of originality, of intellectual production, of thought, and conception ... should be proved ...";.** ***Feist, Infra.,***  499 U.S. at 345; and, ***Sheldon v. Metro-Goldwyn Pictures, Corp.,*** 81 F.2d 49, 54 (2d Cir. 1936), where appears the most compelling and oft-quoted example of this fundamental principle as no less than the Honorable 2nd Circuit Judge

Learned Hand offered by of explanation, that **"...[I]f by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an 'author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats's...".**

50.    In order to determine or not the initial *copyrightability* issue, or even as a defense to an infringement claim, because of the potentiality for **"fortuitous similarity"**, courts assessing the "independent origin" of a work initially look to the author's "creative process" and subjective intent to determine whether a work was copied or "owes its origin" to the purported author.

Please regard, ***Odegard, Inc. v. Costikyan Classic Carpets, Inc.,*** 963 F. Supp. 1328, 1338 (S.D.N.Y. 1997), stating that the **defendants failed to prove independent creation because** the were **",,,unable to describe credibly their design process...".** (Our Emphasis Added.)

51.    An examination of the alleged infringer's state of mind at the time of creation causes a Court to engage in excruciating analysis of the originality quotient. An issue of whether or not the putative author was thinking of or copying a plaintiff's work becomes paramount. Another issue ready to devour otherwise patient objective reasoning, is whether or not the putative author was focusing the mind's eye on a work in the public domain, or from a person, or an animal, instead of the copyrighted work.

Please accord, ***Ty, Inc. v. GMA Accessories, Inc.,*** 132 F.3d 1167, 1170 (7th Cir. 1997) where Judge Posner states: "...[I]magine two people photographing Niagra Falls from the same place at the same time of the day and year and in identical weather-there is no inference of access to anything but the public domain, and, equally, no inference of copying from a copyrighted work...". In *Ty,* Judge Posner found that the allegedly infringing work, a stuffed pig, was "strikingly similar" to the plaintiff's pig, but bore "little resemblance" to "real" pigs in the public domain.; ***Animal Fair, Inc. v. Amfesco Indus., Inc.,*** 620 F. Supp. 175, 182 (D. Minn. 1985), where that District Court rejected defense claim of independent creation of bear claw slippers, stating that "...While [plaintiff and defendant's] slippers both purport to be a representation of a bear's paw, neither slipper accurately reflects the actual appearance of a bear's paw ... both slippers differ from an actual bear's paw in the same respects..."; and, ***Franklin Mint Corp. v. Nat. Wildlife Art Exchange Inc.*** 575 F.2d 62, 65 (3d Cir. 1978) , stating that, "...[T]he fact that the same subject matter may be present in two paintings does not prove copying or infringement. Indeed, an artist is free to consult the same source for another original painting..." The ***Franklin***

court explained that "an artist's style, genre or chosen subject matter may lend itself to infringement." While the subtlety of Monet's impressionism may be difficult to recreate, "...[An] artist who produces a rendition with photo-graph-like clarity and accuracy may be hard pressed to prove unlawful copying by another who uses the same subject matter and the same technique..."; and *Esquire, Inc. v. Varga Enters.*, 81 F. Supp. 306, 307-08 (N.D. Ill. 1948), rev'd in part, 185 F.2d 14 (7th Cir. 1950) stating that, the defendant's new paintings did not infringe the copyright of earlier works owner, although "...[T]he over one hundred paintings by defendant in evidence reveal that the defendant's artistic talent is limited to the portrayal of the female figure in varying degrees of undress .... [I]t is apparent from the testimony that this is all he has ever drawn and seems to be all he ever will draw...". According to the court, "...[A]ll his future drawings will bear some similarity to his previous work, whether or not his past creations are before him at the time he is painting. He has a certain type of art in his mind and, consequently, that is all he is able to express on the drawing board." *Supra.,* at 308. The Second Circuit Court of Appeals came to a different result in *Gross v. Seligman*, 212 F. 930, 931(C.A.21 914), opining that a the same artist's subsequent photograph of the same model constituted infringement, because "...[T]he identity of the artist and the many close identities of pose, light, shade, etc. indicate very strongly that the first picture was used to produce the second." The *Gross* Court solved the issue by simply stating that, whether the artist created the infringing work "with a copy of the first photograph physically present before his eyes" or through "mental reproduction" was immaterial.

52.    What results from such hair-splitting, state of mind analysis is oft quite perplexing. When the evidence shows that the putative original author was contemplating some pre-existing copyrighted work at the moment of creation, such will make such putative author liable for copyright infringement as a infinger, who in other words becomes a pirate and a plagiarist. If not, then the putative author becomes exonerated from any infringement liability, and might also become the celebrated author of a new, copyrightable original work.

Please accord, Kate O'Neill, "Against Dicta: A Legal Method for Rescuing Fair Use From the Right of First Publication", 89 CAL. L. REV. 369, 374 (2001), which states that, "...[I]n a judgment for the copyright holder, the judicial rhetoric often includes indignant allusions to the copier's greed or laziness in attempting to capitalize on another's creativity ..."; In *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 249 (1902), Justice Story explained

17

succinctly, "...[O]thers are free to copy the original. They are not free to copy the copy..."; and, ***Ferguson v. NBC,*** 584 F.2d 111, 114 (5th Cir.Tex.1978), finding that, "...It is not enough to place two works back to back, if both track their ancestries back to Bach...".

53.    A Court's examination has encompassed as often an independent inquiry concerning the putative author's mental state and creative process in assessment of the presence in a supposedly original work of actual *"creativity,'* the second test of *"copyrightability."*

Please accord, Howard B. Abrams, "Originality and Creativity in Copyright Law," 55 LAW & CONTEMP. PROBS., Spring 1992, at 3, 14 (1992), where he informs that, "...The most important consequence of ***Feist*** is that it has **interjected a distinct inquiry concerning creativity into the originality equation. In addition to the traditional originality inquiry into whether a work was independently originated, there must also be a determination that whatever was independently originated was sufficiently creative to satisfy *Feist*...";** Professor Russ VerSteeg has previously explained that "...[A]rguably, ***Feist* requires that courts investigate the functioning of an author's brain..**." VerSteeg, "Rethinking Originalality", at 839 note 14, hereinabove cited at paragraph 26. In evaluating creativity post-***Feist*** in copyright law, professor VerSteeg offers two alternatives for determining creativity: one dictates an "examination of the networks of [an author's] subconscious," the other, and in VerSteeg's own opinion the preferable, insists that courts assess "...[T]he nature of an author's variations..." on works in the public domain, wherever possible. ***Supra.,*** at page 841. Professor VerSteeg emphatically postulates that, in "...[E]valuating an author's contribution from an objective standpoint instead of investigating her psyche may prove to be a more viable method of determining whether ***Feist's*** creativity requirement has been satisfied..."

54.    Notwithstanding the Constitution's demands of only a "modicum" of creativity, Courts, which must labor without a bright-line creativity rule, often are forced to examine the putative author's creative process to determine whether the supposedly original work is within the **"...[N]arrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually non-existent..."**

Please accord, Joyce et al., herein cited above at paragraph 47, at note 180, § 2.02, declaring that, "...Unfortunately there is no bright line rule or general principle [of creativity] that can be involved in every case...."; see also Dale P. Olson, "Copyright Originality," 48 MO. L. REV. 29, 31 (1983), which postulates that, "...[D]espite extensive experience in imposing an

originality requirement, the judicially developed doctrine remains uncertain and confused..."; Mitzi S. Phalen, "Comment, How Much is Enough? The Search for a Standard of Creativity in Works of Authorship Under Section 102(a) of the Copyright Act of 1976," 68 NEB. L. REV. 835, 835-36 (1989), which values the **creativity** requirement as "nebulous" and "troublesome."

55.    In "compilation of fact" cases such as *Feist*, in which the Supreme Court expressly held that a "garden-variety" alphabetical listing of names was "devoid of even the slightest trace of creativity," and thus was not copyrightable, the creation-process inquiry is perhaps most evident.

Please accord, *Feist, Infra,* at 359, where the Supreme Court reiterates concerning the "creative spark" requirement, appearing to demand that all putative authors minimally must have the intent to create a work of true authorship, thereby avoiding any lingering possibility of the "accidental" or "inadvertent" author; *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 105 (2d Cir. 1951), where Judge Frank asserted that, "...[A] copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it..." Judge Frank cites as a vivid example the frustrated artist who, in anger, throws his sponge against the canvass, achieving--inadvertently--his "desired result." *Supra.*, at n.23. After *Feist,* however, copyright protection for the luckless putative artist likely would not be available for the new work because, even though paint brushed canvass, perhaps even in an aesthetically pleasing manner, the end- result was the product of sheer happenstance, and *not* "intellectual production ... thought, and conception." *Feist, Supra.,* 499 U.S. at 362 (citing *Burrow-Giles,Infra.,* at 59-60); *Chamberlin v. Uris Sales Corp.,* 150 F.2d 512, 513 n.4 (2d Cir. 1945), stating that, "...It is not easy to ascertain what is intended and what inadvertent in the work of genius ... [T]hat a man is color-blind may make him a master of black and white art; a painter's unique distortions, hailed as a sign of his genius, may be due to defective muscles..."); and Alfred C. Yen, "Copyright Opinions and Aesthetic Theory," 71 S. CAL. L. REV. 247, 257-58 (1998), intoned that, under Monroe C. Beardsley's "intentionalist definition of art," "[a]ccidents, no matter how beautiful cannot be art."

56.    "Ownership" is of principle importance in these analyses, particularly regarding a "joint work" issue, as Defendant Padre Island interjects now through its Summary Judgment Motion into the case at bar. A putative author's intent at the time of creation has significant

19

bearing in evaluating a situation and determining actual copyrightable ownership. "Intent" plays loud as an essential element in the equative determining factors of the issue of whether or not 17 USC § 501 entitles a putative composer to copyright protection and remedy as a contributor or collaborator to a "joint work." Under 17 U.S.C. § 101 (1994 & Supp. VI 2001), a joint work is defined as **"...[A] work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."** The meaning of "intent" in § 101 is the cause of much heated controversy and argument.

Please accord, Rochelle Cooper Dreyfuss, "Collaborative Research: Conflicts on Authorship, Ownership, and Accountability," 53 VAND. L. REV. 1161, 1206 (2000) , where that commentator argues that 17 U.S.C. § 101 requires "..intent to merge two works into an 'inseparable or interdependent part of a unitary whole' [not] intent to be co-authors...".

57.    Courts, fully aware of the countless "contributors", who may offer minor suggestions, friendly advice, or even paid editorial assistance, have further refined the definition of "intent" to distinguish between menial editorial or artistic contributions, such as those supplied by editors, research assistants, and even friends and family members, and true co-authorship. Not at all surprisingly, in light of the longstanding adherence to strict liability for copyright infringement, the critical distinction between mere collaborators and full co-authors hinges exclusively on the parties' intent, which "the touchstone" of joint authorship.

Please accord, ***Aalmuhammed v. Lee,*** 202 F.3d 1227, 1235-36 (9th Cir. 2000), stating that, "...***Claimjumping*** by research assistants, editors, and former spouses, lovers and friends would endanger authors who talked with people about what they were doing, if creative copyrightable contribution were all that authorship required..."; ***Erickson v. Trinity Theatre, Inc.,*** 13 F.3d 1061, 1071- 72 (7th Cir. 1994) finding that, "...The fact that one actor ... suggested that [the author] include a passage from Macbeth and an introduction to the play does not make him a joint author..."; ***Childress v. Taylor,*** 945 F.2d 500, 509 (2d Cir. 1991) opining that, even though the plaintiff "...[M]ade some incidental suggestions ... there is no evidence that these aspects ... ever evolved into more than the helpful advice that might come from the cast, the directors, or the producers of any play ... a playwright does not so easily acquire a co- author..."; and, ***S.O.S., Inc. v. Payday, Inc.,*** 886 F.2d 1081, 1087 (9th Cir. 1989), enunciating that, "...A person who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act...".

20

58.  Because intent to create one portion of a "unitary whole" is essential to creation of a joint work, an author who creates an independent work, which is later joined with another independent work to create a third work, is not an author of the new work., or even a **"joint author."** (Our Emphasis Added.)

Please accord, **Childress,** *Infra.,* at 509, declared that, the "...[E]qual sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors..." The Childress court explained that joint authors need not "...[U]nderst[and] precisely the legal consequences of that relationship" and "joint authorship can exist without any explicit discussion ... by the parties." *Supra.,* at 508.

59.  Courts have held that the amount and significance of each author's contribution is immaterial. Important to this case is *Clogston v. Am. Acad. of Orthopaedic Surgeons,* 930 F. Supp. 1156, 1162 (W.D. Tex. 1996), where the Honorable District Judge Prado acknowledging that the plaintiff contributed ninety percent of the photographs in the work at issue, but concluded properly that, "the importance of the contribution is simply not a relevant inquiry..."

Please accord, *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266, 267 (2d Cir. 1944), where Justice Hand, definitively stated that, "...[W]hen both plan an undivided whole ... unless they stipulate otherwise in advance, their separate interests will be as inextricably involved, as are the threads out of which they have woven the seamless fabric of the work..."; Mary LaFrance, "Authorship, Dominance, and the Captive Collaborator: Preserving the Rights of Joint Authors," 50 EMORY L.J. 193, 193 (2001), where that commentator states, *"...Absent an agreement to the contrary, each author of a joint work has an equal claim to ... profits and an equal right to exploit the work, even if the authors contributions were not equal. This legal consequence has led most courts to proceed with caution ....".*

60.  Always forever present as an element of copyright infringement, the imminent fear of "difficult problems of proof," is not a consideration in the area of "joint works." Courts, focusing on "intent," seem to have provided a workable solution to the complicated and often emotional issue of joint authorship and correspondingly have developed consistent criteria and objective evidence tests to discern the intent of potential joint authors. Some circumstances might require that a Court should classify the new work, as either a derivative work or a collective work, as opposed to a "joint work."

Please accord, 1 NIMMER, paragraph 26 herein above, § 6.05, at 6-13, note 8,

21

emphasizing that, "...[T]he distinction lies in the intent of each contributing author at the time his contribution is written...". In either case, "the contributing author owns only his contribution, while in the case of a joint work each contributing author owns an undivided interest in the combination of contributions...".

61.    Some Courts having acknowledged the conflicting "feelings and intent" of estranged collaborators and former colleagues, recognize that "..[ subjective state of mind cannot of itself satisfy the objective criteria of the copyright law." Thus, rather than rely on self-serving statements of subjective intent, Courts generally identify objective criteria such as decision making authority, "billing" or "credit," agreements with third parties, and a variety of other objective evidence  to assess the intent of joint authors. By focusing on this objective evidence and "factual indicia" courts are able to address conflicting claims of joint authorship fairly while successfully avoiding dreaded "problems of proof."

Please accord, **Weissmann v. Freeman,** 868 F.2d 1313, 1319 (2d Cir.1989); Susan Keller, "Comment, Collaboration in Theater: Problems and Copyright Solutions," 33 UCLA L. REV. 891, 903-04 (1986) , which states that, "...[I]ntent alone separates a joint work from a derivative or collective work and settles whether one owns an undivided interest in the whole or only one's own contribution..."; and **Childress v. Taylor,** 945 F.2d 500  (C.A.2 (N.Y.),1991), where the Honorable Second Circuit Judge Jon O. Newman stated, beginning at page 504, as follows:

> **"...Co-authorship was well known to the common law. An early formulation, thought by Learned Hand to be the first definition of "joint authorship," see Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2d Cir.1944) ("Marks "), is set out in Levy v. Rutley, L.R., 6 C.P. 523, 529 (Keating, J.) (1871): "a joint laboring in furtherance of a common design." Judge Hand endorsed that formulation in the District Court, concluding that the book for the comic opera "Sweethearts" was a work of joint authorship. Maurel v. Smith, 220 F. 195 (S.D.N.Y.1915), aff'd, 271 F. 211 (2d Cir.1921). Three decades later, he adopted the formulation for this Circuit in Marks, determining that the words and music of a song ("December and May") formed a work of joint authorship even though the lyricist wrote the words before he knew the identity of the composer who would later write the music.**
>
> **Like many brief formulations, the language from Levy v. Rutley is useful in pointing an inquiry in the proper direction but does not provide much guidance in deciding the close cases. Many people can be said to "jointly labor" toward "a common design" who could not plausibly be considered co-authors. And beyond the fairly straightforward context of words and music combined into a song, whatever formulation is selected will not**

necessarily fit neatly around such varied fact situations *505 as those concerning architectural plans, *see Meltzer v. Zoller,* 520 F.Supp. 847 (D.N.J.1981), or computer programs, *see Ashton-Tate Corp. v. Ross,* 728 F.Supp. 597 (N.D.Cal.1989), *aff'd,* 916 F.2d 516 (2d Cir.1990). Though the early case law is illuminating, our task is to apply the standards of the Copyright Act of 1976 and endeavor to achieve the results that Congress likely intended.

The **Copyright Act defines a "joint work" as a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.17 U.S.C. § 101. As Professor Nimmer has pointed out, this definition is really the definition of a work of joint authorship.** *See 1 Nimmer on Copyright* **§ 6.01 (1991). The definition concerns the** *creation* **of the work by the joint authors, not the circumstances, in addition to joint authorship, under which a work may be** *jointly owned,* **for example, by assignment of an undivided interest. The distinction affects the rights that are acquired. Joint authors hold undivided interests in a work, like all joint owners of a work, but joint authors, unlike other joint owners, also enjoy all the rights of authorship, including the renewal rights applicable to works in which a statutory copyright subsisted prior to January 1, 1978.** *See* **17 U.S.C. § 304.**

Some aspects of the statutory definition of joint authorship are fairly straightforward. Parts of a unitary whole are "inseparable" when they have little or no independent meaning standing alone. That would often be true of a work of written text, such as the play that is the subject of the pending litigation. By contrast, parts of a unitary whole are "interdependent" when they have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song. Indeed, a novel and a song are among the examples offered by the legislative committee reports on the 1976 Copyright Act to illustrate the difference between "inseparable" and "interdependent" parts. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976) ("*House Report* "), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736; S.Rep. No. 473, 94th Cong., 2d Sess. 103-04 (1975) ( "*Senate Report* ").FN3. Professor Nimmer suggests that the distinction is analogous to the distinction between derivative and collective works, with parts said to be "inseparable" if the contribution of a second author "recast[s], transform [s] or adapt[s]" the contribution of a first author, and said to be "interdependent" if the contributions of each author are assembled, without recasting, into a collective whole. *See 1 Nimmer on Copyright* § 6.04 at 6-11; *M.G.B. Homes, Inc. v. Ameron Hoes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990)..."

"*...The legislative history also clarifies other aspects of the statutory definition, but leaves some matters in doubt. Endeavoring to flesh out the definition, the committee reports state:*
*[A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone*

*here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit....*
*House Report at 120; Senate Report at 103 (emphasis added). This passage appears to state two alternative criteria—one focusing on the act of collaboration and the other on the parties' intent. However, it is hard to imagine activity that would constitute meaningful "collaboration" unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole, and the case law has read the statutory language \*506 literally so that the intent requirement applies to all works of joint authorship. See, e.g., Weissmann v. Freeman, 868 F.2d 1313, 1317-19 (2d Cir.1989); Eckert v. Hurley Chicago Co., Inc., 638 F.Supp. 699, 702-03 (N.D.Ill.1986).*

"...A more substantial issue arising under the statutory definition of "joint work" is whether the contribution of each joint author must be copyrightable or only the combined result of their joint efforts must be copyrightable. The Nimmer treatise argues against a requirement of copyrightability of each author's contribution, *see* 1 *Nimmer on Copyright* § 6.07; Professor Goldstein takes the contrary view, *see* 1 Paul Goldstein, *Copyright: Principles, Law and Practice* § 4.2.1.2 (1989), with the apparent agreement of the Latman treatise, *see* William F. Patry, *Latman's The Copyright Law* 116 (6th ed. 1986) (hereinafter *"Latman "*). The case law supports a requirement of copyrightability of each contribution. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989); *Ashton-Tate Corp. v. Ross,* 728 F.Supp. at 601; *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 609 F.Supp. 1307, 1318-19 (E.D.Pa.1985), *aff'd without consideration of this point,* 797 F.2d 1222 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Kenbrooke Fabrics Inc. v. Material Things,* 223 U.S.P.Q. 1039, 1044-45, 1984 WL 532 (S.D.N.Y.1984); *Meltzer v. Zoller,* 520 F.Supp. 847, 857 (D.N.J.1981); *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.,* 542 F.Supp. 252, 259 (D.Neb.1982). The Register of Copyrights strongly supports this view, arguing that it is required by the statutory standard of "authorship" and perhaps by the Constitution. *See Moral Rights in Our Copyright Laws: Hearings on S. 1198 and S. 1253 Before the Subcomm. on Patents, Copyrights and Trademarks of the Senate Comm. on the Judiciary,* 101st Cong., 1st Sess. 210-11 (1989) (statement of Ralph Oman).FN4. Two Circuits have adverted to the issue, but found it unnecessary to resolve it. The District of Columbia Circuit has quoted the passage from the Nimmer treatise that argues against a requirement of copyrightability for all contributions to a joint work but then discussed the issue in a footnote beginning "*If* Nimmer is correct...." *Community for Creative Non-Violence v. Reid,* 846 F.2d 1485, 1496 & n. 15 (D.C.Cir.1988) (emphasis added), *aff'd without consideration of this point,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The Third Circuit has explicitly held the issue open. *See Andrien v. Southern Ocean County Chamber of Commerce,* 927 F.2d 132, 136 (3d Cir.1991) (in banc)..."

"...Nevertheless, we are persuaded to side with the position taken by the case law and endorsed by the agency administering the Copyright Act. The insistence on copyrightable contributions by all putative joint authors might serve to prevent some spurious claims by those who might otherwise try to share the fruits of the efforts of a sole author of a copyrightable work, even though a claim of having contributed copyrightable material could be asserted by those so inclined. More important, the prevailing view strikes an appropriate balance in the domains of both copyright and contract law. In the absence of contract, the copyright remains with the one or more persons who created copyrightable material. Contract law enables a person to hire another to create a copyrightable work, and the copyright law will recognize the employer as "author." 17 U.S.C. § 201(b). Similarly, the person with non- copyrightable material who proposes to join forces with a skilled writer to produce a copyrightable work is free to make a contract to disclose his or her material in return for assignment of part ownership of the resulting copyright. *Id.* § 201(d). And, as with all contract matters, the parties may minimize subsequent disputes by formalizing their agreement in a written contract. *Cf.* 17 U.S.C. § 101 ("work made for hire" definition of "specially ordered" or "commissioned" work includes requirement of written agreement). It seems more consistent with the spirit of copyright law to oblige all joint authors to make copyrightable contributions, leaving those with non-copyrightable contributions to protect their rights through contract.

"...There remains for consideration the crucial aspect of joint authorship--the nature of the intent that must be entertained by each putative joint author at the time the contribution of each was created. The wording of the statutory definition appears to make relevant only the state of mind regarding the unitary nature of the finished work--an intention "that their contributions be merged into inseparable or interdependent parts of a unitary whole." However, an inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer- researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.

"...Focusing on whether the putative joint authors regarded themselves as joint authors is especially important in circumstances, such as the instant case, where one person (Childress) is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another

25

(Taylor) are joint authors. *See* **Fisher v. Klein, 16 U.S.P.Q.2d** 1795, 1798 (S.D.N.Y.1990); **Picture Music, Inc. v. Bourne, Inc.**, 314 F.Supp. 640, 647 (S.D.N.Y.1970), *aff'd on other grounds*, 457 F.2d 1213 (2d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). This concern requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of a song..."
(Our Emphasis Added Throughout.)

Please accord, **Aalmuhammed, Infra.,** 202 F.3d at 1235, stating that, "...___In the absence of a___ ___contract___, the inquiry must of necessity focus on the facts..."; **Thomson v. Larson**, 147 F.3d 195, 201 (2d Cir. 1998) finding that, ",,,[C]o-authorship intent does not turn solely on the parties' own words or professed state of mind..."; **Thomson v. Larson**, 147 F.3d 195, 201 (2d Cir. 1998), concluding that, "...As with every judicial inquiry into intent, such objective evidence usually provides the most reliable clue to a person's mindset..."; **Thomson, Infra.,** 147 F.3d at 202-03, recognizing that, "...An important indicator of authorship is a contributor's decisionmaking authority..."); **Lindsay v. The Titanic,**.No. 97 Civ. 9248, 1999 WL 816163, at *6 (S.D.N.Y. Oct. 13, 1999), finding that, "...[W]here one contributor retains a so-called 'veto' authority over what is included in a work, such control is a strong indicator that he or she does not intend to be co-authors with the other contributor..."; **Thomson,Infra.,** 147 F.3d at 203 n.24, stating that,"...[B]oth the Off-Broadway and the Broadway playbills identify Rent as being 'by Jonathan Larson,' [the defendant] while Thomson [the plaintiff] is listed as 'Dramaturg.'"); **Respect, Inc.,Infra.**, 815 F. Supp. at 1121, stating that, "...Certainly [the defendant] could not have made her intention more plain than by the way she billed herself in each of the books...", as well as, at 204-05 pointing to the lower court's reliance on conversations between the parties and between the plaintiff and third person as objective evidence of intent. "The best objective manifestation of a shared intent, of course, is a contract saying that the parties intend to be or not to be co- authors.", and at 205, relying on objective criteria, the **Thomson** court was successfully able to divine the intent of young Broadway phenom Jonathan Larson, creator of the hit musical "Rent," years after his death; **Erickson,Infra.,** 13 F.3d at 1072, underline focusing on a licensing agreement as evidence of the parties' intent; **Gilliam v. Am. Broad. Co., 538 F.2d 14, 22 (2d Cir. 1976),** indicating that the provisions of screenwriters' agreement "suggest that the parties did not consider themselves joint authors of a single work..."; and, **BTE v. Bonnecaze**, 43 F. Supp. 2d 619, 624-25 (___E.D.___ ___La. 1999___), directing that, "...[T]o proceed with this 'intent' inquiry, a court must engage in

**an examination of the factual indicia of ownership and authorship" and listing the relevant factors as: (1) decision making authority, (2) billing and credit, (3) written agreements with third parties, and (4) "any other additional evidence"). Other additional evidence may include previous discussions between the parties or with third persons...."**

63.    The unintentionally innocent and willful contributor may become under certain circumstances a "**Contributory Infringer**", with his cohorts, as opposed to and instead of a "joint author." A potential infringer's intent also is relevant, and often dispositive, in cases of contributory infringement. In spite of the longstanding "unanimity of view" in favor of strict liability for direct and vicarious infringers of copyright, courts premise liability for contributory copyright infringement, partially, on the intent and/or knowledge of the contributory infringer. Contrasting types of infringement, "Knowledge" is the very "touchstone" of contributory copyright infringement. The "enterprise liability" tort law theory in the course of its own evolution spawned as a derivative the judge-made doctrine of "contributory infringement", which USC Title 17 expressly does not enunciate. Under this doctrine, an individual may be liable for the infringing acts of another only if he "induces, causes or materially contributes to the infringing conduct of another" with knowledge of the infringing activity. "Contributory infringement" is described as "one area where knowledge is required," because to be liable "one must intentionally aid another to infringe," which contradicts the general rule of strict liability for copyright infringement. Usually, "Contributory Infringement" may arise in two distinct manners; either "personal conduct that forms part of or furthers the infringement" or the "contribution of machinery or goods that provide the means to infringe." The law also imposes an obligation of inquiry into the nature of the work, and whether or not it is what a putative contributing or "joint author" might represent in regard to the work.

Please Accord, 3 NIMMER, herein above at Paragraph 26, § 12.04[A][2], note 8, at 12-72; *Demetriades v. Kaufmann*, 690 F. Supp. 289, 293 (S.D.N.Y. 1988), stating that, while "...benefit and control are the signposts of vicarious liability, so are knowledge and paticipation the touchstones of contributory infringement..."; 17 U.S.C. § 106 provides for the "bundle" of exclusive rights copyright owners enjoy. "Contributory Infringement" though not expressly provided for USC Title 17, arises from those enactments. Under USC Title 17, copyright owners have the exclusive right to authorize the exercise of their rights by others; 3 NIMMER, § 12.04 [A], note 8, at 12-66 to 12-67, where they state that,"...Congress' use of the phrase 'to

27

authorize' establishes the liability, whether vicarious or as a contributory infringer, of one who does no more than cause or permit another to engage in an infringing act..."; ***Sony Corp. of Am. v. Universal City Studios, Inc.,*** 464 U.S. 417, 434-35 (1984), where the U S Supreme Court states that, ***"...The Copyright Act does not expressly render anyone liable for infringe- ment committed by another ... [T]he absence of such express language in the copyright statute does not preclude the imposition of liability ... on certain parties who have not themselves engaged in the infringing activit [ies]...".*** In ***Sony***, the seminal contributory infringement case to date, the Supreme Court held that the sale of ***"...[C]opying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes..." Supra.,*** at 442; ***Gershwin Publ'g Co. v. Columbia Artists Mgmt., Inc.,*** 443 F.2d 1159, 1162 (2d Cir. 1971)proposes that, **"...[O]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer...");** ***Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.,*** 256 F. Supp. 399, 403 (S.D.N.Y. 1966), affirms that, **"...[T]he basic common law doctrine that one who knowingly participates in or furthers a tortious act is jointly and severally liable with the prime tortfeasor is applicable in suits arising under the Copyright Act...";** Leaffer, herein above Paragraph 26, § 9.20, note 14, at 290, stating that, **"...The easiest cases to find liability for contributory infringement are those where the related defendant has actual knowledge of and comes the closest to directly participating in the infringement...";** A. Samuel Oddi, "Contributory Copyright Infringement: The Tort and Technology Tensions," 69 NOTRE DAME L. REV. 47, 51 (1989), stating that "...**the theory underlying contributory infringement parallels that of trespass upon a property interest...";** and Alfred C. Yen, "A Personal Injury Law Perspective on Copyright in an Internet Age," 52 HASTINGS L.J. 929, 931 (2001), stating that, "...The claim that Internet technology providers are liable for infringement committed by users resembles the application of enterprise liability in tort law...". (Our Emphasis Added.)

64.     It is patently clear from these analyses that all Defendants, actual South Padre Island and Harvest, as well as, proposed Giacchino and Pelican West are either direct infringers, or contributory infringers of Plaintiff's valid copyright in the song lyrics of "South Padre Island. Because of the agreements referenced, between Plaintiff and Giacchino,

Plaintiff's copyrights under USC Title 17 are not subject to simplification, as South Padre Island has attempted in its Summary Judgment Motion. There are material issues of fact in dispute, the determination of which, as a matter of law, entitles Plaintiff to jury decisions.

---

**C. Defendant South Padre Island Can Not Rely On the Defenses as Asserted Due To the Existence of the Two Agreements Between Plaintiff and Proposed Defendants:**

65.    Plaintiff's Affidavit supporting this Response in Oppositions, as well as, his current inclusive Motion for Leave to Amend and to Name Indispensable Party proposed Defendants Giacchino and Pelican West, literally vitiates South Padre Island's defenses asserted in their Summary Judgment Motion. Neither Giaccjhino nor Pelican West had any authority to ignore as has occurred the implications and tenets of those two agreements, Exhibits "A" and "B" to Plaintiff's Affidavit Exhibit "1"

66.    Defendant South Padre Island relies mistakenly on the Fifth Circuit case of *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 (C.A.5 (Tex.),1997). In that case the Fifth Circuit states in regard to South Padre Island's Summary Judgment Motion's contentions, that "...Defendant's summary judgment evidence establishes that Defendant was impliedly granted such license by the actions, attitude, and conduct of joint author/owner Damion Giuacchino/Pelican West including their essential consent to the use of the official town song on the visitor's guide cd-rom,", beginning at page 879, as follows:

> "...*While the Copyright Act requires that exclusive licenses be evidenced by a writing,* no such writing requirement applies to nonexclusive licenses. Section 204(a) of the Act provides that **"[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Section 101 of the Act defines "transfer of copyright ownership" to include exclusive licenses, but expressly excludes nonexclusive licenses.** *See id.* § 101. As such, **"[u]nder federal law, a nonexclusive license may be granted orally, or may even be implied from conduct."** 3 NIMMER, *supra,* at 10-40 (footnotes omitted); *see also I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996); *Effects Assocs. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990).
>        **"When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license...."** 3 NIMMER, *supra,* § 10.03[A], at 10-41 (footnotes omitted). **Other circuits have**

held that an implied nonexclusive license arises when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E.,* 74 F.3d at 776 (citing *Effects,* 908 F.2d at 558-59)..."

"...Lulirama first argues that a nonexclusive license cannot exist between the parties because the parties intended that Axcess would obtain full copyright ownership of the jingles pursuant to the work for hire doctrine. The Eleventh Circuit rejected a similar argument in *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749 (11th Cir.1997). In that case, an artist agreed to write a song for a baseball team, and the parties agreed orally that the baseball team would have an exclusive license to use the song. *See id.* at 751. Applying Florida contract law, the court concluded that, although no exclusive license existed because such a license cannot be created orally, the artist had granted the baseball team a nonexclusive license to use the jingle because it had acquiesced in the team's use of the song. *See id.* at 752. In so doing, the court rejected the argument that the parties' intention to create an exclusive license foreclosed the recognition of a nonexclusive license. *See id.* at 752-53. The court observed:

'Like the district court, we conclude that while it may well be that the parties in their initial negotiations contemplated an exclusive license, JMI cannot reasonably deny, given its subsequent conduct here, that it granted to the Miracle the sort of lesser, nonexclusive license to play the piece during the summer of 1993 that federal law recognizes may result from a purely oral transaction.' *Id.* at 753.

We agree with the analysis of the Eleventh Circuit. **Under Texas contract law, illegal contracts are generally unenforceable.** *See Plumlee v. Paddock,* 832 S.W.2d 757, 759 (Tex.App.--Fort Worth 1992, writ denied). **However, a court will sever the illegal portion of the agreement and enforce the remainder if the parties would have entered the agreement absent the illegal portion of the original bargain.** *See Panasonic Co. v. Zinn,* 903 F.2d 1039, 1041 (5th Cir.1990).FN7. **To the extent that it is not inconsistent with the Copyright Act and its policies, Texas law governs our analysis of whether the parties contractually created a nonexclusive license.** *See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.,* 661 F.2d 479, 482-83 (5th Cir. Unit B Nov.1981)..."

"...Lulirama states in its response brief that "[t]he record here indicates that a work for hire agreement was presumably intended," and that "Michlin mistakenly believed that a valid work for hire agreement had been reached." It would be quite anomalous to allow Lulirama, which admittedly intended by the Jingle Writing Agreement to convey to Axcess a bundle of rights including all of the exclusive rights of copyright ownership, to complain that the intent of the parties to the agreement was frustrated by the district court's conclusion that Lulirama conveyed by implication a *smaller* bundle of rights. Because Lulirama intended to convey to Axcess all of the rights associated with ownership of the copyrights to the jingles, it of necessity

30

> **intended to convey the lesser-included set of rights associated with a**
> **nonexclusive license to use the jingles.**
>
> *Lulirama also argues that the existence of the Promotional*
> *License Agreement between Lulirama and Axcess, which provided*
> *Axcess with an exclusive license to use all works to which*
> *Lulirama could claim an ownership interest for promotional*
> *purposes, forecloses our finding an implied or oral nonexclusive*
> *license. In support of this contention, Lulirama directs us to*
> *Woodard v. Southwest States, Inc., 384 S.W.2d 674 (Tex.1964). In*
> *that case,* **the Texas Supreme Court held that, "[w]here there**
> **exists a valid express contract covering the subject matter, there**
> **can be no implied contract."** *Id. at 675.*
>
> The flaw in Lulirama's argument stems from the fact that no express, written
> contract exists covering the subject matter of the nonexclusive license in this
> case..." (Our Emphasis Added.)

*Lulirama, Supra.,* is readily distinguishable from this case. In the first place, there never was
"**a work for hire**" arrangement between Plaintiff and Giacchino. Second, Plaintiff and
Giaccchino reduced the *agreements* between them to *writing*, which defined the representative
interests that each one held in the collaborative work, which neither agreement would allow
under USC Title 17 classified as a "joint work." Third, Plaintiff and Giacchino agreed to how
the collaborative work would be copyrighted, through whom, and what the resultant interests
and obligations would be in those regards. In fact, it the parties envisioned wide distribution
through established channels in the Music Industry, evinced by the inclusion of publication by
the well known entity, **"Code Music", ASCAP.** Fifth, the contracts involved divided royalties
in a defined manner, and the March 12th 2001 "Agreement" specifically provides that,
"Industry standard royalties will apply to this agreement..." Sixth, there is a specific, manda-
tory stipulation in the hitherto referenced "Agreement" that, "**Any other agreements between**
**Gary Graham, Damion Giacchino, and the group 'Pelican West' shall and will be made**
**on a separate document stating the terms and conditions of such document and will have**
**no bearing on this agreement**." Seventh, the federal USC Title 17 and the cited Texas law in
*Lulirama, Supra.,* both favor and encourage written contracts, and under *neither* is there a
provision for an enforceable "orally implied contract,' as the bases to override the written
express contracts, as are in this case. Eighth, Giacchino's Affidavit is totally disingenuous of
the Plaintiff's copyright and contractual rights, as no where in either agreement between them

31

is there any provision, which would allow any reading, so as to permit Giacchino to disregard his fiduciary duties to Plaintiff inherent in anyone of the referenced copyright agreements, and to account for any royalties earned, or owing, as well as, to protect Plaintiff's interests against all other claimants, which Giacchino has failed to do. Ninth, there is no provision in either agreement, which would allow Giacchino or Pelican West to waive off royalties due to Plaintiff, simply because Giacchino and the members of the band he led, Pelican West "were very happy and excited about the fact that the town of South Padre Island chose to adopt the song 'South Padre Island' as their official town song." That certainly would never constitute an excuse for Giacchino's admitted breaches of contract. Tenth, the fact that "South Padre Island", the song, became the official Town song in no way militates against its re-recording and distribution outside of the parties agreement with the concurrence of Giacchino and Pelican West as constituting per se copyright infringement, for which they are strictly liable to Plaintiff, as a matter of law.

---

## V.

## CONCLUSION

WHEREFORE, THE PREMISES CONSIDERED, Plaintiff Gary Graham respectfully prays of this Honorable Court that the relief herein requested by him be granted, and that this Court grant whatever other relief in law or equity, to which the parties might be entitled, which is just and meet, and the nature of this cause might require.

Respectfully submitted,

By: _____

Donald T. Cheatham
Attorney-in-Charge
Texas Bar No. 24029925
Southern District Bar No: 24029925
825 West 11th Street
Austin, Texas 78701
Telephone (512)494-1212
Telecopy (512)494-1213,
Attorney for Plaintiff
Gary Graham

32

## Certificate of Service

The undersigned attorney does hereby certify that the foregoing **Plaintiff Gary Graham's Response in Opposition to Defendant South Padre Island's Summary Judgment Motion and Motion for Leave to Amend, and To Add Proposed Indispensable Party Defendants, pursuant to applicable Federal Rules of Civil Procedure** has been served by telecopy, and regular mail, US Postage Pre-Paid, Return Receipt Requested, on April 5th 2004, on all counsel of record as follows:


      Eduardo V. Rodruguez
      1265 N. Expressway 83
      Brownsville, Texas 78521
      Telecopy : 956/547-9630


      Eduardo G. Garza
      Willette & Guerra, L.L.P.
      International Plaza, Suite 460
      3505 Boca Chica Boulevard
      Brownsville, Texas 78521
      Telecopy: 956/541-1893

                                          Donald T. Cheatham

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | B-03084 |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| AND HARVEST MULTIMEDIA, | § | |
| INC., | § | |
| Defendants. | § | |

## ORDER

This matter came before the Court upon Defendant the Town of South Padre Island's Motion for Summary Judgment, upon Plaintiff Gary Graham's Record Counsel's Response in Opposition to said Summary Judgment Motion, as well as, Plaintiff's Motion for Leave to Amend Complaint and to Add Indispensable Party Defendants, as well as, for other relief,

Accordingly, it is hereby

ORDERED that Defendant's Motion for Summary Judgmentid [] Denied, [] Partially Granted,[] Granted;

That Plaintiff's Motion for Leave to Amend is [] Granted, Denied[],

and Plaintiff's Motion to Add Indispensable Defendants is [] Granted [] Denied.

Date: _____

_____
U.S. District Judge

Cc:    Eduardo V. Rodriguez
       1265 N. Expressway 83
       Brownsville, Texas 78521

1

Eduardo G. Garza
Willette & Guerra, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521


Donald T. Cheatham
825 W. 11th Street
Austin, Texas 78701

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GARY GRAHAM, | § | |
|        Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | B-03084 |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| AND HARVEST MULTIMEDIA, | § | |
| INC., | § | |
|        Defendants. | § | |

### PLAINTIFF'S SWORN <u>AFFIDAVIT</u> IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO DEFENDANT TOWN OF SOUTH PADRE ISLAND'S SUMMARY JUDGMENT MOTIONS, AS WELL AS, IN SUPPORT OF PLAINTIFF'S MOTION TO AMEND COMPLAINT, AND ADD INDISPENSABLE DEFENDANTS

     1.     My name is Gary Graham, and I am competent to make this affidavit, and understand it to be under oath, under the penalties of perjury, as to the facts I have here recited.

     2.     Based upon best information, personal knowledge and belief, I shall and am prepared to testify under oath at trial to the following facts, which are true and correct:

          a. On March 12th 2001 I and proposed Defendant Damion Giacchino entered into a valid common law copyright Contract, "AGREEMENT for the Song 'South Padre Island' ", which contract is attached hereto by copy, as marked Exhibit "A" to this Affidavit, [marked as Exhibit "1" ], hereto as appended, which states in pertinent part that "<u>Gary Graham</u> is  [sic."the"] <u>composer</u> of the <u>lyrics</u>;" "Damion *Giacchino* is *composer* of music;" and "Lyrics and music to be copywritten (sic."copyrighted") and published by the company 'Code Music,' ASCAP," as well as, that "...Any other agreements between Gary Graham, Damion Giacchino and the group "Pelican West" shall and will be made on a

separate document stating the terms and conditions of such document and will have no bearing on this agreement.";

b. I filed a poor man's copyright, on March 26th reflected as Exhibit "1" to my Deposition, Padre Island's Summary Judgment Exhibit "A";

c. Damion Giacchino was well aware and knew, that I filed such copyright before Damion *Giacchino* fraudulently *filed* for his own competing *copyright* for both the *"Words & Music"* on April 10th 2001, and he acknowledges in his Summary Judgment Affidavit, that I hold a valid copyright as the owner of and for *"the lyrics of the song "South Padre Island;"*

d. Damion Giacchino does *not* hold a valid copyright to the "music and vocal melody", as asserted in III."STATEMENT OF FACTS" 1st paragraph, page 2 Padre Island's Summary Judgment Motion, where South Padre Island directly relies mistakenly upon Giacchino's factually misleading affidavit, where as sworn affiant, Giacchino states that, "Pelican West only holds the copyright to the music", (Paragraph 3 of December 12th 2003 Giacchino Affidavit, Exhibit B to South Padre Island's Summary Judgment Motion;

e. Giacchino's affidavit actually contradicts South Padre Island's own Exhibit "D", Giacchino's Copyright "Certificate of Registration", the affidavit stating that, "Pelican West holds the copyright to the music of the song 'South Padre Island' ";

f. The Copyright "Certificate of Registration" South Padre Island has offered as Exhibit "D" to its Summary Judgment Motion fraudulently and erroneously deposes to the United States Copyright Office under Paragraph "1", "Title of This Work", "South Padre Island, "previous or Alternative Titles", ,      [ which Giacchino leaves blank], "Nature of This Work", "WORDS & MUSIC", Paragraph "2", "Name of Author", "Damion Giacchino", "Nature of   Authorship", "MUSIC AND VOCAL MELODY ";

g. On the Second Page of aforesaid "Certificate of Registration, at Paragraph "5" appears the following:

"PREVIOUS REGISTRATION Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?[] YES [X] NO. If your answer is 'Yes', why is another registration being sought? (Check appropriate box.) +

    a. [] This is the first published edition of a work previously registered in unpublished form.

    b. [] This is the first application submitted as a copyright claimant.

    c. [] This is a changed version of the work, as shown by space 6 on this application.

If your answer is 'Yes' give Previous Registration Number+ Year of Regist. +"

h. On the Second Page of aforesaid "Certificate of Registration, at Paragraph "6" appears the following:

"DERIVITIVE WORK OR COMPILATION Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

    "6a" Preexisting Material  Identify preexisting work or works this work is based on or incorporates.+ "

    "6b" Material Added to This Work  Give a brief general statement of the material that has been added to this work and in which copyright is claimed. +"

      ("+" Denotes downward arrow in Original Copy, Exhibit "D".)

i. Giacchino filed the herein above referenced "Certificate of Registration" on "April 2, 2001", or nineteen days (19) after Giacchino had signed a contract with me. I never agreed or consented to Giaccchino's sole ownership of both the "WORDS & MUSIC" as he fraudulently applied for such copyright, as reflected in Exhibit "D" to South Padre Island's Summary Judgment Motion. The first I learned of Giacchino's Certificate of Registration occurred recently when I read it in assisting my lawyer to Respond to South Padre Island's Summary Judgment Motion.

j. It is of note that Giacchino left blank those portions on that official instrument, which would have identified me as the composer author of the "lyrics", or "words", or "vocal melody", which Giacchino has agreed would be the copyright personalty belonging only to me, and that there was to be a jointly owned copyright shared in by Plaintiff, Giacchino, and Pelican West, in their respective capacities, as lyricist, musical composer, and performers, and that per Exhibit "A" paragraph "4.[,] Industry standard royalties will apply to this agreement." The June 4th 2001 "Legal Agreement", Exhibit "B" to Plaintiff's Affidavit this Response hereto as Exhibit "1" was to control the shares of those royalties, between Giacchino, Pelican West, and me. I am quite disappointed that someone whom I previously believed to be a friend, would engage in such outright deception and dishonesty, and would attempt in such a betrayal to get the better of me. The statements in his affidavit as to our joint intentions are totally untrue, and otherwise false and misleading. I can not believe that he would attempt to make such inaccurate statements under oath toa Court.

k. The June 6th "Legal Agreement" between proposed Defendant Giacchino and me , hereto appended as Exhibit "B" to my own Response in Opposition to South Padre Island's Summary Judgment Motion as my Affidavit, Exhibit "1", by copy, reflects the only "copyright" intentions of the parties. This is also contrary and in dispute to what South Padre Island now asserts in their Summary Judgment Motion in regards to what actually occurred, and the effects of which USC Title 17 and precedent control. Please accord, my Deposition Page 24 Line 22 through Page 35 Line 22, which is Padre Island Summary Judgment Motion Exhibit "A". I never waived or agreed that the royalty arrangement in that agreement would not be paid to us. I never gave Giacchino nor Pelican West any authority to act outside either agreement on my behalf, or to act for me as a sole copyright owner. Further it was never either of our intentions, solely or jointly, that the song Padre Island would constitute a "joint work", as what we envisioned was merely a "collaboration" at best. Simply put, the purpose of the written agreements

was to express our intentions, as well as, our respective rights and obligations under those instruments. I never gave any legal authority to Giacchino or Pelican West, beyond what was contained in those referenced agreements. I trusted Giacchino in this regard, that he would act in each of our individual best interests. I would never have agreed to such a collaboration, had I even sensed his complete betrayal of me."

**FURTHER YOUR AFFIANT SAITH NOT.**

March 29, 2004

I have carefully reviewed the attached "Affidavit of Gary Graham". Based on personal knowledge, information and belief, the factual statements therein contained are true and correct. I affirm the same under the penalties of perjury as allowed by Title 28 of THE UNITED STATES CODE.

Gary Graham

_**Affidavit of Gary Graham, Plaintiff:**_

# EXHIBIT "A"

# AGREEMENT
## For the Song "South Padre Island"

1. Gary Graham is composer of the lyrics.
2. Damion Giacchino is composer of the music.
3. Lyrics and music to be copywritten and published by the company "Code Music," ASCAP.
4. Industry standard royalties will apply to this agreement.
5. It is agreed that the group "Pelican West" will be the artists to record the song, "South Padre Island."
6. Both parties understand and agree that after a mechanical license is issued and a release of the song has been made, that any artist has the right to record this song.
7. Any other agreements between Gary Graham, Damion Giacchino and the group "Pelican West" shall and will be made on a separate document stating the terms and conditions of such document and will have no bearing on this agreement.


_____  12-man-01   _____  3-12-01
Gary Graham        Date         Damion Giacchino        Date

*__Affidavit of Gary Graham, Plaintiff;__*

# **<u>EXHIBIT "B"</u>**

# PELICAN WEST

Radisson Resort Hotel ~ 500 Padre Blvd. ~ South Padre Island, TX 78597

## ~LEGAL AGREEMENT~

**The following shall be a legal agreement between**
## Pelican West and Gary Graham
concerning rights of the song, *South Padre Island.*

◆ Lyrics written by Gary Graham

◆ Music written by Damion Giacchino

◆ Projected selling price of CD is $7.00

◆ Recording expenses of $975.00 and replication expenses of $1690.00 for a total   of $2665 00 shall be paid from initial sales.

◆ A retroactive fee of 380.00 which represents the total expenses of $2665.00 divided by the selling price of the CD, $7.00, will be paid to Gary Graham upon receipt of product.

◆ After expenses have been paid, the following breakdown of revenue for each sale shall occur:

| | |
|---|---|
| Gary Graham | $1.00 |
| Damion Giacchino | $1.00 |
| Members of Pelican West | $5.00 |

Signature _____    Date 6-4-01

Signature _____    Date 6-4-01

Signature _____    Date _____