IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 9 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GARY GRAHAM | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-03-084 |
| VS. | § | |
| | § | (JURY REQUESTED) |
| | § | |
| TOWN OF SOUTH PADRE ISLAND | § | |
| and HARVEST MULTIMEDIA, INC. | § | |
| Defendant. | § | |

## DEFENDANT TOWN OF SOUTH PADRE ISLAND'S REPLY BRIEF TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S SWORN AFFIDAVIT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES DEFENDANT TOWN OF SOUTH PADRE ISLAND and files this it's Reply Brief to Plaintiff's Response to Defendant's Motion for Summary and Plaintiff's Sworn Affidavit and in support thereof would show as follows:

## I.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

Defendant would refer the court to the following statement of issues, some of which were made a part of Defendant's original Motion for Summary Judgement and Brief. For the purposes of completeness, Defendant included these issues in this Reply Brief.

1.     Whether or not the song "South Padre Island" constitutes a joint work under 17 U.S.C. section 501.

2.     Whether or not a copyright infringement of Gary Graham's copyright to the lyrics of the song "South Padre Island" occurred;

3.   Whether or not the Town of South Padre Island had an implied license or implied consent to use or distribute the song at issue from a joint author/owner of that work;

4.   Whether or not Gary Graham's conduct and actions constituted an implied license for the Town of South Padre Island to use the song called "South Padre Island".

5.   Whether or not Plaintiff's Affidavit Stating that the Statements of Joint Intentions Between Pelican West/Giacchino and Himself Made in Giacchino's Affidavit are False and Misleading Constitutes Proper Summary Judgement Evidence in Light of Plaintiff's Own Deposition Testimony; and

6.   Whether or not Defendant violated Plaintiff's copyright to the lyrics of the song "South Padre Island."

### III.

### SUMMARY OF THE ARGUMENT

1.   **Plaintiff's Claims that Statements of Joint Intentions Between Pelican West/Giacchino and Himself are False and Misleading are Contradicted by His Deposition Testimony**

Plaintiff makes assertions in his affidavit filed in response to Defendant's Motion for Summary Judgement that are completely contradicted by his prior deposition testimony. The contradictions revolve primarily around the fact that Plaintiff confirmed in his deposition that the song "South Padre Island" was a cooperative and joint effort between he and Giacchino/Pelican West.  While his affidavit claims that the assertions in Giacchino's affidavit are "false and misleading", his deposition testimony supports a contrary conclusion.  Defendant would contend that Plaintiff's affidavit is unreliable and incompetent summary judgement evidence.

2

2.   **Plaintiff's Sworn Statements About Copyright to Music.**

Plaintiff has sworn in his affidavit that Damion Giacchino and Pelican West do not hold a copyright to the music and vocal melody of the song "South Padre Island." He challenges Giacchino's/Pelican West's ownership interest in the song. Once again, Defendant contends this statement is contradicted by Plaintiff's deposition testimony. Plaintiff testified prior to the execution of his affidavit that Pelican West held a copyright to the music, that Giacchino/Pelican West wrote some lyrics that appear in the song, and that Giacchino/Pelican West had input into the melody of the song.

3.   **Plaintiff Produced No Evidence that Contradicts Defendant's Assertion that Plaintiff's <u>Conduct</u> Granted Defendant An Implied License to Use the Song at Issue**

Plaintiff has no rebuttal to the fact that he voluntarily brought the song at issue to Defendant and never asked for any compensation or contract associated with it. He further cannot contradict the fact that he was present at two official town meetings where the song was considered as the official town song and still undertook no conduct to suggest that the song could not be used by Defendant. Plaintiff's only response is to submit two written agreements between he and Giacchino/Pelican West which at most show that these parties shared enough interest in the song as joint authors to justify written agreements.

4.   **Plaintiff's Argument Regarding Alleged Infringement of Copyrighted <u>Lyrics</u> is Misplaced**

Defendant did not violate Plaintiff's copyright of the lyrics to the song at issue. Defendant did not use the lyrics, steal the lyrics, take credit for the lyrics in any way. Defendant utilized the

3

entire song at issue after receiving implied license based on Plaintiff's and Giacchino/Pelican West's conduct.

5.    **Plaintiff's Argument That the Song at Issue Does Not Constitute a Joint Work is Illogical.**

No evidence exists that shows that Plaintiff intended his lyrics to stand alone with no music. Defendant's summary judgement evidence conclusively establishes that Plaintiff intended his lyrics to be merged with a collaborative effort with Giacchino/Pelican West. Plaintiff's assertion that the song is not a joint work is simply a contradiction of the evidence before the court on this issue.

6.    **Plaintiff's Conduct Constitutes Clear Evidence of His Intent**

Although Plaintiff may not agree with the proposition, a party's conduct can constitute an implied license to use a copyrighted work.  Plaintiff is trying to draw focus away from his conduct by identifying two written agreements because he has no adequate rebuttal to his actions with respect to Defendant.

7.    **No Evidence Was Produced by Plaintiff to Support His allegation of an Intentional Copyright Infringement by Defendant**

Plaintiff has alleged that the alleged infringement was an intentional act of Defendant. Defendant contends that the evidence before the court does not support a finding of an intentional copyright infringement.

**III.**
**DEFENDANT'S REPLY TO POINTS RAISED IN PLAINTIFF'S SWORN AFFIDAVIT**
**FILED IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

A)   **Plaintiff's Claims that Statements of Joint Intentions Between Pelican**
     **West/Giacchino and Himself are False and Misleading are Contradicted by His**
     **Deposition Testimony**

Plaintiff has sworn in his affidavit that the statements in Damion Giacchino's affidavit as to

the joint intentions between them are "totally untrue, and otherwise false and misleading." He

also stated "I cannot believe that he would attempt to make such inaccurate statements under oath

to a court." Defendant would submit that the clearest response to these new assertions of Plaintiff

made in his sworn affidavit would be to refer the court to certain excerpts of the deposition

testimony of Plaintiff given on November 3, 2003. These excerpts clearly confirm Plaintiff's

intent to create a joint work with Giacchino/Pelican West consisting of a song made up of

Plaintiff's original lyrics and Giacchino's/Pelican West's music and new lyrics. They can be

summarized as follows:

> Q. Did Pelican West have any input in the melody of the song–to the music that appears
>    on the song South Padre Island?
> A. Yes.
> Q. Was it a joint effort between you and Pelican West?
> A. Yes.
>
> (See Exhibit A1 pg. 30 lines 16-21).
>
>
> Q. Who decided to add the harmony to the song South Padre Island?
> A. We all did.
> Q. Was it a joint effort?
> A. Yes.
>
> (See Exhibit A1 pg. 31 lines 3-7).

5

Q. Was it your intent that the lyrics that you wrote for the song South Padre Island be merged with music of Pelican West to create the song that appears on the CDs South Padre Island?

A. You merge the lyrics with the music. Of course that's what you do.

Q. That was your intent when you provided them with the lyrics, correct?

A. Right.

(See Exhibit A1 pg. 27 lines 11-19).

Q. Pelican West holds a copyright on the song South Padre Island, correct?

A. For the music, yes, that's correct.

(See Exhibit A1 pg. 29 lines 17-19).

Q. You said you provided them with the lyrics so that they could put music to the song, right?

A. Right

Q. Did you?

A. Well, let's make it exact here. The deal was–is that in exchange for them putting up the money for the recording session, whatever, I gave them half the music, which is–it's done a lot.

(See Exhibit A1 pg. 25 lines 23-25, and pg. 26 lines 1-5).

Q. And Pelican West was supposed to, I guess, make this song known to the public, get it distributed, or what?

A. Right. It was a cooperative effort.

(See Exhibit A1 pg. 25 lines 14-16).

Plaintiff's affidavit is simply an effort to introduce a complete contradiction to deposition testimony he has committed to which confirms the existence of joint authorship/ownership of the song South Padre Island. It is completely misleading and erroneous for Plaintiff, when faced with a motion for summary judgement based on his own admissions, to now claim that the song South Padre Island was not a joint work despite his acknowledgment of the contributions to the song by Giacchino/Pelican West and his admission that Pelican West held the copyright to the music of the song. As such, Defendant would submit that the affidavit of the Plaintiff is unreliable and

6

incompetent summary judgement evidence.

**B)    Plaintiff's Sworn Statements About Copyright to Music.**

Plaintiff has sworn in his affidavit that Damion Giacchino and Pelican West do not hold a copyright to the music and vocal melody of the song "South Padre Island." He claims he never consented to Giacchino's sole ownership of words and music and states that he first learned of Giacchino's Certificate of Registration recently when he read Defendant's Motion for Summary Judgement. Plaintiff's sworn deposition testimony that occurred on November 3, 2003 indicates that this statement simply cannot be true. In his deposition, Plaintiff confirmed that he holds the copyright to the lyrics of the song and that he does **not** hold the copyright to the **entire song**. (emphasis added). (Please See Exhibit A1, pg. 27 lines 23-25 and page 28 line 1). Plaintiff specifically confirmed however, that Pelican West holds a copyright to the music of the song South Padre Island. (Please See Exhibit A1, pg. 29 lines 17-19 attached hereto). He also conceded that he originally wrote the "song" as a commercial and that Pelican West changed the lyrics, wrote some lyrics, changed the music, and had input into the melody of the song. (Please See Exhibit A1, pg. 29 lines 20-25, page 30 lines 1-19, pg. 32 lines 5-25, pg. 33 lines 1-15 and Exhibit B1 attached hereto). Further, the "Legal Agreement" offered by Plaintiff in response to Defendant's Motion specifically indicates that the music to the song was written by Damion Giacchino. Plaintiff now tries to claim that Damion Giacchino's copyright and ownership interests are invalid yet he has repeatedly confirmed that Damion Giacchino wrote music and words that were incorporated into the final joint work made the subject of this litigation.

It is clear that Plaintiff acknowledged by his testimony that Damion Giacchino and Pelican

7

West are essentially interchangeable terms or concepts and that there was no intent to fraudulently misrepresent Graham's contributions to the song South Padre Island. It was undisputed in Defendant's Motion for Summary Judgement and the evidence attached thereto that Plaintiffs held the copyright to the **lyrics** of the song. However, in order to attempt to rebut the fact that the song at issue is a joint work, Plaintiff has improperly resorted to claiming he had no knowledge of Giacchino/Pelican West's copyright and that this song is actually only Gary Graham's. Graham's deposition testimony confirms that he in fact knew "Pelican West" held the copyright to the music of the song and played a major part in developing the vocal melody to the song long before he ever read Defendant's Motion for Summary Judgement.

It is indisputable and conceded by Plaintiff that Damion Giacchino wrote some of the lyrics to the song at issue. It is also indisputable and formerly conceded by plaintiff that Giacchino holds a copyright to the music of the song at issue. Plaintiff is attempting to challenge Giacchino's copyright of words and music Giacchino wrote in his affidavit after he has already judicially admitted in his deposition that Giacchino in fact did this. Further, Defendant contends that Plaintiff cannot argue that Giacchino/Pelican West had no authority to provide implied license to Defendant to use the song when the very writings he cites as support evidence an interest that would be shared by joint authors. Plaintiff's affidavit is misleading and an attempt to confuse the issue of joint ownership/authorship by essentially attempting to improperly lay claim to the entire song at issue.

**C)** **Plaintiff Produced No Evidence that Contradicts Defendant's Assertion that Plaintiff's <u>Conduct</u> Granted Defendant An Implied License to Use the Song at Issue**

Plaintiff has no rebuttal to the fact that his conduct provided implied consent to Defendant to use the song at issue. It is undeniable that Plaintiff's bringing the song to the Defendant to have it declared the official town song constitutes clear evidence of his intent to allow the town to use and play the song for others. Plaintiff has acknowledged in his deposition that he never asked Defendant for money, royalties, or a contract. 9Please See Exhibit A1 pg. 40 lines 3-5). If he never intended for the Defendant to play the song for others, why would he have voluntarily brought the song to the Defendant and celebrated when the declaration was entered? Plaintiff completely ignored this evidence and produced no contradictory evidence for the court to consider on this issue because no such contrary evidence exists.

Plaintiff cites an excerpt from <u>Lulirama Ltd., Inc. vs. Axcess Broadcast Services, Inc.</u> , 128 F3d 872, 879 (5th Cir. 1997) which states "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license...." 3 NIMMER, supra, § 10.03[A], at 10-41 (footnotes omitted). Other circuits have held that an implied nonexclusive license arises when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Defendant's summary judgement evidence conclusively establishes that Plaintiff went to Pelican West and sought their skills to create the music for the song and re-write some lyrics. (See Exhibit A1 pg. 23 lines 24-25, pg. 24 line 1, and lines 18-20). It is undisputed that the lyrics and music were combined to make the song South Padre Island. Plaintiff specifically intended that Giacchino and Pelican West copy and distribute the song South Padre Island containing some of Plaintiff's lyrics. (See Exhibit A1 pg. 25 line 25, and pg. 26 lines 1-16). To argue that no work

9

for hire or like agreement existed is inconsistent with Plaintiff's own testimony cited herein.

Further, Defendant does not concede that non-exclusive licenses can only be granted by conduct

in cases involving work for hire agreements.

**D)    Plaintiff's Argument Regarding Alleged Infringement of Copyrighted <u>Lyrics</u> is Misplaced**

Plaintiff contends that Giacchino and Pelican West could not have licensed anything

regarding Plaintiff's copyrighted lyrics because such copyright belongs to Plaintiff.  Defendant

would re-submit that first and foremost, the implied license to use the song arose from the

conduct of Giacchino and Plaintiff.  Further, Defendant never used Plaintiff's "lyrics", it

incorporated the entire song (consisting of lyrics and music that together form a joint work) which

was brought to Defendant by Plaintiff.  Defendant did not re-print Plaintiff's lyrics, did not re-

write Plaintiff's lyrics, and did not incorporate Plaintiff's lyrics into some other song.  To follow

Plaintiff's logic regarding a license to use the lyrics to the song which he claims is not a joint

work, Plaintiff would not have had any authority to bring the song to the Defendant to declare it

as the official town song because he did not hold a copyright to the <u>music</u> of the song!

Essentially, Plaintiff would be admitting the he violated Giacchino and Pelican West's copyright to

the music of the song by bringing it to Defendant in the first place.

**E)    Plaintiff's Argument That the Song at Issue Does Not Constitute a Joint Work is Illogical.**

Plaintiff must concede that songs are made up of lyrics and music.  When these two

elements were joined in the joint work called "South Padre Island", that song/joint work became a

10

tangible work that Plaintiff could and did bring to the Defendant for its use. There is absolutely no evidence before the court that Plaintiff ever intended his lyrics to stand alone with no music. On the contrary, Defendant's summary judgement evidence conclusively establishes that Plaintiff intended his lyrics to be merged with a project that was jointly undertaken by he and Giacchino/Pelican West. Both Plaintiff and Giacchino/Pelican West collaborated with each other and intended that their contributions be merged as parts of a unitary whole. The intent of Plaintiff to co-author a song with Giacchino/Pelican West is clear and has not been rebutted by Plaintiff.

**F)      Plaintiff's Conduct Constitutes Clear Evidence of His Intent**

Plaintiff speaks of two agreements he has referenced as the only evidence of Plaintiff's intent. He wants this court to ignore all other evidence of his intent including his admissions in his own deposition testimony. The actions of Plaintiff that reflect his intent on creating a joint work are evidenced by the fact that Plaintiff facilitated and worked to get the song declared the "official town song". It is considered well established law in the 5th Circuit that a non-exclusive implied license need not be evidenced by a writing (such as the agreements referenced by Plaintiff), rather such a license may be implied from conduct. Lulirama, 128 F.3d at 879; Carson v Dynegy, 344 F.3d 446, 451 (5th Cir. 2003); see generally CMS Software Design System Inc. v. Info Designs, Inc., 785 F.2d 1246, 1248 (5th Cir. 1986); and Batistse v Island Records, Inc.,, 179 F.3d 217, 222 (5th Cir. 1999). Plaintiff cannot ignore his actions and conduct and claim that the only evidence of intent stems from two writings that do not discuss or mention Defendant.

**G)      No Evidence Was Produced by Plaintiff to Support His allegation of an Intentional Copyright Infringement by Defendant**

11

Without waiving the arguments, evidence, and authorities cited by Defendant herein and in its Motion For Summary Judgement and Brief, Defendant would submit that no evidence exists of any alleged intentional infringement of Graham's copyright. Defendant's evidence shows that Defendant did not acquire this song by its own accord, it was brought to the defendant. Defendant has never denied Plaintiff's contribution to the song at issue and Defendant has never claimed it wrote or created the song at issue. Finally, Defendant's summary judgement evidence shows the clear message of intent demonstrated by Plaintiff's conduct and the rationale for why Defendant contends it had implied license and consent to use its official town song.

## II.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant the TOWN OF SOUTH PADRE ISLAND requests that all of Plaintiff's claims against it be dismissed with prejudice, that Plaintiff take nothing by this lawsuit, that Defendant recover all costs incurred herein, and that Defendant recover such other and further relief, at law and in equity, to which they may show itself to be justly entitled to.

Singed on this 19th day of April, 2004.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
1534 E. 6th Street Suite 200
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: Charles Willette Jr. /pEG
    Charles Willette, Jr.

12

USDC No. 1937
State Bar No. 21509700

Eduardo Garza
State Bar No. 00796609
USDC Adm. No. 3399
**ATTORNEYS FOR
DEFENDANT THE TOWN
OF SOUTH PADRE ISLAND**

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2004, a true and correct copy of the above and foregoing has been served on all counsel of record via certified mail as noted below:

*Via CMRRR*
Donald T. Cheatham
ATTORNEY AT LAW
825 West 11th Street
Austin, Texas 78701

*Via* _____
Eduardo V. Rodriguez
ATTORNEY AT LAW
1265 N. Expressway 83
Brownsville, Texas 78521

Eduardo G Garza

14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GARY GRAHAM                )(
                           )(
        Plaintiff          )(
                           )(
    VS.                    )( CIVIL ACTION NO. B-03-O84
                           )(
TOWN OF SOUTH PADRE        )(
ISLAND and HARVEST         )(
MULTIMEDIA, INC.           )(
                           )(
        Defendant          )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
GARY GRAHAM
NOVEMBER 3, 2003

---

    ORAL AND VIDEOTAPED DEPOSITION OF GARY GRAHAM, produced

as a witness duly sworn by me at the instance of the defendant

Town of South Padre Island, taken in the above-styled and

numbered cause on November 3, 2003, before THURMAN J. MOODY,

Certified Shorthand Reporter No. 2861 in and for the state of

Texas, at the offices of Willette & Guerra, L.L.P., 3505 Boca

Chica Boulevard, Suite 460, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.



EXHIBIT
A-1



ORIGINAL

POCKRUS REPORTING SERVICE
McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

11:20  1      A.    Yes.

11:20  2      Q.    Does your accountant do your taxes for you?

11:20  3      A.    Yes.

11:20  4      Q.    Who's your accountant?

11:20  5      A.    Used to be Ron -- I can't recall his name now.  It's

11:21  6    Moore, Horton & Company in Missouri.  I can't recall his name.

11:21  7      Q.    Did your -- when you did your work as an entertainer

11:21  8    or a songwriter, was that done under a separate name, a

11:21  9    company name, or just done under your name?

11:21  10     A.    Just under my name.

11:21  11     Q.    There's no separate type of income tax that's filed

11:21  12   on behalf of --

11:21  13     A.    No.

11:21  14     Q.    -- a recording company or something like that?

11:21  15     A.    No.

11:21  16     Q.    What was your involvement in the song called *South*

11:22  17   *Padre Island*?

11:22  18     A.    I wrote the song.

11:22  19     Q.    What exactly did you write?

11:22  20     A.    The lyrics.

11:22  21     Q.    You hold a copyright for those lyrics of the song

11:22  22   *South Padre Island*, correct?

11:22  23     A.    Yes, I do.

11:22  24     Q.    When did you approach the band Pelican West to put

11:22  25   music to those lyrics?

| | | |
|---|---|---|
| 11:22 | 1 | A.    I think it was sometime in January of '01. |
| 11:22 | 2 | Q.    May I ask what you're referring to? |
| 11:22 | 3 | A.    This is a time line. |
| 11:22 | 4 | Q.    Are those documents that -- there's a folder in front |
| 11:22 | 5 | of you with some documents in it, correct? |
| 11:22 | 6 | A.    Right. |
| 11:22 | 7 | Q.    Are those documents you reviewed in preparation for |
| 11:22 | 8 | your deposition today? |
| 11:22 | 9 | A.    No. |
| 11:22 | 10 | Q.    What is it? |
| 11:22 | 11 | A.    Just this time line. |
| 11:22 | 12 | Q.    That's the first page you're talking about? |
| 11:22 | 13 | A.    Right. |
| 11:22 | 14 | Q.    What's the rest of that folder that you have here? |
| 11:23 | 15 | A.    Correspondence. |
| 11:23 | 16 | Q.    That's stuff between you and your lawyer? |
| 11:23 | 17 | A.    Yes. |
| 11:23 | 18 | Q.    Why did you approach Pelican West with these lyrics |
| 11:23 | 19 | that you wrote? |
| 11:23 | 20 | A.    Good group. |
| 11:23 | 21 | Q.    What did you want them to do? |
| 11:23 | 22 | A.    I wanted them to record it and I played it for them |
| 11:23 | 23 | on the guitar and they loved it and they wanted to record it. |
| 11:23 | 24 | We made a deal for them to record it. |
| 11:23 | 25 | Q.    What was the deal? |

11:23  1      A.   The deal was -- is that they paid for everything to

11:23  2   record it, get a finished CD that they could sell off of the

11:23  3   stage and plus go to the radio stations with at their expense.

11:24  4   In exchange for that, I gave them the music.

11:24  5      Q.   Any other details to the agreement?

11:24  6      A.   I don't have it here in front of me.  I do have it,

11:24  7   but I think that it mentions in there that the royalty rate

11:24  8   will be standard for the industry.

11:24  9      Q.   Is this a written agreement?

11:24 10      A.   Yes.

11:24 11      Q.   Do you maintain a copy of that agreement at your

11:24 12   home?

11:24 13      A.   Yes, I do.

11:24 14      Q.   And Pelican West was supposed to, I guess, make this

11:24 15   song known to the public, get it distributed, or what?

11:24 16      A.   Right.  It was a cooperative effort.

11:25 17      Q.   What exactly did you give them?  Did you give them

11:25 18   anything in writing?

11:25 19      A.   We had a typed-up agreement.

11:25 20      Q.   But other than that, with respect to the lyrics of

11:25 21   the song -- did you provide them lyrics in writing?

11:25 22      A.   I don't understand.

11:25 23      Q.   You said that you provided them with the lyrics so

11:25 24   that they could put music to the song, right?

11:25 25      A.   Right.

11:25  1       Q.   Did you?

11:25  2       A.   Well, let's make it exact here.  The deal was -- is

11:25  3   that in exchange for them putting up the money for the

11:25  4   recording session, whatever, I gave them half the music, which

11:25  5   is -- it's done a lot.

11:25  6       Q.   Okay.

11:25  7       A.   That's what the deal was.

11:25  8       Q.   How did you give them the lyrics?  Was it something

11:25  9   you typed up on a sheet of paper, something you wrote up,

11:25  10  or --

11:25  11      A.   Yes.

11:25  12      Q.   Which one was it?

11:25  13      A.   I sang it, played it for them plus I gave them the

11:25  14  typed lyrics.

11:26  15      Q.   How many pages of lyrics did you provide them?

11:26  16      A.   One.

11:26  17      Q.   It was a typewritten document?

11:26  18      A.   Yes.

11:26  19      Q.   Did that page have any writing on it other than the

11:26  20  typewritten -- stuff that you would have typed with a

11:26  21  computer, I would imagine?

11:26  22      A.   I think it was on a computer, yes.

11:26  23      Q.   Did the page you gave Pelican West have anything

11:26  24  other than typewritten words on it?

11:26  25      A.   No.

11:26　1　　　Q.　What did Pelican West do with respect to the song

11:26　2　*South Padre Island?*

11:26　3　　　A.　What did they do?  They recorded it.

11:26　4　　　Q.　Other than -- when you say they recorded it, what

11:26　5　does that mean?  Can you be more specific to what exactly they

11:26　6　did?

11:26　7　　　A.　Went to the studio and did what we call a session.  I

11:26　8　was present and helped with engineering on it and what have

11:26　9　you, then we brought -- get the master from that, and they

11:27　10　sent the master away to a company and had CDs produced.

11:27　11　　　Q.　Was it your intent that the lyrics that you wrote for

11:27　12　the song *South Padre Island* be merged with music of Pelican

11:27　13　West to create the song that appears on the CDs *South Padre*

11:27　14　*Island?*

11:27　15　　　A.　You merge the lyrics with the music.  Of course

11:27　16　that's what you do.

11:27　17　　　Q.　That was your intent when you provided them with the

11:27　18　lyrics, correct?

11:27　19　　　A.　Right.

11:27　20　　　Q.　You do not hold a copyright on the song *South Padre*

11:27　21　*Island*, correct?

11:27　22　　　A.　I hold a copyright on the song *South Padre Island.*

11:27　23　　　Q.　You own a copyright to the lyrics *South Padre Island?*

11:27　24　　　A.　Right.

11:28　25　　　Q.　But do you have a copyright on the entire song?

11:28  1    A.   No.

11:28  2              (Exhibit No. 1 marked.)

11:28  3    Q.   (By Mr. Garza:)  Mr. Graham, I'm going to hand you

11:28  4    what's been marked as Deposition Exhibit No. 1.

11:28  5    A.   Uh-huh.

11:28  6    Q.   Do you know what that document is?

11:28  7    A.   Yes.

11:28  8    Q.   Can you identify it for me please?

11:28  9    A.   It's a United States copyright.

11:28  10   Q.   And what copyright is it on?

11:28  11   A.   *South Padre Island*.

11:28  12   Q.   What part of the song *South Padre Island* is it a

11:29  13   copyright on?

11:29  14   A.   It says here the lyrics.

11:29  15   Q.   Is there any other part of the song that is included

11:29  16   in the copyright registration that you have that you're

11:29  17   holding as Exhibit No. 1?

11:29  18   A.   No.

11:29  19   Q.   And who is the holder of those lyrics as per the

11:29  20   document marked Exhibit 1?

11:29  21   A.   I am.

11:29  22   Q.   Was this document signed by you?

11:29  23   A.   Yes.

11:29  24   Q.   What numbered paragraph was it signed on?

11:29  25   A.   Paragraph six here.

11:29  1    Q.   May I see it?  I'd like to hold it up just for the

11:29  2  video record, if we can get a shot and see what Deposition

11:29  3  Exhibit 1 is.

11:29  4               THE VIDEOGRAPHER:  I've got it.

11:29  5               MR. GARZA:  Thank you.

11:29  6    Q.   (By Mr. Garza:)  Now, under the -- under section

11:29  7  five where it says types of authorship in this work, there's

11:29  8  three boxes.  There's one for music, there's one for lyrics,

11:29  9  there's one for something called other text.  The one that's

11:29  10  marked off on this registration is lyrics, right?

11:30  11    A.   Correct.

11:30  12    Q.   Was that done by you?

11:30  13    A.   Yes.

11:30  14    Q.   Did you make all the marks on this form before filing

11:30  15  it with the copyright office?

11:30  16    A.   My wife typed it and I signed it.

11:30  17    Q.   Pelican West holds a copyright on the song *South*

11:30  18  *Padre Island*, correct?

11:30  19    A.   For the music, yes, that's correct.

11:30  20    Q.   Did Pelican West change some of your lyrics?

11:30  21    A.   Yeah.  We changed some of them at the time.

11:30  22    Q.   Pelican West actually wrote some of the lyrics that

11:30  23  appear in the final version of the song *South Padre Island*,

11:30  24  correct?

11:30  25    A.   Some of them, yes.

11:30 1      Q.   Did Pelican West write the music to the song *South*
11:30 2  *Padre Island*?
11:30 3      A.   I gave them the music.  They changed some of that,
11:30 4  too.  So --
11:30 5      Q.   Did they write the sheet music for the song *South*
11:30 6  *Padre Island*?
11:30 7      A.   I have never seen any sheet music to it.
11:30 8      Q.   Did they choose the chords that they were going to
11:30 9  play in the song *South Padre Island*?
11:31 10     A.   I don't know what that has -- you know, I guess when
11:31 11 you get in the studio, anything can happen, you know.  Whether
11:31 12 they did, you know, I don't know.
11:31 13     Q.   Who wrote the melody that appears in the CD entitled
11:31 14 *South Padre Island*?
11:31 15     A.   I did.
11:31 16     Q.   Did Pelican West have any input in the melody of the
11:31 17 song -- to the music that appears on the song *South Padre*
11:31 18 *Island*?
11:31 19     A.   Yes.
11:31 20     Q.   Was it a joint effort between you and Pelican West?
11:31 21     A.   Yes.
11:31 22     Q.   Who wrote the harmony of the song *South Padre Island*?
11:31 23     A.   The harmony?
11:31 24     Q.   Yes, there's a melody and a harmony part, correct?
11:31 25 Or am I mistaken?

| | | |
|---|---|---|
| 11:31 | 1 | A.    There's a melody and it's -- harmonies are things |
| 11:31 | 2 | that are added in the studio. |
| 11:31 | 3 | Q.    Who decided to add the harmony to the song *South* |
| 11:31 | 4 | *Padre Island*? |
| 11:31 | 5 | A.    We all did. |
| 11:31 | 6 | Q.    Was it a joint effort? |
| 11:31 | 7 | A.    Yes. |
| 11:31 | 8 | Q.    Pelican West performed the song, correct? |
| 11:31 | 9 | A.    Yes. |
| 11:31 | 10 | Q.    Did you do any performance that appears on the CD, |
| 11:32 | 11 | the final CD of the song *South Padre Island*? |
| 11:32 | 12 | A.    I worked with the engineer. |
| 11:32 | 13 | Q.    Were you playing any instrument -- |
| 11:32 | 14 | A.    No. |
| 11:32 | 15 | Q.    -- singing or anything like that? |
| 11:32 | 16 | A.    No.  No. |
| 11:32 | 17 | Q.    Pelican West recorded the song, correct? |
| 11:32 | 18 | A.    Yes. |
| 11:32 | 19 | Q.    Who supplied the vocals for the song *South Padre* |
| 11:32 | 20 | *Island* that appears on the CD? |
| 11:32 | 21 | A.    Pam. |
| 11:32 | 22 | Q.    Who is Pam? |
| 11:32 | 23 | A.    Singer. |
| 11:32 | 24 | Q.    Who does she sing for? |
| 11:32 | 25 | A.    Pam.  Pam.  She's singer for Pelican West.  I think |

| 11:32 | 1 | that's her.  Pam, yeah. |

11:32  1  that's her.  Pam, yeah.

11:32  2      Q.  Pelican West supplied the vocals?

11:32  3      A.  Yes.  She did all the vocals.

11:32  4          (Exhibit No. 2 marked.)

11:32  5      Q.  (By Mr. Garza:)  I'm going to hand you what's been

11:33  6  marked Deposition Exhibit No. 2.  Have you ever seen that

11:33  7  document before?

11:33  8      A.  Yeah.  This is back when I first -- first wrote it.

11:33  9      Q.  Can you tell me what Deposition Exhibit No. 2 is?

11:33  10      A.  It's a typed version of the song when I first wrote

11:33  11  it.

11:33  12      Q.  So Exhibit No. 2 contains a copy of the typewritten

11:33  13  lyrics to the song *South Padre Island*?

11:33  14      A.  Right.

11:33  15      Q.  And that -- the typing that appears in this document,

11:33  16  is that the same typing that you were referring to earlier

11:33  17  with respect to the lyrics you provided to Pelican West?

11:33  18      A.  Yeah.  Then there's some changes after this.

11:33  19      Q.  But you typed that document that's marked as Exhibit

11:33  20  2?

11:33  21      A.  I think so, yes.

11:33  22      Q.  The additional markings that are on the document

11:34  23  listed as Exhibit 1 --

11:34  24      A.  Uh-huh.

11:34  25      Q.  -- that appear to be made in pen or handwriting --

| 11:34 | 1 | A.   Uh-huh. |

11:34    1    A.    Uh-huh.

11:34    2    Q.    -- that was done by somebody at Pelican West?

11:34    3    A.    It wasn't done by me.

11:34    4    Q.    So the only writing that you would have done on

11:34    5    Deposition Exhibit No. 2 would have been the actual

11:34    6    typewritten stuff; is that correct?

11:34    7    A.    Well, that's not -- that's not really correct.  We

11:34    8    changed -- we sat down and agreed on some of the lyrics

11:34    9    because originally the song was written as a commercial.

11:34   10    Q.    Who changed it from being a commercial?

11:34   11    A.    Damien and I both worked on it.  He put a lot of time

11:34   12    on it himself.

11:34   13    Q.    May I see it?  Do you know who made these markings

11:34   14    and handwriting?

11:34   15    A.    I do not.

11:34   16            MR. GARZA:  I'm going to hold the deposition up

11:34   17    to the one we have been referring to.  Thank you.

11:35   18    Q.    (By Mr. Garza:)  Whose idea was it to approach the

11:35   19    Town of South Padre Island with the song *South Padre Island*?

11:35   20    A.    That was a thing, that one of the aldermen heard me

11:35   21    playing it and singing it one day and he liked it and I told

11:35   22    him that when we got done with it I'd give him a CD, Pelican

11:35   23    West was going to record it.  And when we got finished with

11:35   24    it, I played it for him and they wanted me to bring it to a

11:35   25    town meeting.

GARY GRAHAM

### SIGNATURE OF GARY GRAHAM

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on November 3, 2003, except as to any corrections I have listed on page 56 herein.

GARY GRAHAM

THE STATE OF Missouri

COUNTY OF Benton

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 23rd day of Jan., 2003.

JULIA L. BETTS
Notary Public - Notary Seal
State of Missouri
Commissioned in Benton County
My Commission Expires Jun 12, 2007

Julia L Betts
Notary Public in and for
The State of ~~Texas~~ Missouri

My commission expires:
Jun 12, 2007

### POCKRUS REPORTING SERVICE

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GARY GRAHAM                    )(
                               )(
        vs.                    )( CASE NO. B-03-084
                               )(
TOWN OF SOUTH PADRE ISLAND and )(
HARVEST MULTIMEDIA, INC.       )(

REPORTER'S CERTIFICATE

I, THURMAN J. MOODY, Certified Shorthand Reporter, certify that the witness, GARY GRAHAM, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on November 3, 2003; that the deposition was reported by me in Stenographic shorthand and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on ~~November~~ _____, 2003.

_____
THURMAN J. MOODY, CSR NO. 2861
Expiration Date: 12/31/03

Pockrus Court Reporting Service
Firm Registration No. _____
Post Office 531786
Harlingen, Texas 78553
1-800-423-7713 (Toll Free)

POCKRUS REPORTING SERVICE

McAllen 630-3331 * Harlingen 423-7703 * Brownsville 350-4940