United States District Court
Southern District of Texas
ENTERED

MAR 3 1 2005

Michael N. Milby, Clerk of Court
By Deputy Clerk ⟨signature⟩

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| **GARY GRAHAM,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **C.A. No. B-03-84** |
| § | |
| **TOWN OF SOUTH PADRE ISLAND** § | |
| **AND HARVEST MULTIMEDIA, INC.,** § | |
| **Defendants.** § | |

## ORDER

BE IT REMEMBERED that on March 30, 2005, the Court **GRANTED IN PART AND DENIED IN PART** Defendant's Motion for Summary Judgment [Dkt. No. 25]; and **DENIED** Plaintiff's Motion to Amend Complaint [Dkt. No. 31].

### I.  Undisputed Factual and Procedural Background

The Court begins by noting that the quality of Plaintiff's briefing is abysmal. Instead of methodically responding to the points raised in Defendant's Motion for Summary Judgment, Plaintiff has barraged the Court with a hodgepodge of factual and legal statements that have made the Court's work more difficult.  More specifically, through obscure references to the Irish King Diarmed (567 A.D.), and a presentation of the history of copyright law beginning with the Statue of Anne (1709 England), Plaintiff presents the Court with 32 questions he believes must be resolved.  Needless to say, the Court views the task at hand more narrowly.  Additionally, the Plaintiff reproduced several pages of single-spaced excerpts from cases that are easily accessible on Westlaw and Lexis/Nexis.  At times, Plaintiff actually quotes language in case law that is helpful to defendants.  Alas, with divining rod in hand, the Court wades through the 32-page[1] response that reads more like an incoherent treatise –never again will the Court liberally grant leave to exceed the briefing page limit, for no good deed goes

---

[1] The response is 44 pages if the Court counts the 12 pages of "summary arguments" and list of authorities.

unpunished.

Plaintiff Gary Graham alleges that his copyright was infringed when the Town of South Padre Island used and reproduced the song without his permission. Defendant Town of South Padre Island argues it did not infringe Plaintiff's copyright to the lyrics of the song, and the song constitutes a joint work pursuant to 17 U.S.C. § 101. Defendant additionally argues it had an implied license to use the song based on the conduct and actions of Plaintiff, Giacchino, and Pelican West. Finally, Defendant asserts it had permission and authority to use and distribute the song because a joint author of the work, Giacchino, consented to such use and distribution.

Plaintiff composed lyrics to the song *South Padre Island.* The song was originally written as a commercial.[2] Damion Giacchino is a member of the band Pelican West. On March 26, 2001, Plaintiff registered his copyright pursuant to Title 17 of the United States Code. Plaintiff contends that only he holds a valid copyright to the song *South Padre Island*, and consequently, Damion Giacchino does not hold a valid copyright to the same song. Defendant argues Plaintiff holds a valid copyright to the lyrics of the song only, while Giacchino holds the copyright to the music and vocal melody to the song. Giacchino and the band Pelican West rewrote some of the lyrics to the song, altered the music to the song, and performed and recorded the song.

This dispute began when Plaintiff approached the band Pelican West to explore the possibility of recording the song. Plaintiff contends he entered into two contracts with Pelican West and Damion Giacchino, in which Pelican West agreed to pay for everything to record the song, and produce a finished CD that could be sold offstage. Plaintiff asserts a town alderman asked him to bring the song to a South Padre Island Town meeting to play the song and discuss the town's adoption of the song as the "official town song." At the first meeting, Plaintiff played a CD of the song, which Pelican West had recorded. At the second town meeting, which Plaintiff attended, the town voted and the song was in fact declared the "official town song." Pelican West

---

[2]Plaintiff stated in his deposition that both he and Damion Giacchino worked on the song, changing it from a commercial to the song *South Padre Island.* Plaintiff stated, "[Damion] put a lot of time on it himself." Def's Motion for Summary Judgment, Ex. A, at p. 33.

and Damion Giacchino did not attend these meetings, although they were aware of the meetings and according to Plaintiff were "thrilled" at the possibility of the song becoming "official."

Initially, Plaintiff was also pleased with the Town's adoption of the song. Plaintiff acknowledges in his deposition that Plaintiff did not ask the Town of South Padre Island for any money associated with the song, and Plaintiff did not discuss royalties with the town. Plaintiff never approached anyone to negotiate a royalty agreement or any other agreement. Once the song was declared the official town song, South Padre Island reproduced CDs of the song and included the CD in its visitor's guide CD-Rom. The CDs were produced at the Town's expense, and the CDs were distributed for free. Defendants present unrefuted evidence in the form of an affidavit that Damion Giacchino did not know the town was going to include the song on its visitor's guide, but that after he found out, he never voiced an objection, and he had no opposition to the town's use of the song on their CD-Rom. Damion Giacchino has not brought suit against the Town of South Padre Island for copyright infringement, and he does not contest the Town's use of the song. Rather, his only criticism concerned the CD-Rom's poor finished quality.

## II. Motion to Amend Complaint and Add Indispensable Party Damion Giacchino

Plaintiff filed a Motion for Leave to Amend Complaint to Add Third Indispensable Defendant [Dkt. No. 31] nearly two months after discovery closed and after the dispositive motion deadline. Plaintiff argues the amendment is needed because he only learned for the first time that Pelican West band leader, Damion Giacchino, had copyrighted both the "words and music" to the "song" *South Padre Island* without informing Plaintiff of his copyright registration when Defendant filed its Motion for Summary Judgment. Plaintiff alleges in his motion that Giacchino willfully infringed his copyright, breached contracts with the Plaintiff, and filed a fraudulent application with the United States Copyright Office. *See* Pl's Response to Def's Motion for Summary Judgment and Motion for Leave to Amend Compliant, at p. 2 [Dkt. No. 31]. These actions, Plaintiff contends, violated two agreements between Plaintiff and Pelican West.

Although leave to amend should be freely given when justice requires, it is within

this Court's discretion to deny Plaintiff leave to amend his complaint. *See* Fed. R. Civ. P. 15(a). In this case, Plaintiff moved to amend his complaint and add Damion Giacchino as an indispensable party long after discovery closed and the dispositive motion deadline passed. Federal Rule of Civil Procedure 19(a) governs this Court's decision concerning whether the absent party should be joined. Joinder under Rule 19(a) is warranted if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person [sought to be added] claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).

Plaintiff makes no attempt to explain either why Damion Giacchino is an indispensable or necessary party. Plaintiff's additional allegations in no way indicate the "proposed" defendant is indispensable to this action: Giacchino's absence in no way impedes complete relief to those individuals who are already parties; Giacchino does not claim an interest relating to the subject of the action, in fact Defendant has submitted Giacchino's affidavit in which he states he does not believe a violation of his copyrights occurred and he does not desire to take action against the Town of South Padre Island; and it does not appear that Giacchino has any claim he wishes to pursue against Plaintiff. In short, Plaintiff has utterly failed to demonstrate why Giacchino is an indispensable party under Rule 19(a) or why the Court should exercise its discretion and grant him leave to amend his complaint at such a late date.[3]

---

[3]The Court says nothing of the likely futility of adding Giacchino as a Defendant for the alleged infringement of Plaintiff's copyright to the lyrics to the song *South Padre Island*. "'A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright.'" *See Quintanilla v. Texas Television Incorporated*, 139 F.494, 498 & n.20 (5th Cir. 1998) (citations omitted). Additionally, Plaintiff's allegation that Giacchino registered a copyright of the same material less than one month after Plaintiff registered his copyright is not material to Plaintiff's infringement claim under 17 U.S.C. § 201(a), which states that authors of a joint work are co-owners of the copyright work. Thus, as composer of the lyrics, Plaintiff would have an ownership interest in the copyright he alleges was fraudulently filed.

Perhaps most notable for the Court is Plaintiff's contention that he had no idea Damion Giacchino had filed a copyright registration for the "words and music" to the "song" *South Padre Island* until Defendant filed its motion for summary judgment. This statement contradicts his own deposition taken long before Defendant filed its motion for summary judgment. During his deposition, Plaintiff was asked: "Pelican West holds a copyright on the song *South Padre Island*, correct?" To this Plaintiff replied: "For the music, yes, that's correct." Def's Motion for Summary Judgment, Ex. A, at p. 28. Thus, Plaintiff conceded he was aware that Pelican West held a copyright to the music. In light of this, there is no reason Plaintiff did not amend his complaint prior to the close of discovery at a time when the addition of Giacchino would not have prejudiced parties already involved in the suit. Furthermore, complete relief is available to the parties and justice can be done without the addition of Giacchino as a defendant. *See Spartech Corp. v. Opper*, 890 F.2d 949, 954 (7th Cir. 1989) ("The test for an indispensable party is whether justice cannot be done unless it is joined.") (quoted in *Haulin Exotics, Ltd. v. Freightliner Corp.*, 1998 WL 276218, at *2 (E.D. La. 1998)).

The Court therefore **DENIES** Plaintiff's Motion to Amend Complaint [Dkt. No. 31].

### III.  Summary Judgment Standard

Summary Judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). *See also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case"). *See also Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999). Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex*

*Corp.*, 477 U.S. at 327, the party "need not negate the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 323).

If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial. <u>See</u> Fed. R. Civ. P. 56(e). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Little*, 37 F.3d at 1071 (citing *Celotex*, 477 U.S. at 325). "Unsubstantiated assertions" or "mere allegations or denials" will not adequately cast doubt on material facts at issue. *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994). *See also* Fed. R. Civ. P. 56(e). Likewise, the nonmovant must present more than a mere "scintilla" of evidence. *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994). The evidence must be viewed in the light most favorable to the nonmovant. *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). Summary Judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict." *Little*, 37 F.3d at 1071.

## IV.  General Applicable Legal Standards

To prevail on an infringement claim, the Plaintiff must prove "ownership of a valid copyright, and copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Musical works, including lyrics to a song, may be copyrighted under 17 U.S.C. § 102(a)(2). A person who copies either the musical work in its entirety, which includes the composition's words and music together, or one who copies just the music or words alone is liable for copyright infringement. *See* Paul Goldstein, *Copyright* § 2.8 (2d ed. 1996).

As the author of lyrics to a song, one usually has the exclusive right to distribute, copy, modify, sell, or display his work, or to authorize others to do so. *See* 17 U.S.C. § 106. The exclusivity of these rights generally applies unless: 1) the copyright owner gives permission to someone else to distribute, copy, modify, display the work, etc., *see American Direct Marketing, Inc. v. Azad Intern, Inc.*, 783 F.Supp. 84, 87 (E.D.N.Y. 1992); 2) the work is in the "public domain," *see Tufenkian Import/Export Ventures, Inc.*

6

*v. Einstein,* 338 F.3d 127,132 (2d Cir. 2003); 3) using the work in the above mentioned way constitutes "fair use," *see Nihon Keizai Shimbun, Inc. v. Comline Business*, 166 F.3d 65, 72 (2d Cir. 1999); or 4) an individual has an express or implied license to use the work. *See I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774-76 (7th Cir. 1996). If none of the exceptions applies, the use of a work will constitute copyright infringement.

Although a work is immediately and automatically copyrighted when it is published, in order to enforce a copyright, the copyright owner must first register the work with the United States Copyright Office. *See* 17 U.S.C. § 411(a) ("[N]o action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title."). The work must be fixed in a tangible medium of expression and must exist in a physical form, such as musical lyrics that are written on paper. *See* 17 U.S.C. § 102. A work will qualify for a copyright if it also is an original work to the extent that the author contributed some creativity.

### V. Copyrighted Works

On March 26, 2001, Plaintiff filed a Certificate of Registration with the United States Copyright Office. In Plaintiff's copyright registration, Plaintiff identified his authorship of the work by checking a box next to the category "lyrics." Although there was a category for "music," Plaintiff *only* checked the "lyrics" box. *See* Def's Motion, Ex. C. The parties do not contest that Plaintiff holds a valid copyright to the lyrics of the song *South Padre Island*. Plaintiff acknowledged in his deposition that he understood he did not have a copyright to the entire song: "Q. But do you have a copyright to the entire song? A. No." Ex. A, at pp. 27-28 .

On April 10, 2001, Damion Giacchino filed a Certificate of Registration with the United States Copyright Office in which he describes the nature of the work as "words and music." *See id.* at Ex. D. Further, the copyright form describes the nature of the authorship as "music and vocal melody." *See id.*[4] As a result of this undisputed

---

[4]Despite Plaintiff's contentions otherwise, Giacchino's copyright registration only claims authorship in the "music and vocal melody." Giacchino's copyright registration does not facially include a claim to authorship of the words to the song. The only reference to the "words" of the

evidence, the Court finds Plaintiff held a valid copyright to the lyrics of the song.

### VI. Was the Song *South Padre Island* a Joint Work Under 17 U.S.C. § 501?

Authors of a joint work are co-owners of the copyright in that work. 17 U.S.C. § 201(a). Pursuant to 17 U.S.C. § 101, "[a] joint work is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." The Fifth Circuit has consistently drawn its jurisprudence for the elements of joint authorship under section 101 from courts in the Second Circuit. *See, e.g., BTE v. Bonnecaze*, 43 F.Supp.2d 619, 622 (E.D. La. 1999) (noting this fact); *Clogston v. American Academy of Orthopaedic Surgeons*, 930 F.Supp. 1156 (W.D. Tex. 1996) (drawing support from Second Circuit law).

Although a determination of whether "putative joint authors regarded themselves as joint authors" is important, "[t]his concern requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of a song." *Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991) (providing a detailed history of co-authorship under common law).[5] "Parts of a unitary whole are considered 'inseparable' when they have little or no meaning standing alone." *Clogston*, 930 F.Supp. at 1158 (citing *Childress*, 945 F.2d at 505). "Parts of a unitary whole are considered 'interdependent' when 'they have some meaning standing alone but achieve their primary significance because of their combined effect.'" *Id.* "The lyrics and music of a song are often such interdependent parts." *Id. Childress* applied a three-part joint-authorship test in which the party claiming joint authorship must establish (1) each collaborator intended the other to be a joint author of the work; (2) each author's work was independently copyrightable; and (3) each author intended that

---

song appear in the space provided concerning the "nature of the work," which contains the descriptor "music and words."

[5]In *Childress*, a playwright sued an actress and other defendants for alleged violations of the Copyright Act. The actress claimed she was a co-author of a play based on her contributions, which included making suggestions for the inclusion of certain characters, suggesting character development, suggesting certain scenes in the play, and contributing other artistic input. 945 F.2d at 502. The Court held there was no evidence that the playwright ever contemplated, or would have accepted, crediting the play as a joint work, and thus the Court granted summary judgment for the playwright. *Id.* at 509.

his work be merged into inseparable or interdependent parts of the whole. *Childress*, 945 F.2d at 505-09. As other courts have distinguished, the intent to be co-authors does not mean "the parties intended, or were even aware of, the legal ramifications of joint authorship. It is sufficient if the parties intended to both be authors as that term is commonly understood." *Clogston*, 930 F.Supp. at 1159 n.2.

In determining a lyricist and composer were co-authors, the often cited Judge Learned Hand explained the concept of a "joint work" in *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944):

> [I]t makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such. That was the case here: Marks wrote the words for a song; Loraine composed the music as music for that song. It is true that each knew that his part could be used separately; the words, as a "lyric," the melody as music. But that was not their purpose; the words and the music were to be enjoyed and performed together; unlike the parts of a "composite work," each of which is intended to be used separately, and whose only unity is that they are bound together . . . . The popularity of a song turns upon both the words and the music; the share of each in its success cannot be appraised; they interpenetrate each other as much as the notes of the melody, or separate words of the "lyric." The value of the privilege of renewal is measured by the survival of their combined power to please the public taste. To allow the author to prevent the composer, or the composer to prevent the author, from exploiting the power to please, would be to allow him to deprive his fellow of the most valuable part of his contribution; to take away the kernel and leave him only the husk.

In this dispute, the parties disagree as to whether the necessary intent to create a joint work existed. Defendant cites to the following excerpt from Plaintiff's deposition:

> Q. Was it your intent that the lyrics that you wrote for the song *South Padre Island* be merged with music of Pelican West to create the song that appears on the CD *South Padre Island*?
> A. You merge the lyrics with the music. Of course that's what you do.
> Q. That was your intent when you provided them with the lyrics, correct?
> A. Right.

*Id.* at Ex. A, p. 27.

Additionally, Plaintiff testified:

> Q. Pelican West holds a copyright on the song *South Padre Island*, correct?
> A. For the music, yes, that's correct.

9

Q. Did Pelican West change some of your lyrics?

A. Yeah. We changed some of them at the time.

Q. Pelican West actually wrote some of the lyrics that appear in the final version of the song *South Padre Island*, correct?

A. Some of them, yes.

Q. Did Pelican West write the music to the song *South Padre Island*?

A. I gave them the music. They changed some of that, too. So–

Q. Did they write the sheet music for the song *South Padre Island*?

A. I have never seen any sheet music to it.

Q. Did they choose the chords that they were going to play in the song *South Padre Island*?

A. I don't know what that has –you know, I guess when you get in the studio, anything can happen, you know. Whether they did, you know, I don't know.

Q. Who wrote the melody that appears in the CD entitled *South Padre Island*?

A. I did.

Q. Did Pelican West have any input in the melody of the song –to the music that appears on the song *South Padre Island*?

A. Yes.

Q. Was it a joint effort between you and Pelican West?

A. Yes.

. . .

Q. [T]here's a melody and a harmony part, correct? . . .

A. There's a melody and it's –harmonies are things that are added in the studio.

Q. Who decided to add the harmony to the song *South Padre Island*?

A. We all did.

Q. Was it a joint effort?

A. Yes.

. . .

Q. Pelican West recorded the song, correct?

A. Yes.

Q. Who supplied the vocals for the song *South Padre Island* that appears on the CD?

A. Pam.

Q. Who is Pam?

A. Singer.

Q. Who does she sing for?

A. Pam. Pam. She's a singer for Pelican West.

Def's Motion for Summary Judgment, Ex. A, at pp. 28-31.

Plaintiff elaborated on his relationship with Pelican West:

Q. Why did you approach Pelican West with these lyrics you wrote?

A. Good group.

Q. What did you want them to do?

A. I wanted them to record it and I played it for them on the guitar and they loved

it and they wanted to record it. We made a deal for them to record it.
Q. What was the deal?
A. The deal was–is that they paid for everything to record it, get a finished CD that they could sell off of the stage and plus go to the radio stations with it at their expense. In exchange for that, I gave them the music.
. . .
Q. And Pelican West was supposed to, I guess, make this song known to the pubic, get it distributed, or what?
A. Right. It was a cooperative effort.
Q. What exactly did you give them? Did you give them anything in writing?
A. We had a typed up agreement.
. . .
Q. You said you provided them with the lyrics so that they could put music to the song, right?
A. Right.
Q. Did you?
A. Well, let's make it exact here. The deal was –is that in exchange for them putting up the money for the recording session, whatever, I gave them half the music, which is–it's done a lot.

Def's Motion for Summary Judgment, Ex. A, at p. 25-26.

In addition to Plaintiff's deposition testimony, Defendant has presented the Court with the affidavit of Damion Giacchino. In this affidavit, Giacchino explained that "Gary [Graham wrote] the lyrics to the song and wanted Pelican West's help in putting music to it, performing it, and recording it." *Id.*, Ex. B ¶ 2. Giacchino also states, "Gary Graham provided the original lyrics to the song. I changed some of the original lyrics to the song, added new lyrics I had written, and incorporated them into the song with some of the original lyrics written by Gary Graham." *Id.* ¶ 3. Giacchino's affidavit testimony does not conflict with Plaintiff's deposition testimony.

Although Plaintiff argues he had no intention of co-authoring a joint work, he has presented no competent summary judgment evidence refuting Defendant's contentions. Long after he provided deposition testimony and after receiving Defendant's Motion for Summary Judgment, filed on March 10, 2004, Plaintiff filed his response to the motion in which he attached an affidavit dated March 29, 2004. In this affidavit, Plaintiff attempts to raise a factual dispute concerning his intent. Much of this affidavit is conclusory and contains legal arguments. For example, Plaintiff "attests" that he holds "a valid copyright as the owner of and for the lyrics of the song 'South Padre Island.'"

11

Pl's Response, attached affidavit, ¶2c.

An affidavit that conflicts with deposition testimony will not create a genuine issue of fact without some satisfactory explanation as to why the conflict exists. *See Jeffery v. United States of America*, 2004 WL 390810, at *3 (W.D. Tex., Jan. 8, 2004) (citing *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002)). Plaintiff has provided no explanation for why the affidavit, created long after his deposition was taken and nearly three weeks after Defendant filed its motion for summary judgment, contains discrepant information.

More specifically, Plaintiff states in his affidavit, "it was never either of our intentions, solely or jointly, that the song Padre Island would constitute a 'joint work,' as what we envisioned was merely a 'collaboration' at best. Simply put, the purpose of the written agreements was to express our intentions, as well as, our respective rights and obligations under those instruments." *Id.* ¶ 2k. Mere collaboration is generally not enough to demonstrate two contributors are joint authors. Plaintiff's affidavit does not create a fact issue concerning Plaintiff's intent. The affidavit, even if it were competent summary judgment evidence, merely states Plaintiff did not intend the *legal consequences* of joint authorship—not that he did not intend to create a joint interdependent work. Plaintiff actually references an intent to *collaborate* with Pelican West to produce a song, which although not enough alone, suggests interdependence.

With the exception of Plaintiff's blanket denial in his affidavit that he intended to co-author the song, which is contradicted by his deposition testimony, there is no other evidence in the record to suggest Plaintiff did not intend to co-author the song. Plaintiff approached Pelican West with the intent that they would take his lyrics, through collaborative acts, and create a song using Plaintiff's words and, at least in part, Giacchino's and Pelican West's music. Even the agreements Plaintiff cites and attaches to his affidavit state that Plaintiff is the composer of the lyrics, Damion Giacchino is the composer of the music, and the lyrics and music are to be copywritten and published by the company "Code Music," ASCAP. *See* Pl's Response to Def's Motion for Summary Judgment, Exs. A & B. These agreements evidence Plaintiff's and Damion Giacchino's intent to create a joint work with Plaintiff and Giacchino sharing

12

equally in the authorship with a third party ultimately obtaining a copyright of the finished sound recording of the song. Moreover, according to an agreement signed in June 2001, Plaintiff and Damion Giacchino were to share equally in the revenue received for the sale of the CD--each receiving $1 for each sale of the CD. Members of Pelican West were to receive 5/7 of the revenue.

Defendant has presented unrefuted, competent summary judgment evidence that the elements of joint authorship are met in this case: (1) each collaborator intended the other to be a joint author of the work; (2) each author's contribution, the lyrics and music respectively, are independently copyrightable and were registered for copyrights separately; and (3) each author intended that his work be merged into inseparable or interdependent parts of the whole. *See Childress*, 945 F.2d at 505-09. Thus, the requirements for a joint work are met. *See also Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998); *see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1069 (7th Cir. 1994).

In the light of the above evidence, the Court finds there is no genuine issue of material fact concerning Plaintiff's intent to form a joint work for the song *South Padre Island*.

### VII.  Did Defendant South Padre Island have authority to distribute the song from a joint author of the work by implied license?

Pursuant to 17 U.S.C. § 201, authors of a joint work are co-owners of the copyright to the work with an equal undivided interest in the work. 17 U.S.C. § 201(a); *Childress*, 945 F.2d at 508. "Each co-owner has the right to use or to license the use of the work, subject to an accounting to the other co-owners for any profits." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994) (citing *Childress*, 945 F.2d at 505); *see also* 17 U.S.C. §201(a). If a defendant has a license to use the copyrighted work in a particular way, the defendant cannot have committed infringement. *See Feist*, 499 U.S. at 361. It is axiomatic that one joint owner of a copyrighted work may grant authorization to a third party, and the status of joint owner is a defense to a copyright infringement claim. *See* MELVIN B. NIMMER & DAVID NIMMER, 1 NIMMER ON COPYRIGHT § 6.10 (1999) ("[A]n authorization to the defendant from one joint owner will

13

be an effective defense to an infringement action brought by another joint owner." *quoted in Batiste v. Island Records, Inc.*, 179 F.3d 217, 224 (5th Cir. 1999)). Because the Court has determined that Plaintiff and Damion Giacchino are joint owners of the song *South Padre Island*, the Court must determine whether Defendant South Padre Island was granted permission by a joint author, expressly or impliedly by action and conduct, to use and distribute the song *South Padre Island*.

"While the Copyright Act requires that exclusive licenses be evidenced by a writing, no such writing requirement applies to nonexclusive licenses." *Lulirama Ltd., Inc. v. Axcess Broadcast Serv., Inc.*, 128 F.3d 872, 884 (5th Cir. 1997) (citing *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248 (5th Cir. 1986)). A copyright holder can grant a nonexclusive license through conduct or an oral agreement. *See, e.g., Lulirama Ltd., Inc.*, 128 F.3d 879; *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). A nonexclusive license only grants the licensee the right to use the copyrighted work, but it does not transfer copyright ownership. *See I.A.E*, 74 F.3d at 775. Consent to use a work may be given in the form of express "permission or lack of objection." *Id.* Although the holder of a nonexclusive license has no standing to sue for copyright infringement, a nonexclusive license creates an affirmative defense to a claim of copyright infringement. *Id.*

In *I.A.E,* the Seventh Circuit cites several factors a court may use in evaluating whether an implied license exists. *See I.A.E*, 74 F.3d at 776. Notably, courts have held a nonexclusive implied license exists when three factors are present: (1) the licensee requests the creation of the work, (2) the licensor makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee copy and distribute the work. *Id.* (citing *Effects*, 908 F.2d at 558-59). "The leading treatise on copyright law, 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A], at 10-37 (1991), states that '[a] nonexclusive license may be granted orally, or may even be implied from conduct.' In *Effects Assocs.*, the court wrote that a nonexclusive license may arise by implication where the creator of a work at a defendant's request 'hand[s] it over, intending that defendant copy and distribute it.'" *MacLean Associates, Inc. v. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778-79 (3d Cir. 1991) (citing

*Effects Assocs. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).

In this case, the fact that Plaintiff delivered a copy of the song to the Town "'does not of itself convey any rights to the copyrighted work embodied in the object.'" *MacLean Assocs., Inc.*, 952 F.2d at 779 (quoting 17 U.S.C.A. § 202 (West 1977)); *see also Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, 2000 WL 1854903, at *4 (S.D.N.Y. July 12, 2000) ("[T]he mere transfer of an object . . . in which copyrighted material is embodied does not imply a license to engage in copying of that object." (quoting 17 U.S.C. §202)). Indeed, courts have found implied licenses in only narrow circumstances. Permission to the use an object embodying copyrighted work does not imply permission to copy that work. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). Thus, "[d]elivery of the copy of the creation 'is one factor that may be relied upon in determining that an implied license has been granted.'" *Id.* (quoting *Effects Assocs.*, 908 F.2d at 559 n.6.) And, as noted above, because "a nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee, the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license." *Id.* (citing *Effects Assocs.*, 908 F.2d at 558 n.5).

The burden is on the "putative licensee" to show a license exists allowing it to reproduce the protected material. *Viacom Int'l, Inc.*, 2000 WL 1854903, at * 3. Similarly, to infer a license from the Plaintiff's failure to limit explicitly the scope of the Town's use of the song would incorrectly place the burden on Plaintiff to demonstrate he did not give permission to the Town. In light of the above concepts and the burden or proof, the Court turns to the record before it. The Court relies on Plaintiff's uncontroverted deposition testimony. Defendant presented the following excerpt from Plaintiff's deposition testimony:

> Q. Whose idea was it to approach the Town of South Padre Island with the song *South Padre Island*?
> A. That was a thing [sic], that one of the aldermen heard me playing it and singing it one day and he liked it and I told him that when we got done with it I'd give him a CD, Pelican West was going to record it. And when we got finished with it, I played it for him and they wanted me to bring it to a town meeting.
> Q. Who's the alderman that heard you playing it?
> A. Doyle Wells.

. . .
Q. Did he just happen to stop by or were you all doing business or something?
A. He stopped by occasionally.
Q. And did you specifically say, hey, let me show you this song I wrote called *South Padre Island* and play it for him?
A. No, he asked me because he had heard it appraised.
Q. Where had he heard it?
A. It [sic] played it on the guitar for him.
Q. Where?
A. In the office.
Q. Once you wrote it, did you just invite him over to hear it or –
A. No, he was there one day and I was kind of proud of it at that time because there had been a lot of attempts to write the song *South Padre Island* and they all failed miserably.
. . .
Q. And you played the song for him.  This is before it was actually reduced to a CD?
A. Oh, yeah.
Q. And what did he tell you after you finished playing?
A. Loved it.
Q. And how did it come about that the song was taken to the Town of South Padre Island?  Whose idea was that?
A. I was asked to bring it and we played it at a town meeting.
Q. Who asked you to bring it?
A. Doyle did.
. . .
Q. Did you ask to be placed on the agenda at a town meeting?
A. I don't think I every really asked.  I agreed.
Q. You didn't make any oral request to be placed on the agenda?
A. I can't remember how that really transpired.  I think I was asked to put it on the agenda.
Q. It obviously got on the agenda for a town meeting, correct?
A. Right.
Q. And my understanding is that the board of aldermen meeting was held on April 18th, 2001, where the issue of adopting that song as the town song was discussed; is that correct?
A. I'll take your word for that date.
Q. Other than the date, is the rest of that correct?
A. Yes.
. . .
Q. Did you make any type of presentation at the town meeting where they were discussing whether or not to adopt *South Padre Island* as the town song?
A. Not at that meeting.  There was a previous meeting where I played it for the entire audience.  There was an audience that was a quite [sic] a crowd gathered and that I played for them.

16

Q. How many meetings did you attend?
A. Two.
Q. So the first meeting you played it?
A. Uh-huh.  Yes.
Q. And what did you do at the second meeting?
A. They voted on it.
Q. For the first meeting, were you on the agenda or did you just appear and play it?
A. We just appeared and played it.
Q. Who appeared with you?
A. Trying to remember who was there.  I set up the sound system and played it to the crowd.
Q. Was it just you?
A. Uh-huh.  Yes.
Q. Was it just –I guess just your guitar, yourself?
A. No, no, no.
Q. Background music or–
A. I didn't take my guitar.  I played a CD.
Q. So by this time the song was already reduced to a CD by Pelican West?
A. Yes.
Q. So at the first meeting when you showed the town the song, you showed them the song as it was recorded on the CD by Pelican West?
A. Correct.
Q. Was Pelican West present with you?
A. No.
Q. Did [Pelican West] know you were going to the town meeting?
A. Yes.
Q. They didn't voice any objection to you going to the town meeting with the CD?
A. No.
Q. Were they happy about you going to the town meting?
A. They were thrilled.
. . .
Q. Was it something you wanted to do?
A. Sure.  I thought it would be nice to have that as an accolade, if you will.

Def's Motion for Summary Judgment, Ex. A, at pp. 35-38 (Pl's deposition).

At the second meeting Plaintiff attended, the minutes of the April 18, 2001, Board of Alderman meeting for South Padre Island reflect that a motion to approve Gary Graham's "South Padre Island" song as the official island song carried unanimously.  *Id.*, Ex. E.  According to Plaintiff's deposition, he was pleased and impressed with the Board of Alderman's decision to make the song the official song of South Padre Island.  *Id.*, Ex. A, at p. 39.  Plaintiff never voiced objection to making the

17

song the official song of South Padre Island. *Id.* at p. 40. When asked what Plaintiff foresaw from the adoption of the song as the official song, Plaintiff replied that he "thought it had a long life expectancy in front of it." *Id.* Plaintiff never asked the Town for any money associated with the song because "[he] do[es] not sell [his] songs." *Id.* No one from the Town discussed royalties with Plaintiff, nor did Plaintiff approach the Town regarding a royalty agreement or purchase of the song. Plaintiff did state, however, that once the town adopted the song as the official song, Plaintiff "thought [they] could reach a royalty arrangement where they could have it on their own music, on the internet, use it in commercials." *Id.*

Plaintiff testified he wanted the song to be spread and heard, but he would have liked some royalty rates from it. *Id.* at 45. Moreover, Plaintiff testified that he "never gave anybody permission to [reproduce the song]. Not only illegally produced without [his] knowledge, it had a video on it." *Id.* at 42. Finally, Plaintiff testified: "after [he] did the research and found that they made thirty-five hundred copies of [the CD-Roms] after they told [him] they did not, that to [him] is illegal." *Id.* Of particular concern to Plaintiff was the quality of the song on the CD-Rom. According to Plaintiff, Damon Giacchino called Plaintiff once he had heard the CD-Rom because he was also unhappy with the quality of the song's reproduction. *Id.* at 43, 45. Once Plaintiff learned that the song had been released on the CD-Rom, Plaintiff called Dan Quant.[6] *Id.* at 45. Plaintiff explained to Mr. Quant that he and Damion Giacchino were unhappy with the copies made, and Plaintiff informed Mr. Quant that he did not want the copy he heard distributed to anyone. *Id.* Plaintiff testified that even after he told Mr. Quant the Town should stop distributing the visitor's guide CD-Rom, which contained the song, the Town continued to distribute the CD-Rom. *Id.* at 46. According to Plaintiff, the next month the Town passed out fifty press packets at a media dinner. *Id.* Although Plaintiff was not at the press dinner, he stated Mark Milam, a reporter from the Valley Morning Star, called Plaintiff and told him the CD "stunk." *Id.* at 47.

---

[6]It is not clear from Plaintiff's deposition testimony exactly what position Dan Quant holds with the Town of South Padre Island.

Defendant argues Pelican West knew Plaintiff was taking the song to the town, and the band approved of this action, and was "thrilled" about the possibilities associated with such exposure.  *See* Def's Motion, at p. 7 & Ex. A, p. 38.  Further, Damion Giacchino states in his affidavit that "both [he] and Pelican West expected that the Town would use the song and play the song since it was the "official town song."  *Id.* at Ex. B.  Although Giacchino was not aware the town was going to include the song in its visitor's guide CD-Rom, and he did not find out about the CD-Rom until after it was created, he never voiced opposition to its creation, and he at no time believed the Defendant's use of the song was improper.  *Id.*  Defendant argues that because Damion Giacchino has authority, as the co-author of a joint work, to grant South Padre Island a nonexclusive license to use the song, South Padre Island had permission to use and distribute the song, and thus it did not infringe Plaintiff's copyright. Additionally, Defendant argues Damion Giacchino's belief that the Defendant's use of the song was at no time improper is material to the issue of whether Defendant was granted an implied license to use the song.

A finding that Damion Giacchino and Plaintiff are co-authors of a joint work means that under certain circumstances Damion Giacchino's actions may grant a nonexclusive license to the Town to use the song.  *See generally Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) (co-author has authority to grant a nonexclusive license).  In fact, "[i]n certain circumstances, failure by the copyright owner to object to reproduction of copyrighted works may provide the basis for implying a nonexclusive license, . . . [but] this basis for an implied license is available only when the owner's silence is coupled with knowledge of the copying."  *Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, 2000 WL 1854903, at *3-5 (S.D.N.Y. July 12, 2000); *see also Latin v. Bautista*, 2003 WL 470333, at *13 (S.D.N.Y. Feb. 24, 2003).

Similarly, Defendant argues that Plaintiff's own actions granted the Town a nonexclusive implied license to use the song by reproducing and distributing it. Defendant stresses that Plaintiff voluntarily took the song to two separate town meetings and voluntarily played the song to the Board of Aldermen; Plaintiff was impressed and happy that the song was chosen as the official song; Plaintiff voiced no

objection to the adoption of the song as the official Town song; and Plaintiff never sought monies or royalties from the Town.

In this case there was no written agreement between Plaintiff and the Town to copy or distribute the song. Plaintiff, however, delivered the copyrighted material without warning that its further use would constitute copyright infringement. *See MacLean Assocs, Inc.,* 952 F.2d at 776. Moreover, Plaintiff delivered the work after an alderman, Mr. Doyle Wells, requested the song. Although these facts *may* support the existence of a nonexclusive license, *see Lulirama Ltd, Inc.,* 128 F.3d at 879, the mere deliverance of the song to the Town only granted the Town permission to declare the work the official song of South Padre Island. Plaintiff's deposition testimony creates a material fact concerning whether Plaintiff as the putative licensor intended that the Defendant copy and distribute the song. Thus, the scope of the Town's use of the song —i.e., what declaring the work the "official song" of South Padre Island meant in terms of copying and distributing the song in the CD-Rom visitor's packet remains contested based on a factual dispute.

Defendant presents only a common sense response, without any supporting evidence, when it questions what good declaring the work the official song would be if the Town could not then copy and distribute it. Plaintiff testified in his deposition that he envisioned the song's official designation would be but one step in further discussions and negotiations concerning copying, distribution, and royalties. Defendant has not presented unrefuted evidence that any implied license that may have existed included permission to copy and distribute the song. When there is ambiguity concerning what rights were conveyed when a copyright owner transfers an object, these ambiguities are usually resolved by finding that only a transfer of the material occurred, and not rights in the copyrighted work. *See Shugrue v. Continental Airlines, Inc.,* 977 F.Supp. 280, 285 (S.D.N.Y. 1997).

There are material issues of fact in dispute concerning the totality of the parties' conduct relating to whether Plaintiff intended to grant the Town permission to use the song, and thus whether Plaintiff gave the Town a nonexclusive license to use the song. *Lulirama Ltd, Inc.,* 128 F.3d at 879 (citing 3 NIMMER § 10.03A, 10-41 (citations omitted)).

Additionally, material issues of fact exist concerning the scope of any implied nonexclusive license to use the song, as well as whether Plaintiff later revoked permission to use the song.[7]  *See Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003) ("whether such a license was irrevocable rests solely with whether [the licensor] received consideration."); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994) (holding implied license is revocable where no consideration has been given for the license).   The Court, therefore, cannot grant Defendant's Motion for Summary Judgment on the implied license issue.

### VIII.  Conclusion

Based on the Court's analysis, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment [Dkt. No. 25]; and **DENIES** Plaintiff's Motion to Amend Complaint [Dkt. No. 31].

The Court will enter a scheduling order setting this case for trial.

DONE this 30th day of March, 2005, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

---

[7]Although Defendant argues co-author Giacchino gave implied permission to use the song by his failure to object, the Court will not reach this issue because there is a factual dispute concerning whether Plaintiff revoked any implied license that may exist.

21